UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARRYL KEITH ROSENCRANTS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DANIMER SCIENTIFIC, INC., STEPHEN E. CROSKREY, JOHN A. DOWDY, III, JOHN P. AMBOIAN, RICHARD J. HENDRIX, CHRISTY BASCO, PHILIP GREGORY CALHOUN, GREGORY HUNT, ISAO NODA, and STUART W. PRATT,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Darryl Keith Rosencrants ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Danimer Scientific, Inc. ("Danimer" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Danimer securities between December 30, 2020 and March 19, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Danimer was formerly known as "Live Oak Acquisition Corp." ("Live Oak"), a publicly traded special purpose acquisition company ("SPAC").[1]  In December 2020, Live Oak consummated a business combination with Meredian Holdings Group, Inc., doing business as Danimer Scientific ("Legacy Danimer"), a performance polymer company specializing in bioplastic replacements for traditional petrochemical-based plastics (the "Business Combination").  Following the Business Combination, Live Oak changed its name to "Danimer Scientific, Inc.," changed its business to Legacy Danimer's business, and replaced its management with Legacy Danimer's management.

3.     Since 2020, Legacy Danimer—and, following the Business Combination, Danimer—has sold polyhydroxyalkanoates ("PHAs") commercially under its proprietary "Nodax" brand name for usage in a wide variety of plastic applications including water bottles, straws, and food containers, among others.  The Company has touted Nodax as a 100% biodegradable, renewable, and sustainable plastic, which is purportedly superior to traditional plastics because of

---

[1] An SPAC is a development stage company that has no specific business plan or purpose or has indicated its business plan is to engage in a merger or acquisition with an unidentified company or companies, other entity, or person.

its advanced biodegradability.  The Company attributes Nodax's advanced biodegradability to microorganisms in nature that eat the bioplastic.

4.      Weighing against the credibility of these claims is a troubled history of dubious business practices by Legacy Danimer's—now Danimer's—prior and current management.  For example, the Company's current Chief Executive Officer ("CEO") and Chairman of the Board of Directors ("Chairman"), Stephen E. Croskrey ("Croskrey"), previously served as president of an armor company that paid $30 million to the U.S. Department of Justice ("DOJ") to settle claims that the company knowingly manufactured and sold defective bullet-proof vests.  Court documents indicate that Croskrey had attempted to cover up this fraud by threatening a supplier.  Months before going public, Legacy Danimer also settled a lawsuit with its former CEO, alleging that he had fabricated his resume and entered into a fraudulent side agreement with a former director.  Moreover, a Live Oak partner, Gary Wunderlich ("Wunderlich"), was previously accused by the SEC of aiding and abetting an entity's violations of antifraud and compliance provisions.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Danimer had deficient internal controls; (ii) as a result, the Company had misrepresented, *inter alia*, its operations' size and regulatory compliance; (iii) Defendants had overstated Nodax's biodegradability, particularly in oceans and landfills; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

6.      On March 20, 2021, the *Wall Street Journal* ("WSJ") published an article entitled "Plastic Straws That Quickly Biodegrade in the Ocean, Not Quite, Scientists Say" addressing, among other things, Danimer's claims that Nodax breaks down far more quickly than fossil-fuel

plastics.  The WSJ article alleged that, according to several experts on biodegradable plastics, "many claims about Nodax are exaggerated and misleading."  While Danimer reportedly asserts its claims are factual, the article cites at least one expert as stating that making broad claims about Nodax's biodegradability "is not accurate" and is "greenwashing."

7.      On March 22, 2021, the first trading day following publication of the WSJ article, Danimer's stock price fell $6.43 per share, or 12.87%, to close at $43.55 per share on March 22, 2021.

8.      Following the end of the Class Period, on April 22, 2021, Spruce Point Capital Management ("Spruce Point") published a report on Danimer, noting, among other red flags, various inconsistencies with Legacy Danimer's (and Danimer's) historical and present claims regarding the size of its operations, Nodax's makeup and degradability, and the Company's expected profitability.

9.      Following publication of the Spruce Point report, Danimer's stock price fell $2.01 per share, or 8.04%, to close at $22.99 per share on April 22, 2021.

10.      Then, on May 4, 2021, Spruce Point published another report on Danimer alleging that the Company had "wildly overstated" production figures, pricing, and financial projections based on documents Spruce Point had acquired from the Commonwealth of Kentucky's Department of Environmental Protection ("KDEP") under the Freedom of Information Act ("FOIA"), all of which cast serious doubt on the integrity of the Company's internal controls.

11.      Following publication of this second Spruce Point report, Danimer's stock price fell $1.49 per share, or 6.31%, to close at $22.14 per share on April 22, 2021.

12.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

15.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Pursuant to Danimer's most recent annual report on Form 10-K, at March 26, 2021, there were 88,327,719 shares of the Company's Class A common stock outstanding.  Danimer's Class A common stock trades on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in Danimer's Class A common stock located within the U.S., some of whom undoubtedly reside in this Judicial District.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**PARTIES**

17.     Plaintiff, as set forth in the attached Certification, acquired Danimer securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

18.     Danimer is a Delaware corporation with principal executive offices located at 140 Industrial Boulevard, Bainbridge, Georgia 39817.  The Company's Class A common stock and warrants trade in an efficient market on the NYSE under the ticker symbols "DNMR" and "DNMR WS," respectively.

19.     Defendant Croskrey has served as Danimer's CEO and Chairman at all relevant times.

20.     Defendant John A. Dowdy, III ("Dowdy") has served as Danimer's Chief Financial Officer at all relevant times.

21.     Defendant John P. Amboian ("Amboian") has served as a Director of Danimer at all relevant times.

22.     Defendant Richard J. Hendrix ("Hendrix") has served as a Director of Danimer at all relevant times.

23.     Defendant Christy Basco ("Basco") has served as a Director of Danimer at all relevant times.

24.     Defendant Philip Gregory Calhoun ("Calhoun") has served as a Director of Danimer at all relevant times.

25.     Defendant Gregory Hunt ("Hunt") has served as a Director of Danimer at all relevant times.

26.     Defendant Dr. Isao Noda ("Noda") has served as a Director of Danimer at all relevant times.

27.     Defendant Stuart W. Pratt ("Pratt") has served as a Director of Danimer at all relevant times.

28.     Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda, and Pratt are sometimes referred to herein as the "Individual Defendants."

29.     The Individual Defendants possessed the power and authority to control the contents of Danimer's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of Danimer's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.   Because of their positions with Danimer, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.   The Individual Defendants are liable for the false statements and omissions pleaded herein.

30.     Danimer and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

31.     Danimer was formerly known as "Live Oak Acquisition Corp.," a publicly traded SPAC.   In December 2020, Live Oak consummated the Business Combination with Legacy Danimer, a performance polymer company specializing in bioplastic replacements for traditional

petrochemical-based plastics.  Following the Business Combination, Live Oak changed its name to "Danimer Scientific, Inc.," changed its business to Legacy Danimer's business, and replaced its management with Legacy Danimer's management.

32.     Since 2020, Legacy Danimer—and, following the Business Combination, Danimer—has sold PHAs commercially under its proprietary "Nodax" brand name for usage in a wide variety of plastic applications including water bottles, straws, and food containers, among others.  The Company has touted Nodax as a 100% biodegradable, renewable, and sustainable plastic, which is purportedly superior to traditional plastics because of its advanced biodegradability.  The Company attributes Nodax's advanced biodegradability to microorganisms in nature, which purportedly eat this bioplastic.

### Materially False and Misleading Statements Issued Before the Class period

33.     Leading up to the Business Combination, Legacy Danimer's management had already begun touting Nodax as a revolutionary product with the potential to displace traditional fossil-fuel plastics and eventually eliminate plastic-associated litter through its superior and fast-acting biodegradability.  For example, in October 2020, Legacy Danimer issued an investor presentation in connection with the proposed Business Combination with Live Oak (the "Business Combination Presentation"), claiming that its PHAs (*i.e.*, Nodax) were "[f]ully degradable in 12-18 weeks after the product is discarded."

34.     The Business Combination Presentation also touted that Legacy Danimer's "Rapidly Growing Blue Chip Customer Base with Take-or-Pay Contracts has Led to [a] Fully Sold-Out Position," with management forecasting PHA finished products volume of 2 million lbs. and $6 million in sales for 2020, implying a PHA average selling price ("ASP") of $3.00 per lb.

35.     Meanwhile, management was obscuring dissension and allegations of wrongdoing within its own ranks.   For example, on December 16, 2020, Live Oak filed a proxy statement/prospectus on Form 424B3 with the SEC in connection with the Business Combination (the "Business Combination Prospectus").   The Business Combination Prospectus disclosed:

> In November 2015, the Company terminated a former executive . . . . The Company filed suit against the former executive . . . during 2016, and various counterclaims were filed by the former executive . . . . During the third quarter of 2020, this matter was settled with the Company agreeing to pay $8 million to resolve all outstanding claims . . . and the  exchange of mutual releases among the parties.

36.     Notably, the cause for the lawsuit was left undisclosed in the Business Combination Prospectus.   The reality was that Legacy Danimer had sued its former CEO, Paul Pereira ("Pereira"), for fabricating his resume, which was used to secure his position as the company's CEO.  Full disclosure regarding the lawsuit would have exposed how Legacy Danimer had failed to properly vet the hiring of its own CEO, who had lied about his educational background and several degrees he had supposedly earned from various universities.   The same lawsuit also accused Pereira of entering into a fraudulent side deal with one of the Company's former directors, Tim Smith ("Smith").   Pereira, for his part, countered with allegations of wide-ranging criminal and unethical behavior at Legacy Danimer, including, but not limited to, securities fraud, tax evasion, and insider trading.   Pereira also indicated that his life had been threatened after he had, at first, resisted demands from Smith that Pereira pay 30% of his compensation to a group of insiders known as the "Bainbridge Five" that essentially maintained control over Legacy Danimer.

**Materially False and Misleading Statements Issued During the Class Period**

37.     The Class Period begins on December 30, 2020, the day after Danimer issued a post-market press release announcing the completion of the Business Combination.   That press release   represented   that   "[t]he   Company's   signature   polymer,   Nodax™   PHA

(polyhydroxyalkanoate), is a 100% biodegradable, renewable, and sustainable plastic" that "is the first PHA polymer to be certified as marine degradable, the highest standard of biodegradability, which verifies the material will fully degrade in ocean water without leaving behind harmful microplastics."  That press release also touted that the Company was partnering with blue chip companies to "introduce more sustainable alternatives to straws, food and beverage containers, and flexible packaging, among others," and that, "[b]ased on signed and pending contracts, the Company is fully sold out of all production in its Kentucky facility."

38.  On January 28, 2021, Danimer filed a registration statement on Form S-1 with the SEC, which, after amendment, was declared effective by the SEC on February 16, 2021, and which was signed by each of the Individual Defendants (the "Registration Statement").  The Registration Statement characterized Danimer as delivering "renewable, environmentally friendly bioplastic materials to global consumer product companies."

39.  With respect to the extent of Danimer's PHA products' biodegradability—particularly Nodax—the Registration Statement represented, *inter alia*:

> PHA is a naturally occurring bioplastic that effectively biodegrades in both anaerobic environments, such as a waste treatment facility, and aerobic environments, such as an ocean. PHA will degrade in environments in which microbes or fungi are present, without the presence of heat and moisture . . . . PHA is degradable in industrial compost, home compost, soil, fresh water, marine water and anaerobic conditions . . . . Danimer's Nodax® PHA possesses seven TUV AUSTRIA certifications and statements of industrial and home compostability, is biodegradable in anaerobic soil, freshwater and marine environments and is 100% bio-based.

40.  Additionally, the Registration Statement touted that, "[u]nlike PLA [polyactic acid] . . . Danimer biopolymers can . . . biodegrade in natural soil and water environments, including the marine environment."

41.     The Registration Statement also provided generic, boilerplate warnings that "climate change concerns, and changes in the regulation of such concerns, including greenhouse gas emissions, could also subject us to additional costs and restrictions"; that Danimer's operations "are subject to an extensive regulatory approval process by the FDA and other regulatory agencies in the U.S. and abroad"; that "a marketed product is subject to continual review, and later discovery of previously unknown safety issues or failure to comply with the applicable regulatory requirements may result in restrictions . . . as well as possible civil or criminal sanctions"; and that "increased regulation of, or prohibition on, the use of plastics generally . . . could . . . limit the use of these products, and could lead to . . . an increase in the cost of production of such products"; all of which failed to disclose that Danimer's operations were specifically regulated by environmental agencies, much less that Danimer had been cited for noncompliance with environmental regulations in the past.

42.     With respect to the size of Danimer's operations, the Registration Statement stated, *inter alia*, that "Danimer's corporate headquarters, primary research facility, PLA reactive extrusion plant, tolling operation, as well the site of its PHA commercial demonstration plant are located in Bainbridge, GA, in approximately 200,000 square feet of real property."

43.     With respect to Danimer's internal controls, the Registration Statement represented, *inter alia*, that Defendants relied on information technology systems to aid with "overall internal control processes, maintain records of our property, plant and equipment"; that Danimer will "adopt new internal controls and disclosure controls and procedures"; and that Defendant Basco, a Danimer (and prior to that, Legacy Danimer) Director on the Company's Board of Directors "has extensive experience in financial reporting and oversight in maintaining strong internal controls."

44.     On February 9, 2021, Danimer issued a press release announcing that it had hired an innovative packaging expert as the Company's Vice President – Technology Development R&D.  That press release touted that "Nodax™ PHA possesses six TUV AUSTRIA certifications of industrial and home compostability, is biodegradable in soil, fresh water and marine environments and is 100% bio-based."

45.     On February 16, 2021, Danimer filed a prospectus on Form 424B3 with the SEC, which formed part of the Registration Statement, and contained the same statements as referenced in ¶¶ 38-43, *supra*, regarding the environmental friendliness of Danimer's operations, the biodegradability of Nodax and its superiority to PLA-based products, the Company's regulatory risks, the size of Danimer's operations, and Danimer's internal controls.

46.     On March 16, 2021—as well as various other dates throughout the Class Period—Danimer's website represented that the Company's Bainbridge, Georgia headquarters was comprised of a "20-acre campus with over 235,000 sqft of manufacturing space,"[2] and continues to do so as of the filing of this Complaint.

47.     The statements referenced in ¶¶ 37-46 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Danimer had deficient internal controls; (ii) as a result, the Company had misrepresented, *inter alia*, its operations' size and regulatory compliance; (iii) Defendants had overstated Nodax's

---

[2] Based on the internet archival tool the Wayback Machine, an initiative of the Internet Archive, which is a non-profit digital library of internet sites.  The Wayback Machine has captured instances of Danimer's website since 2017.  The link to the captured instance of Danimer's website on March 16, 2021 is: https://web.archive.org/web/20210316161919/https://danimerscientific.com/

biodegradability, particularly in oceans and landfills; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

48.     On March 20, 2021, WSJ published an article entitled "Plastic Straws That Quickly Biodegrade in the Ocean, Not Quite, Scientists Say" addressing, among other things, Danimer's claims that Nodax breaks down far more quickly than fossil-fuel plastics.  Specifically, the WSJ article reported that "many claims about Nodax are exaggerated and misleading, according to several experts on biodegradable plastics," and that, despite breaking down more quickly than traditional fossil-fuel plastics, "[b]iodegradable straws, bottles and bags can persist in the ocean for several years."

49.     The WSJ article quoted, among other experts, Jason Locklin ("Locklin"), a University of Georgia professor who directs the university's New Materials Institute, and who co-authored a study cited by Danimer as validating Nodax.  Locklin stated that "[t]he claims are what I would call sensationalized" and that making broad claims about Nodax's biodegradability "is not accurate," while adding: "I think that's greenwashing."[3]  According to the WSJ article, "Mr. Locklin's study—described in marketing material by Danimer and its customers as verifying Nodax as 'a truly biodegradable alternative to petrochemical plastics'—showed that Nodax in

---

[3] Danimer later issued a press release attempting to rebut the WSJ article's assertions regarding Nodax.  That press release included a letter from Locklin to WSJ retracting his statements insofar as they concerned Nodax and the misleading nature of claims made by Danimer and its management.  As pointed out by Spruce Point in the first of their two reports on Danimer, countervailing this retraction is the fact that "[b]oth the University [of Georgia] and Dr. Locklin have significant financial ties to Danimer, [which] the Company has tried to obscure by removing press releases [published between 2012 and 2017] from its website," one of which "is the announcement of funding to University of Georgia Labs," and that Locklin "receiv[es] financial support" from Danimer and has several former students and a New Materials Institute colleague employed at the Company.  Moreover, the WSJ did not issue any retraction or correction to its article in response to Locklin's letter.

powdered form breaks down quickly, but that the rate is much more variable when tested as a film," which is "the form used to make bags, straws and bottles."

50.    The WSJ article also cited a Michigan State University professor with over 30 years' experience researching biodegradable plastics, who noted that "variations in temperature and microorganisms in the ocean make it very difficult to promise a bottle made from Nodax will biodegrade in 18 months."  Moreover, according to this same expert, even though Danimer touts that Nodax was certified by TUV Austria ("TUV"), which is an international certification body for compostable items, "[t]he marine biodegradability test used to gain certification from TUV is conducted in a lab using seawater at a temperature of 30 degrees Celsius (86 Fahrenheit)," whereas "the average ocean temperature is 4 degrees Celsius (39.2 Fahrenheit), which means items could degrade more slowly in real life."  The same expert noted that "[a]t some ocean temperatures, Nodax straws could take between five and 10 years to biodegrade," whereas "[b]ags and bottles could take even longer."

51.    Additionally, the WSJ article cited TUV's own bioplastics certification department head, who cautioned that "[l]ab tests are done on sheets of plastic, while finished products come in different shapes and thicknesses or have dyes and labels, all of which could impact how they biodegrade in the real world."

52.    Notably, after WSJ questioned Danimer's Chief Science and Technology Officer, Phil Van Trump ("Van Trump"), on Defendant Croskrey's claims on an investor call in October 2020 that Nodax would be consumed by bacteria if it ended up in a landfill (which was important because, according to WSJ, "[g]iven the lack of widespread composting facilities that accept packaging waste, many products made from Nodax today are bound to end up in landfills"), "Mr.

Van Trump said the claim by the Danimer chief wasn't wholly accurate, saying Nodax products are unlikely to biodegrade in most modern landfills."

53.     On March 22, 2021, the first trading day following publication of the WSJ article, Danimer's stock price fell $6.43 per share, or 12.87%, to close at $43.55 per share on March 22, 2021.

### Post-Class Period Developments

54.     On April 22, 2021, Spruce Point published a report on Danimer, noting, among other red flags, various inconsistencies with Legacy Danimer's, and Danimer's, historical and present claims regarding their business and operations.  For example, the Spruce Point report noted that, on the Company's current website, Danimer describes its Bainbridge, Georgia facility as a "20-acre campus with over 235,000 sqft of ***manufacturing space***," but that the Company's SEC filings attest to its Bainbridge location comprising only "200,000 square feet of ***real property***," which should be impossible (emphases added).  The Spruce Point report also highlighted that these claims differed from Legacy Danimer's prior claims about its manufacturing space, including how, in 2017, Legacy Danimer stated it had acquired 1.2 million square feet of *additional* manufacturing space nested in a *135*-acre campus.  Additionally, the Spruce Point report pointed out that Danimer had recently dropped certain representations it had made in the Business Combination Presentation related to Nodax's makeup and degradability, as well as the Company's expected profitability. For example, while the Business Combination Presentation claimed that Danimer's PHAs were "[f]ully degradable in 12-18 weeks after the product is discarded,"  Danimer removed those claims in its March 29, 2021 fourth quarter and full year 2020 investor presentation (the "4Q/FY20 Presentation") for its March 29, 2021 fourth quarter and full year 2020 earnings call (the "4Q/FY20 Earnings Call"), shortly after WSJ published its article on Danimer.

55.     Further bolstering the WSJ article's assertions, the Spruce Point report cited to a scientific article published in 2020, entitled "Biodegradation of Wasted Bioplastics in Natural and Industrial Environments: A Review," which also indicated that Danimer's claims regarding Nodax's biodegradability were overstated.  Specifically, that article found, *inter alia*, that "PLA-based bioplastics showed a similar biodegradability of PHAs," and that PHA-based bioplastics, such as Nodax, had "less than 10% of biodegradability over a period of one year in aquatic environments, while biodegradation was in general below 50% after one year in soil environment." According to the Spruce Point report, the same scientific article also found that PHA-based bioplastics did not completely degrade in anaerobic environments, such as sealed landfills, and that such disposal was harmful to the environment as PHA-based bioplastics in these environments released methane, a greenhouse gas worse that carbon-dioxide.

56.     Following publication of the Spruce Point report, Danimer's stock price fell $2.01 per share, or 8.04%, to close at $22.99 per share on April 22, 2021.

57.     Then, on May 4, 2021, Spruce Point published another report on Danimer, alleging that the Company had "wildly overstated" production figures, pricing, and financial projections based on documents acquired from the KDEP via a FOIA request.  For example, this second Spruce Point report cited a January 29, 2020 letter from Hall Environmental Consultants, LLC, submitted as part of a permit required semi-annual report on behalf of Danimer Scientific Kentucky, Inc. ("Danimer Kentucky"), to the KDEP Division for Air Quality.  The contents of the letter showed that Danimer's internal controls related to its production figures were deficient:

> ***It should be noted that natural gas usage and bioplastic production numbers are slightly different from what was submitted for the 2020 first-half semiannual report.*** Danimer was in the process of changing their natural gas supplier and there was some confusion on the reported usages. ***In addition, the bioplastic production numbers that were previously submitted included production from the companies [sic] Georgia location.*** The facility was not able to operate in January/February of

2020 as the facility had yet to construct. ***The updated information provided in this report accurately reflects what <u>actually occurred</u> at this facility in 2020.***

(Emphases added).

58.     The second Spruce Point report also cited Danimer facility biopolymer production data that Spruce Point had received through its FOIA request, which did "not properly reconcile," further casting doubt on the accuracy of the Company's internal controls.  Specifically, Spruce Point subtracted Kentucky-only monthly production records from aggregated Kentucky and Georgia monthly production records to formulate implied Georgia-only monthly production records.  Spruce Point found: "Based on the data, for April and June 2020, implied Georgia facility production was negative, a mathematically impossible result."  Spruce Point concluded that, "[d]espite this clear evidence showing the Company cannot accurately report production figures, Danimer does not disclose any weaknesses of its internal financial controls."

59.     Likewise, the second Spruce Point report found "inconsistent figures in Danimer's reporting of monthly natural gas usage for its Kentucky facility."  Specifically, Spruce Point found that in a first-half of 2020 report to the KDEP Division for Air Quality, Danimer recorded Kentucky facility natural gas usage figures from March 1, 2020 to June 1, 2020 that differed from what it later recorded for those same months when reporting its full year 2020 monthly natural gas usage.  Spruce Point found "that upon notification by an independent consultant that the numbers were inaccurate, Van Trump" had materially restated the figures "on January 29, 2021 after Danimer completed its SPAC transaction on December 29, 2020," but "made no disclosure about the production errors, or mention of any financial control issues in its 10-K."

60.     Further, the second Spruce Point report found that Danimer's PHA ASP appeared 30%-42% below management's claims.  For example, in FOIA-requested documents, Spruce Point found full year 2020 Kentucky facility actual production of 2,527,953 lbs., which, when reconciled

with Danimer's reported sales of $4.4 million in its 2020 annual report, implied a PHA ASP of $1.74 per lb. (*i.e.*, $4.4 million in sales divided by 2.527 million lbs. in production).  Meanwhile, in slide 16 of the Business Combination Presentation (slide 26 of which stated that the Company was in a "Fully Sold-Out" position), management forecast 2 million lbs. of production and $6 million in sales, which implied a PHA ASP of $3.00 per lb.  Additionally, on the 4Q/FY20 Earnings Call, Defendant Croskrey stated that "the average selling price is pushing about 270 [$2.70] right now" and has "been increasing slightly, over the last few months."  Both figures were materially higher than the $1.74 per lb. PHA ASP supported by FOIA documents and the Company's 2020 annual report.  Spruce Point also noted that, "[e]ven if we assume a one-month lag between production and shipment, ASP would still be $2.01/lb. or 20% - 33% below management's claims."  Spruce Point also questioned, after comparing the Company's six and ninth month reported results to determine the Company's third quarter results, why product sales declined by 13.8% and total sales fell by 6.3% in the fourth quarter of 2020 if the Company's claim that it was in a "Fully Sold-Out" position was accurate.

61.    The second Spruce Point report also pointed out that Danimer had failed to disclose that it is regulated by environmental agencies, that its production facilities emit hazardous air pollutants, and that the Company had been subject to prior regulatory violations.  Specifically, the Spruce Point report cited a KDEP Division for Air Quality Statement of Basis document it received via FOIA request, which stated that, because of the level of uncontrolled volatile organic compounds and methanol—*i.e.*, air pollutants—emitted by Danimer Kentucky's facility for producing bioplastics, "the facility will be taking a Federally Enforceable monthly production limit of 500,000 pounds of bioplastic from the Bioplastics Production Area," among other limits.  Additionally, the second Spruce Point report cited an Air Inspection Report from the KDEP

Division for Air Quality, showing that Danimer's Kentucky facility was of "Out of Compliance" and received a "Notice of Violation."  Spruce Point noted that "[w]hile Danimer was out marketing its growth story after the SPAC announcement in October 2020, there was no subsequent disclosure that it was facing compliance violations in Kentucky by the Division of Air Quality."

62.    Following publication of this second Spruce Point report, Danimer's stock price fell $1.49 per share, or 6.31%, to close at $22.14 per share on April 22, 2021.

63.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

64.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Danimer securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

65.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Danimer securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Danimer or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

66.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

67.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

68.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Danimer;

- whether the Individual Defendants caused Danimer to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Danimer securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

69.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

70. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Danimer securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired, and/or sold Danimer securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

71. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

72. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

73.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

74.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

75.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities.   Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Danimer securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Danimer securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

76.    Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Danimer securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Danimer's finances and business prospects.

77.     By virtue of their positions at Danimer, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

78.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Danimer, the Individual Defendants had knowledge of the details of Danimer's internal affairs.

79.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Danimer. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Danimer's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Danimer securities was artificially inflated throughout the Class Period. In

ignorance of the adverse facts concerning Danimer's business and financial condition, which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Danimer securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

80. During the Class Period, Danimer securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Danimer securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Danimer securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Danimer securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

81. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

83. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

84. During the Class Period, the Individual Defendants participated in the operation and management of Danimer, and conducted and participated, directly and indirectly, in the conduct of Danimer's business affairs. Because of their senior positions, they knew the adverse non-public information about Danimer's misstatements.

85. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Danimer's financial condition and results of operations, and to correct promptly any public statements issued by Danimer which had become materially false or misleading.

86. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases, and public filings which Danimer disseminated in the marketplace during the Class Period concerning Danimer's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Danimer to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Danimer within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Danimer securities.

87.     Each of the Individual Defendants, therefore, acted as a controlling person of Danimer.  By reason of their senior management positions and/or being directors of Danimer, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Danimer to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Danimer and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

88.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Danimer.

### **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated:  May 14, 2021                                 Respectfully submitted,

                                                                POMERANTZ LLP

                                                                */s/ Jeremy A. Lieberman*
                                                                Jeremy A. Lieberman

J. Alexander Hood II
James M. LoPiano
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, <u>Darryl Keith Rosencrants</u>, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Danimer Scientific, Inc. ("Danimer" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Danimer securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Danimer securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Danimer securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury that the foregoing is true and correct.


Executed ___04/29/2021___
                (Date)


_____
                (Signature)


_____
         (Type or Print Name)

**Danimer Scientific, Inc. (DNMR)**                                    **Rosencrants, Darryl Keith**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 3/10/2021 | 1 | $37.0000 |
| Purchase | 3/11/2021 | 26 | $39.5100 |
| Purchase | 3/12/2021 | 23 | $38.0000 |
| Purchase | 3/16/2021 | 50 | $47.3000 |