UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE DANIMER SCIENTIFIC, INC. SECURITIES LITIGATION | Master File No. 1:21-cv-02708- MKB-RLM |
| *THIS ACTION APPLIES TO:* | **CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| *ALL ACTIONS* | **<u>CLASS ACTION</u>** |

## TABLE OF CONTENTS

**Page**

I.     NATURE AND SUMMARY OF THE ACTION ................................................. 1

II.    JURISDICTION AND VENUE ................................................................. 19

III.   PARTIES ......................................................................................... 20

       A.    Plaintiffs ............................................................................... 20

       B.    Defendants ............................................................................ 20

IV.    BACKGROUND AND SUBSTANTIVE ALLEGATIONS ................................ 23

       A.    Origins of Danimer ................................................................. 23

       B.    Origins of Live Oak ................................................................. 24

       C.    In the Backdrop of a Worldwide Plastic Pollution Problem,
             Defendants Presented their Purportedly New Plastic Alternative
             Product as the Ultimate Solution ............................................... 25

       D.    Greenwashing Conveys a False Impression or Provides Misleading
             Information about a Product's Impact on the Environment ............... 30

       E.    Defendants Misrepresented the Biodegradability of PHA and
             Engaged in Greenwashing ........................................................ 32

       F.    Defendants Overstated Production Capacity and Planned Growth
             of Production Capacity of Its Nodax® PHA ................................. 39

       G.    Defendants Misrepresented the Demand for their Nodax® PHA,
             Including the True Nature of Some of their Most Prominent
             Customer Relationships and Omitted the Indeterminate Nature of
             their "Take Of Pay" Contracts .................................................. 42

       H.    Defendant Failed to Disclose Material Red Flags in Defendant
             Croskrey's Background Calling Into Question His Honesty and
             Integrity ............................................................................... 49

       I.    Defendants Failed to Disclose Danimer's Internal Control
             Deficiencies and Weaknesses .................................................... 50

V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING
       STATEMENTS ................................................................................. 52

       A.    October 5, 2020 Press Release and 8-K Filing Announcing De-
             SPAC Transaction Agreement with Live Oak ............................... 52

B.     Danimer's October 5, 2020 Investor Presentation and Investor Conference Call ........................................................................54

C.     Defendants' October 6, 2020 Call with TD Ameritrade......................................60

D.     Danimer's October 5, 2020 Investor Presentation (Attachment to Form 8-K) .............................................................................61

E.     Danimer's October 15, 2020 Press Release Announcing United Soybean Board Grant.......................................................................62

F.     Bacardi/Danimer October 21, 2020 Press Release Announcing 100% Biodegradable Spirits Bottle.....................................................63

G.     Danimer's November 17, 2020 Press Release Announcing Eagle Beverage Products Partnership ...........................................................65

H.     Danimer's Registration Statement and Proxy Statement/Prospectus ..................65

I.     Danimer's December 29, 2020 Press Release Announcing Completion of De-SPAC Transaction with Live Oak ...........................................68

J.     Defendant Croskrey's December 30, 2020 Statement on CNBC that it was "sitting on over $200 million of take or pay off agreements."...............................................................................69

K.     Danimer's Registration Statement on Form S-1 and Prospectus for the February 2021 Offering ...............................................................72

L.     Danimer Press Release about Mars Wrigley Partnership ......................................75

M.     Danimer's March 29, 2021 Fourth Quarter and Full Year 2020 Financial Results....................................................................................76

N.     Danimer's March 29, 2021 Earnings Call ............................................................76

O.     Danimer's March 30, 2021 Annual Report on Form 10-K....................................78

VI.     THE TRUTH BEGINS TO EMERGE .........................................................................80

A.     The *Wall Street Journal* Report ...........................................................................80

B.     Spruce Point Reports...............................................................................................83

C.     Muddy Waters Corroborates Spruce Point and Goes Beyond...............................87

        1.     Muddy Waters' History of Accurately Uncovering Fraud .......................87

2. The September 15, 2021 Muddy Waters Report Reveals Unrebutted Inconsistency in Danimer's Production Capacity and Customer Relationships ...............................................................89

3. Defendant's Rebuttal to the Muddy Waters Report Ignores Most of the Report and for the First Time Admits its Nameplate Production Capacity and Expansion in Half the Amount Stated ................................................92

VII.   CLASS ACTION ALLEGATIONS .................................................................94

VIII.  FRAUD ON THE MARKET .............................................................................95

IX.    NO SAFE HARBOR .........................................................................................96

X.     ADDITIONAL SCIENTER ALLEGATIONS ..................................................96

XI.    LOSS CAUSATION ..........................................................................................98

COUNT ONE  VIOLATIONS OF § 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER (AGAINST DEFENDANTS DANIMER, CROSKREY, HENDRIX, AND DOWDY) .....................99

COUNT TWO  VIOLATIONS OF § 20(A) OF THE EXCHANGE ACT IN CONNECTION WITH THE § 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 CLAIMS (AGAINST DEFENDANTS CROSKREY, HENDRIX, AND DOWDY) ...............................................................................100

COUNT THREE  VIOLATIONS OF § 14(A) OF THE EXCHANGE ACT (AGAINST DEFENDANTS DANIMER, CROSKREY, HENDRIX, TARBOX, AMBOIAN, BRAHAM, FURER, FORD AND SWEET) ..........................101

COUNT FOUR  VIOLATIONS OF § 20(A) OF THE EXCHANGE ACT IN CONNECTION WITH THE § 14(A) CLAIMS (AGAINST DEFENDANTS CROSKREY, HENDRIX, TARBOX, AMBOIAN, BRAHAM, FURER, FORD AND SWEET) ..................................................................105

COUNT FIVE  FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT (AGAINST DEFENDANTS DANIMER, HENDRIX, TARBOX, AMBOIAN, BRAHAM, FURER, FORD AND SWEET) ..............................................107

COUNT SIX  FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT (AGAINST DEFENDANTS HENDRIX, TARBOX, AMBOIAN, BRAHAM, FURER, FORD AND SWEET) ....................................................110

COUNT SEVEN  FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT (AGAINST DEFENDANTS HENDRIX, TARBOX, AMBOIAN, BRAHAM, FURER, FORD AND SWEET) ....................................................112

COUNT EIGHT  FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT (AGAINST DEFENDANTS DANIMER, CROSKREY, DOWDY,

AMBOIAN, HENDRIX, BASCO, CALHOUN, HUNT, NODA AND PRATT).................................................................................................114

COUNT NINE  FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT (AGAINST DEFENDANTS CROSKREY, DOWDY, AMBOIAN, HENDRIX, BASCO, CALHOUN, HUNT, NODA AND PRATT) ..............................116

PRAYER FOR RELIEF .........................................................................................118

DEMAND FOR JURY TRIAL ...............................................................................118

Lead Plaintiff James Swanson and additional plaintiff Joseph Burtner ("Plaintiffs"), by and through their undersigned counsel, bring this action under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of themselves and a class of other similarly situated investors against Danimer Scientific, Inc. ("Danimer" or the "Company") and the other Defendants named herein. Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the ongoing investigation of their undersigned counsel, which includes review of: Defendants' press releases, conference call transcripts, filings with the U.S. Securities and Exchange Commission ("SEC"), and other public statements; information obtained through requests for information under Georgia Open Records Act and Kentucky Open Records Act; news stories, analyst reports and other public information concerning Danimer and/or the industry within which it operates; and information obtained from confidential witnesses.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    This securities class action is brought on behalf of a class consisting of (i) all persons or entities who purchased or otherwise acquired Danimer and/or Live Oak Acquisition Corp. ("Live Oak") securities during the period October 5, 2020 to May 4, 2021, inclusive (the "Class Period"); (ii) all holders of Live Oak Class A common stock entitled to vote on the  De-SPAC Transaction between Danimer and Live Oak consummated on December 28, 2020 (defined below); and (iii) on behalf of investors who purchased or otherwise acquired Danimer Securities pursuant to the De-SPAC Registration Statement, or the February 2021 Offering Registration Statement (both defined below) (the "Class").[1]

---

[1] Excluded from the Class are Defendants herein,  the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives,

2.      Plaintiffs bring claims on behalf of the Class against Danimer and certain of its current and former officers and directors, and certain former officers and directors of Live Oak (collectively, "Defendants") for violations of Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(a), and 78t(a) and Rules 10b-5(a)-(c) and 14a-9, promulgated thereunder, 17 C.F.R. § 240.10b-5 and 17 C.F.R. §240.14a-9; and Sections 11, 12 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o).

3.      This action arises from a series of materially false and misleading statements, or material omissions by Live Oak, a special purpose acquisition company ("SPAC")[2], and Danimer, its target acquisition, which misled investors into investing hundreds of millions of dollars into a company that purported to develop a fully biodegradable plastic alternative product, which the Company presented as "a solution to one of the world's greatest problems".[3]  At the beginning of the Class Period, when Live Oak and Danimer announced their intended De-SPAC Transaction, Defendants represented that Danimer was "a leading producer of polyhydroxyalkanoate ("PHA")[4], a new, **100% biodegradable** plastic feedstock alternative sold under the proprietary Nodax®

---

heirs, successors or assigns and any entity in which  Defendants have or had a controlling interest.

[2] A SPAC is a shell, or blank-check, company which raises cash in an initial public offering ("IPO") with the goal of buying an unidentified private company, usually within two years, in a deal which would then take the acquired company public.

[3] October 2020 Danimer letter to shareholders announcing definitive agreement for business combination with Live Oak ("October Shareholder Letter") filed with SEC, https://www .sec.gov/Archives/edgar/data/1779020/000121390020030104/ea127812-425_liveoakacq.htm (last accessed Dec. 10, 2021).

[4] Danimer also sells another bio-plastic called PLA. It does not produce PLA. It buys PLA and formulates it for customers. PLA is biodegradable in a specific type of environment: one that has very specific oxygen levels and has temperatures that exceed 140°F. This only occurs in industrial compost environments. Reportedly, outside industrial compost environments it can take 100 – 1000 years to biodegrade.

brand name, **for usage in a wide variety of plastic applications including water bottles, straws, food containers,** among other things."[5] Defendants further represented that Danimer was producing and selling PHA to some of the largest consumer food and beverage companies in the world, including Pepsi and Nestlé,  with over $200 million in "take or pay" contracts, and that their proprietary Nodax® PHA was "**a 100% biodegradable .… plastic**"[6] "**that reliably breaks down in both industrial composting facilities and backyard compost units**"[7] and "will biodegrade aerobically or anaerobically in soil, water and industrial or home compost **within three to six months** depending on conditions."[8]

4.      In truth, PHA does not biodegrade in three to six months (12-18 weeks).  It can take years for PHA to fully breakdown anaerobically, and only then with the production of methane, a greenhouse gas, and can be much worse for the environment than traditional plastic in certain respects. Similarly, PHA biodegrades aerobically at a much slower rate than the Company claims and only under specific conditions not accessible to all consumers, and not in the typical marine environment. For example, the marine biodegradability test used to gain certification from TUV

---

[5] Live Oak Proxy Statement/Prospectus dated December 16, 2020 (defined below as Proxy Statement/Prospectus) (which also forms part of the registration statement on Form S-4 filed with the SEC, by Live Oak) (the "Registration Statement"), https://www.sec.gov/Archives/edgar/data/0001779020/000121390020043065/f424b31220_liveo akacq.htm (last accessed Dec. 10, 2021) at 136. *See also* *74.

[6] Press Release, "Danimer Scientific, a Next Generation Bioplastics Company, Announces Fourth Quarter and Full Year 2020 Results", Mar. 29, 2021. https://ir.danimerscientific.com/news/press-releases/detail/27/danimer-scientific-a-next-generation-bioplastics-company (last accessed Dec. 10, 2021).

[7] Press Release, "Mars Wrigley and Danimer Scientific Help Environmentally Conscious Consumers to Compost at Home by Developing Biodegradable Packaging from Natural Ingredients", Mar. 16, 2021.  https://danimerscientific.com/2021/03/16/mars-wrigley-and-danimer-scientific-help-environmentally-conscious-consumers-to-compost-at-home-by-developing-biodegradable-packaging-from-natural-ingredients/ (last accessed Dec. 10, 2021).

[8] For example, Proxy Statement/Prospectus at 123.

is conducted in a lab using seawater at a temperature of 30 degrees Celsius (86 Fahrenheit), whereas the average ocean temperature is 4 degrees Celsius (39.2 Fahrenheit), which means items could degrade more slowly in real life. At some ocean temperatures, Nodax® PHA straws could take between five and ten years to biodegrade, whereas bags and bottles could take even longer. The Federal Trade Commission has found, and the Sixth Circuit Court of Appeals has affirmed, that such bald representations of biodegradability are misleading. *See also In The Matter of ECM BioFilms, Inc. als d/b/a Enviroplatics International,* https://www.ftc.gov/enforcement/cases-proceedings/122-3118/ecm-biofilms-inc-also-dba-envirointernational-matter; *ECM Biofilms, Inc. v. Fed. Trade Comm'n*, 851 F.3d 599 (6th Cir. 2017).

5.      Moreover, contrary to Defendants' statements about growing customer demand requiring expansions of the Company's production facilities, Danimer's actual and planned production capacity of PHA was less than half of what it represented. Defendants misleadingly represented the actual demand for their Nodax® PHA, including the true nature of some of their most prominent customer relationships and omitted the indeterminate nature of their "take of pay" contracts, including the dissatisfaction of Pepsi and Nestlé with Danimer's ability to meet requirements leading to Pepsi to divest its interest in Danimer during the Class Period.

6.      Danimer also omitted to disclose certain material, negative facts concerning Defendant Stephen Croskrey's ("Croskrey"), Danimer's Chief Executive Officer, professional background and failed to disclose that during 2020, Danimer disclosure controls and procedures were not effective because of a material weakness in Danimer's controls over the accounting for certain financial instruments.

7.      The Class Period begins on October 5, 2020, when Live Oak, a SPAC that raised $200 million in a May 2020 IPO, and Danimer, then called Meredian Holdings Group, Inc. (doing

business as Danimer Scientific, or Legacy Danimer),[9] announced that they had entered into a definitive agreement for a business combination that would result in Danimer being a publicly traded company (the "De-SPAC Transaction"), which was, in effect, Danimer's IPO. Prior to the De-SPAC Transaction, Live Oak's Class A common shares traded on the New York Stock Exchange ("NYSE") under the ticker symbol "LOAK," and its warrants traded under the symbol "LOAK WS." Upon the closing of the De-SPAC Transaction, the combined company would be renamed Danimer Scientific, Inc. and its common stock would trade under the ticker symbol "DNMR" on the NYSE beginning December 30, 2020; warrants would trade under the ticker symbol DNMR.WS.

8.      In order to consummate the De-SPAC Transaction, however, Defendants needed Live Oak's Class A shareholders to approve the transaction in a vote. For Live Oak, the De-SPAC transaction meant Live Oak would not have to return the $200 million it raised in the May IPO.

9.      For Danimer, the SPAC deal offered a quicker route to the public markets and the funding the Company needed than a traditional IPO. "The SPAC route gives us the speed that we need to get to that capital. We just don't have time to start a traditional IPO process right now," Defendant Croskrey said in an interview.[10]  In addition to the funds put into the deal by Live Oak's SPAC, a group of investors including Federated Hermes Kaufmann Small Cap Fund and Apollo Management, LP agreed to a $210 million PIPE (private investment in public equity) investment. The deal reportedly would provide Danimer with approximately $385 million in cash.

10.      Thus, on October 5, 2020, the sales pitch for approving the De-SPAC Transaction commenced. For example, during conference call with investors, Defendant Croskrey represented

---

[9] Meredian Holdings Group, Inc. will hereinafter be referred to as "Danimer".

[10] https://www.reuters.com/article/us-live-oak-acqsn-m-a-danimer/u-s-bioplastics-firm-danimer-agrees-890-million-deal-to-go-public-idUSKBN26Q17M

that when a Danimer PHA-based product was discarded into a landfill, it would be consumed by bacteria.  Moreover, an October 5, 2020 investor presentation represented that Nodax® is "fully degradable in 12-18 weeks after the product is discarded."[11]  In a joint press release that day, both Danimer and Live Oak stated:[12]

> The Company's signature polymer, Nodax™ PHA (polyhydroxyalkanoate), is a **100% biodegradable**, renewable, and sustainable plastic produced using canola oil as a primary feedstock. Nodax™ PHA is the first PHA polymer to be certified as **marine degradable, the highest standard of biodegradability, which verifies the material will fully degrade in ocean water without leaving behind harmful microplastics.** As a result, NodaxTM … eliminates the need for recycling and can replace the 80% of plastics that are never recycled or incinerated.

11.    These representations were later revealed by *The Wall Street Journal* to be materially false and/or misleading and to constitute "greenwashing." Greenwashing is the process of conveying a false impression or providing misleading information about how a company's products are more environmentally sound, as further described below. Greenwashing is under increased scrutiny at the SEC and the Federal Trade Commission ("FTC").  Greenwashing is damaging to consumers and investors as it imbues purchasing decisions with disinformation.  It "harms innovation, since it makes it more difficult for legitimate, environmentally friendly products to compete with sellers who engage in deception."[13]

---

[11] https://www.sec.gov/Archives/edgar/data/1779020/000101376220000050/ea127764ex99-3_liveoak.htm

[12] https://www.businesswire.com/news/home/20201005005265/en/Danimer-Scientific-a-Next-Generation-Bioplastics-Company-to-Become-a-Public-Company

[13] Federal Trade Commission, Statement of Commissioner Rohit Chopra, Regarding the FTC Energy Guide Rule at p. 5, Commission File No. R611004 (Dec. 22, 2020) (encouraging the FTC to "use[] all of its legal authorities to combat practices that harm consumers, distort competition, and undermine national goals on energy independence and climate change").

12.    The misleading sales pitches continued through October to December 2020 in the lead up to the shareholder vote. On December 16, 2020, Defendants filed a Proxy Statement/Prospectus with the SEC that represented "Live Oak's management and board of directors believe that Danimer is a high-growth next generation eco-tech company **that produces 100% biodegradable polymers** for use in plastic applications"; "Live Oak's management and board of directors **considered Danimer's strong partnerships with industry leaders, such as CPG brands including Pepsi and Nestlé** and key converters such as Wincup and Genpak, which it believes contribute to Danimer's rapidly growing blue chip customer base **with take-or-pay contracts that has led to fully sold-out position through Phase II capacity addition**"; and "Live Oak's management and board of directors considered the fact that Danimer has large addressable market, with currently over 500 billion pounds worldwide of single-use plastics that are not recycled or incinerated."[14]

13.    On December 28, 2020, Live Oak's board of directors unanimously approved the De-SPAC Transaction. Live Oak's stockholders, likewise, approved the De-SPAC Transaction at a special meeting. On December 29, 2020, Legacy Danimer and Live Oak announced that they had completed the De-SPAC Transaction, and on December 30, 2020, Danimer shares and warrants began trading on the NYSE.

14.    In a press release that day, Danimer again repeated many of the false and misleading representations, including that:

- The Company's signature polymer, Nodax™ PHA (polyhydroxyalkanoate), is a 1**00% biodegradable,** renewable, and sustainable plastic produced using canola oil as a primary feedstock.

---

[14]

https://www.sec.gov/Archives/edgar/data/0001779020/000121390020043065/f424b31220_liveo akacq.htm

- Nodax™ PHA is the first PHA polymer to be certified as **marine degradable**, the highest standard of biodegradability, which verifies the material will fully degrade in ocean water without leaving behind harmful microplastics.

- As a result, Nodax$^{TM}$ offers a better beginning-of-life and end-of-life cycle than any of today's traditional plastics **and can replace the 80% of plastics that are never recycled or incinerated**.

- The Company has partnered with key manufacturers and consumer products companies such as PepsiCo, Nestlé, Bacardi, Genpak, WinCup, Columbia Packaging Group, Kemira and Plastic Suppliers Inc. as they introduce more sustainable alternatives to straws, food and beverage containers, and flexible packaging, among others.

- Our customers view our Nodax™ PHA technology as a core component of their corporate sustainability strategy and a key vehicle to achieve their ESG commitments of reducing plastic waste **by making their plastic packaging fully biodegradable**.

- Based on signed and pending contracts, the Company is fully sold out of all production in its Kentucky facility.[15]

15.     As a result of the De-SPAC Transaction and the related PIPE offering, Danimer received approximately $385 million of unrestricted cash, net of transaction costs, on the balance sheet to fully fund future, planned growth, including the expansion of its current Kentucky facility and the build out of its contemplated greenfield facility. These funds were primarily comprised of cash from Live Oak's former trust account and concurrent equity private placements from institutional investors, including certain funds managed by affiliates of Apollo, Federated Hermes Kaufmann Small Cap Fund, and over $50 million from Live Oak affiliates.

---

[15] *Business Wire*, "Danimer Scientific, a Next Generation Bioplastics Company, Completes Business Combination with Live Oak Acquisition Corp." Dec. 29, 2020. https://www.businesswire.com/news/home/20201229005412/en/Danimer-Scientific-a-Next-Generation-Bioplastics-Company-Completes-Business-Combination-with-Live-Oak-Acquisition-Corp. (last accessed Jan. 19, 2021); and https://ir.danimerscientific.com/news/press-releases/detail/22/danimer-scientific-a-next-generation-bioplastics-company (last accessed Dec. 10, 2021).

16.     After the De-SPAC Transaction, Legacy Danimer's senior management team continued on and led the Company. In addition to serving as Chief Executive Officer of Danimer Scientific, Defendant Croskrey was named Danimer's Chairman of the Board. Defendant Rick Hendrix ("Hendrix"), Chief Executive Officer of Live Oak, joined Danimer's Board, and Defendant John Amboian ("Amboian"), Non-Executive Chairman of Live Oak, joined Danimer's Board as lead director.

17.     Following a marked rise in Danimer's stock price, on January 28, 2021, Danimer filed a Registration Statement with the SEC on Form S-1 (repeating or expanding on the same false claims) for the issuance of up to 32,435,961 shares of common stock and up to 16,279,253 shares of Class A common stock issuable upon the exercise of warrants and options previously issued by Legacy Danimer and Live Oak.   On February 16, 2021, the registration statement was amended and the SEC declared the registration statement effective.   On February 16, 2021, Danimer filed a prospectus on Form 424(b)(3) with the SEC (the "February 2021 Prospectus"). Collectively, the February 2021 Prospectus and registration statement effective February 16, 2021 are referred to as the "Feb. 2021 Registration Statement".

18.     The Feb. 2021 Registration Statement repeated the claims above and again misrepresented Nodax's® biodegradability, representing "Our PHA … will biodegrade aerobically or anaerobically in soil, water and industrial or home compost **within three to six months depending on conditions**."[16]

19.     On March 16, 2021, Danimer issued a joint press release with global snack maker Mars Wrigley. The press release touted the certified, reliable biodegradability of Nodax® in soil

---

[16] https://www.sec.gov/Archives/edgar/data/1779020/000121390021009683/ea135803-424b3_danimersci.htm

and marine environments, as well as in industrial and home composting. Specifically, the press release asserted that Nodax® "biodegrades in both soil and marine environments." In the press release, Danimer also announced its "plan to introduce Nodax®PHA into flexible and rigid packaging that reliably breaks down in both industrial composting facilities and backyard compost units, offering an enhanced value proposition for environmentally conscious consumers and retailers." The press release further states that "Nodax®PHA can serve as an alternative to traditional petrochemical plastic and has been certified as **biodegradable in soil and marine environments**."[17]

20.    On March 20, 2021, the truth about Danimer began to be revealed to the investing public. On that day, *The Wall Street Journal* published an article entitled "Plastic Straws That Quickly Biodegrade in the Ocean? Not Quite, Scientists Say."[18] In this article, the *WSJ* wrote that although "Nodax breaks down far more quickly than fossil-fuel plastics … **many claims about Nodax are exaggerated and misleading, according to several experts** on biodegradable plastics. They say more testing and stricter regulations are needed, and warn that marketing products as marine biodegradable could encourage littering. Biodegradable straws, bottles and bags can persist in the ocean for several years, they say." According to the article, Jason Locklin—the expert who the *WSJ* states co-authored a study touted by Danimer as validating Nodax®—stated that Danimer's "claims are what I would call sensationalized".  Mr. Locklin's study—described in marketing material by Danimer and its customers as verifying Nodax® as "a truly biodegradable alternative to petrochemical plastics"—showed that Nodax® in powdered form breaks down

---

[17] https://danimerscientific.com/2021/03/16/mars-wrigley-and-danimer-scientific-help-environmentally-conscious-consumers-to-compost-at-home-by-developing-biodegradable-packaging-from-natural-ingredients/

[18] https://www.wsj.com/articles/plastic-straws-that-quickly-biodegrade-in-the-ocean-not-quite-scientists-say-11616238001

quickly, but that the rate is much more variable when tested as a film, the form used to make bags, straws and bottles.  Locklin continued that "[m]aking broad claims about Nodax's biodegradability "is not accurate" and  "I think is greenwashing."  The article continued stating:

> **But variations in temperature and microorganisms in the ocean make it very difficult to promise a bottle made from Nodax will biodegrade in 18 months,** according to Ramani Narayan, a professor at Michigan State University who has been researching biodegradable plastics for over 30 years.
>
> The marine biodegradability test used to gain certification from TUV is conducted in a lab using seawater at a temperature of 30 degrees Celsius (86 Fahrenheit). But the average ocean temperature is 4 degrees Celsius (39.2 Fahrenheit), which means items could degrade more slowly in real life, Mr. Narayan said. He compares it to bread, which gets moldy less quickly inside the fridge.
>
> **At some ocean temperatures, Nodax straws could take between five and 10 years to biodegrade, he said. Bags and bottles could take even longer**.
>
>          \*\*\*
>
> TUV said it doesn't certify products like bottles or straws as ocean biodegradable because it doesn't want to encourage littering, nor does it allow companies to make such claims about finished products even when the raw materials have been certified.
>
> Lab tests are done on sheets of plastic, while finished products come in different shapes and thicknesses or have dyes and labels, all of which could impact how they biodegrade in the real world, said Philippe Dewolfs, head of TUV's bioplastics certification department.
>
>          \*\*\*
>
> Given the lack of widespread composting facilities that accept packaging waste, many products made from Nodax today are bound to end up in landfills. However, **modern landfills are designed to prevent biodegradation since organic matter releases methane, a potent greenhouse gas, when it breaks down.** Even if an item does biodegrade in landfills, experts say it's hard to predict how long the process would take since landfills differ widely from one another—plus that would be an undesirable outcome.

**Nodax doesn't have any certification indicating it biodegrades in landfills. However, Mr. Croskrey on an investor call in October said the product would be consumed by bacteria if it ended up in a landfill. Responding to questions from The Wall Street Journal, Mr. Van Trump said the claim by the Danimer chief wasn't wholly accurate, saying Nodax products are unlikely to biodegrade in most modern landfills.**

***

"Everything biodegrades at some point," including fossil-fuel plastics, he said. "The question is how soon."

21.     In defense, the *WSJ* quoted Danimer's chief technology officer ("CTO") as stating: "The material truly is biodegradable so we're not greenwashing," said its chief technology officer, Phil Van Trump, while admitting. "**The only thing that will potentially change is how long it takes to biodegrade**."

22.     On this news, Danimer's stock price fell $6.43 per share, or approximately 13%, to close at $43.55 on March 22, 2021, on heavier than usual volume.

23.     But apparently biodegradability was not the only thing Defendants misrepresented or omitted in their SEC filings, press releases, conference calls and presentations used to sell the De-SPAC Transaction and issuance of shares. On April 22, 2021, short-focused research firm[19] Spruce Point Capital Management ("Spruce Point")[20] issued a report entitled "When the Tide Goes

---

[19] "Short-selling, while high risk, adds so much value to the market. Short-sellers are investors whose incentive comes from making profits from the misdeeds of executives and companies. They often are the first whistleblowers of crimes like fraud or embezzlement. By not being connected to companies and having more risk involved, they watch and research the market to ensure things are going the way they believe. This often leads to more informed, accurate and ethical reporting of market trends." https://thewhitonline.com/2021/10/features/activist-short-seller-ben-axler-talks-stocks-with-rowan-business-students/

[20] Spruce Point is run by Ben Axler. Mr. Axler is the founder of Spruce Point Capital Management and co-founded Prescience Point Research Group (2012-2014), a short-focused research firm. Mr. Axler is an activist short-seller, forensic financial researcher, and has exposed billions of dollars of financial schemes globally. Prior to founding his company in 2009, Mr.

out, What Will Wash Ashore?" on Danimer, writing that Danimer represented "Another Go Around at Plastic Alternatives with Several Corporate Governance Red Flags: 65%-100% Downside Risk" (the "April 22 Report"). The April 22 Report revealed "several corporate governance red flags" involving the past and current CEOs, the CTO and current Danimer executives and Directors. These red flags included previously omitted information about "[c]urrent Danimer CEO [Defendant] Stephen Croskrey, previously President of Armor Holdings Product Division … was directly involved in a potential cover up of defective body armor." The April 22 Report continued: "[w]e question the independence of Danimer's scientific research as Danimer has been a financial backer of the University of Georgia Lab and several professors who authored the supporting research…. We also believe Danimer has concealed, through numerous website changes and omission of past press releases, a pattern of conflicting and irreconcilable statements on capacity, facility size, and capex costs … ."

24.     In addition to these red flags, the April 22 Report found multiple conflicting sources of Danimer's facility sizes and production capacity and inconsistencies between reported figures and city filings for Kentucky facility capital costs. The April 22 Report also provided evidence that the buildout of Danimer's Kentucky Facility's production capacity was only 10% completed as of January 15, 2021, contradicting the Company's statements that it had completed several

---

Axler spent eight years as an investment banker with Credit Suisse and Barclays Capital where he structured and executed financing, derivative risk management, and M&A deals for leading Fortune 500 clients. Mr. Axler's work has been widely recognized in the financial industry for its originality and track record of performance. Mr. Axler is a frequent market commentator and has appeared on CNBC, Bloomberg/BNN, and FOX Business television, and in the print edition of the Financial Post and Barron's.  Mr. Axler was also profiled in the book "The Happiness Advantage: The Seven Principles of Positive Psychology That Fuel Success and Performance at Work." Mr. Axler graduated from Yale University with a Master's degree in Statistics, and received both a Bachelor of Arts degree in Statistics and a Bachelor of Science in Marketing and Business Administration from Rutgers College, where he graduated with Summa Cum Laude and Phi Beta Kappa honors. https://www.cfany.org/speaker-organizer/mr-axler/

components of the first phase of the production capacity buildout by the end of the third quarter of 2020.

25.     The April 22 Report also raised doubts about the strength of the Company's purported partnerships with Pepsi and Nestlé because Pepsi just recently sold its highly touted equity stake in Danimer and both the top Pepsi and Nestlé executives with close relationships to Danimer recently resigned.

26.     Regarding Danimer's biodegradability representations, the April 22 Report noted that the Company made changes to its presentations following the publication of March 20, 2021 WSJ article (removing "derived from 100% Renewable Source" and "Fully degradable in 12 – 18 weeks after the product is discarded."[21]

27.     The April 22 Report also cited a scientific article from 2020 entitled "Biodegradation of Wasted Bioplastics in Natural and Industrial Environments: A Review," which indicated that the Company's representations about the biodegradability of Nodax® were misleading.[22] Specifically, the article found that "PLA-based bioplastics showed a similar biodegradability of PHAs," and that PHA based bioplastics, such as Nodax®, had "less than 10% of biodegradability over a period of one year in aquatic environments, while biodegradation was in general below 50% after one year in soil environment."[23] The April 22 Report also points out

---

[21] Compare October 2020 Presentation:
https://www.sec.gov/Archives/edgar/data/1779020/000101376220000050/ea127764ex99-3_liveoak.htm with March 2021 (Q4 2020 Earnings Call):
https://www.sec.gov/Archives/edgar/data/1779020/000121390021018338/ea138515ex99-2_danimersci.htm

[22] Folino, Adele & Karageorgiou, Aimilia & Calabrò, Paolo & Komilis, Dimitrios. (2020). "Biodegradation of Wasted Bioplastics in Natural and Industrial Environments: A Review." https://www.researchgate.net/publication/343275108_Biodegradation_of_Wasted_Bioplastics_in_Natural_and_Industrial_Environments_A_Review. (last accessed January 12, 2022.)

[23] *Id.* at 28.

that a research study shows that in an anaerobic environment, such as a sealed landfill, the PHA product does not completely biodegrade, and that bioplastics in a landfill can, in fact, be worse than traditional plastic, as they release methane gas, which has a global warming potential that far exceeds that of carbon dioxide.

28.     On this news, Danimer's stock price declined from a closing price on April 21, 2021 of $25.00 per share to close at $22.99 per share on April 22, 2021, a decline of $2.01 per share, or approximately 8%, on heavier than usual volume.

29.     On May 4, 2021, Spruce Point issued a follow-up report to the April 22 Report writing, "insights from Danimer FOIA show smoking gun evidence of pricing inflation and slackness in capacity" (the "May 4 Report").  The May 4 Report continued that "with the benefit of a recently released [FOIA] request from the Kentucky Department of Environmental Protection, we have evidence that suggests Danimer's production figures, its pricing, and rosy financial projections are wildly overstated. Monthly Kentucky PHA production figures have been restated by up to 100% after coming public. Danimer's PHA average selling price appears to be 30% - 42% below management's claims. Moreover, Danimer's recently reported production figures are so far below their actual capacity, that it calls into question why is Danimer telling investors it needs hundreds of millions of dollars in capacity expansion?"

30.     On this news, Danimer's shares further plummeted, falling from a close on May 3, 2021 of $23.63 per share to close on May 4, 2021 at $22.14 per share, a decline of $1.49 per share, or approximately 6.3% on heavier than usual volume.

31.     On May 5, 2021, the Company received a letter from the Atlanta regional office of the SEC, in connection with a non-public, fact-finding inquiry, requesting that the Company

voluntarily produce certain specified information.  Danimer did not disclose the SEC's letter until December 2021.

32.     On May 14, 2021, Danimer amended and restated its annual 10-K SEC filing and stated that Danimer's internal controls and procedures in 2020 "were not effective because" of "material weakness" in Danimer's "controls over the accounting for complex financial instruments."[24]

33.     On May 21, 2021, Spruce Point published a third report ("May 21 Report") noting that the State of Kentucky securities regulator "opened a formal inquiry" after reviewing Spruce Point's findings. The May 21 Report further observed that in Danimer's recent Q1'21 call, Danimer made statements about being unable to raise prices further, and the impact of rising prices in canola oil, that conflict with Defendants claims of unfettered demand and sold-out capacity and revealed **ballooning finished product inventory as a percentage of total inventory and product sales**[25], which are a signal of products are not selling through. The May 21 Report also pointed out the language change in Danimer's statements, within a short period of time from stating that the Georgia Bainbridge "2 million square foot..$700 million" facility which will "employ approximately 400 people **when fully operational…will be operational in mid-to late 2023**" to much more vague  $700 million "manufacturing complex" which **will "begin operations in mid-to-late 2023."**[26]

---

[24]

https://www.sec.gov/Archives/edgar/data/0001779020/000121390021026449/f10k2020a1_danimerscien.htm

[25] Danimer finished goods increased from 48% of product sales in 6/30/2020 to 80% in 3/31/2021. See Spruce Point May 21 Report at 14.

[26] Comparing 2020 10-K and Press release to the newer Q1 2021 10-Q.

34.     So too, on May 21, 2021, *Reuters* reported that the Company was under investigation by the Division of Securities of the Kentucky Department of Financial Institutions, stating, in part, the following:[27]

> The Division of Securities of the Kentucky Department of Financial Institutions told Reuters on Friday that it has "launched an inquiry into the investor complaint related to Danimer Scientific."

35.     Spruce Point was not the only investigative analyst firm to point out the inconsistencies in Danimer's representations. On September 15, 2021, research firm Muddy Waters issued a report that significantly corroborated the April 22, May 4 and May 21 Spruce Point Reports. In these reports Muddy Waters found, among other things, that Defendants "significantly misrepresented the state of its customer relationships, product development, readiness to scale, and TAM [total addressable market] for PHAs." The report also noted that demand for Danimer's Nodax® product appeared weak, as inventory was growing compared to sales,  and that Danimer had greatly misled investors about the state of its actual  partnerships with blue chip company customers, as, for example, Muddy Waters could only confirm end usage for straws, and the contracts had many outs. On this news, Danimer's shares further plummeted, falling from a close on September 14, 2021 of $17.24 per share to close on September 15, 2021 at $14.73 per share, a decline of $2.51 per share, or approximately 14.5%, on heavier than usual volume.

36.     On November 15, 2021, Defendants held a Q3 2021 earnings call.[28] As noted by analysts, Danimer missed revenue expectations. Importantly, in the earnings call, Defendants

---

[27] https://www.reuters.com/business/sustainable-business/kentucky-securities-regulator-opens-inquiry-into-danimer-scientific-2021-05-21/

[28] https://viavid.webcasts.com/viewer/event.jsp?ei=1507719&tp_key=5d2d59faf5

refused to reveal Danimer's average PHA sales price ("ASP"), giving further corroboration to the

Spruce Point and Muddy Waters reports that ASPs were a faction of what was represented:

> Q - Jon Tanwanteng[research analyst]:
>
> Okay, great. And then you didn't give an ASP number this quarter, you usually do. I wonder if you could supply that? And also the volume of PHA products in the quarter or maybe an average utilization rate compared to the nameplate capacity?
>
> A – Defendant Croskrey"
>
> Sure. So the ASP we have decided that we're not going to continue to provide that due to competitive reasons, but we've only provided that in the first place to correct misinformation in the market. And so we're not going to continue that in the future, but we were up slightly on a year-over-year basis and slightly -- up slightly on a quarter-over-quarter basis.

37.     In response, Muddy Waters tweeted: "Seems the market gets that the Q3 results

and call were awful. **What really stands out is the sudden opacity [with respect to] PHA ASP**.

When you're being scrutinized for obfuscation and exaggeration, you should never answer with

more obfuscation…Unless the truth is really that bad!"

38.     To date, Danimer shares have not recovered, closing at a record low of $5.93 per

share on January 18, 2021.

39.     Throughout the Class Period, Defendants made materially false and misleading

statements regarding the Company's business. Among those misstatements and/or failures to

disclose were the following: (i) Defendants misrepresented the biodegradability of its Nodax®

PHA product; (ii) Defendants overstated Danimer's production of PHA capacity  and planned

capacity by at least 50%; (iii) Defendants misrepresented the demand for their Nodax® PHA,

including the true nature of some of their most prominent customer relationships and omitted the

indeterminate nature of their "take of pay" contracts; (iv) Defendants omitted material adverse

information about Defendant Croskrey's background; and (v) Defendants omitted that Danimer had deficient internal controls.

## II.    JURISDICTION AND VENUE

40.    The federal law claims asserted herein arise under Sections 10(b), 14(a), and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), 78n(a), and 78t(a), and Rules 10b-5 and 14a-9, promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5 and 17 C.F.R. §240.14a-9 and under Section 11, 12 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l and 77o).

41.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

42.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.  Plaintiff Burtner is a resident of this District.

43.    Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1931(b), and conducts substantial business in the state of New York.

44.    In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

### A.    Plaintiffs

45.    Lead Plaintiff James Swanson, as set forth in his certification previously filed with the Court, acquired Danimer securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

46.    Additional Plaintiff Joseph Burtner, as set forth in his certification previously filed with the Court, acquired Danimer securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

### B.    Defendants

47.    Defendant Danimer is a corporation organized under Delaware law and headquartered at 140 Industrial Boulevard, Bainbridge, Georgia 39817. Danimer shares trade on the NYSE under the ticker "DNMR." Danimer purports to be "a performance polymer company specializing in developing and producing bioplastic replacements for traditional petrochemical-based plastics" according to Danimer's Annual Report filed on Form 10-K with the SEC on March 30, 2021 ("2020 Annual Report"). The Company has said that it "believe[s] that we are the only commercial company in the bioplastics market to combine the production of a base polymer along with the reactive extrusion capacity in order to give customers a 'drop-in' replacement for a wide variety of petrochemical-based plastics," and has described itself as "a leading producer of polyhydroxyalkanoate ("PHA"), which occurs naturally in living organisms and is chemically similar to polyesters." Danimer's key product is its PHA that sells under the brand name Nodax®, which the Company has falsely represented is a 100% biodegradable, renewable, and sustainable plastic alternative.

48.    Defendant Croskrey is Danimer's Chief Executive Officer and the Chairman of the Company's Board of Directors, having served in those capacities since February 2016. Defendant

Croskrey signed the February 2021 Offering Registration Statement and made materially false and misleading statements to investors in investor conferences, press releases and SEC filings, as alleged herein.

49.     Defendant Richard Hendrix ("Hendrix") is the co-founder and managing partner of Live Oak Merchant Partners, Chief Executive Officer of Live Oak, and a member of Danimer's Board of Directors. He has served as a director of Danimer since December 2020, and previously served as Live Oak's Chief Executive Officer and director from May 2020 to December 2020. Defendant Hendrix signed the De-SPAC Registration Statement, and  the February 2021 Offering Registration Statement and made materially false and misleading statements to investors in investor conferences, press releases and SEC filings, as alleged herein.

50.     Defendant John A. Dowdy, III ("Dowdy") is Danimer's Chief Financial Officer, having served in that capacity since May 2014.  Defendant Dowdy signed the February 2021 Offering Registration Statement.

51.     Defendant John P. Amboian ("Amboian") was Chairman of Live Oak, and is a director of Danimer.  Defendant Amboian signed the De-SPAC Registration Statement and the February 2021 Offering Registration Statement.

52.     Defendant Cristy Basco ("Basco") is a director of Danimer and signed the February 2021 Offering Registration Statement.

53.     Defendant Philip Gregory Calhoun ("Calhoun") is a director of Danimer and signed the February 2021 Offering Registration Statement.

54.     Defendant Gregory Hunt ("Hunt") is a director of Danimer and signed the February 2021 Offering Registration Statement.

55.     Defendant Isao Noda ("Noda") is a director of Danimer and signed the February 2021 Offering Registration Statement.

56.     Defendant Stuart Pratt ("Pratt") is a director of Danimer and signed the February 2021 Offering Registration Statement.

57.     Defendant Andrea K. Tarbox ("Tarbox") was Chief Financial Officer and a director of Live Oak and signed the De-SPAC Registration Statement.

58.     Defendant Tor R. Braham ("Braham") was a director of Live Oak and signed the De-SPAC Registration Statement.

59.     Defendant Jonathan Furer ("Furer") was a director of Live Oak and signed the De-SPAC Registration Statement.

60.     Defendants Harold Ford Jr. ("Ford") was a director of Live Oak and signed the De-SPAC Registration Statement.

61.     John W. Sweet ("Sweet") was a director of Live Oak and signed the De-SPAC Registration Statement.

62.     Collectively, Defendants named in Paragraphs 48-61 are referred to as the "Individual Defendants."

63.     The Individual Defendants, because of their positions at the Company or Live Oak, possessed the power and authority to control the content and form of the Company's or Live Oak's annual reports, quarterly reports, press releases, investor presentations, or other materials provided to the SEC, securities analysts, money and portfolio managers and investors, i.e., the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with

the Company or Live Oak and access to material non-public information available to them but not to the public, the Individual Defendants possessed the power and authority to control the contents of Danimer's or Live Oak's representations to the investing public.

## IV.   BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A.   Origins of Danimer

64.     Danimer was originally formed in 2004 and sought to provide sustainable polymer solutions by developing compostable and biodegradable plastic alternatives.

65.     Around 2007, Meredian Inc. ("Meredian"), a company that would later merge with Danimer, bought the patents underlying PHA technology from Procter & Gamble Company ("P&G") after P&G had spent over a decade trying to develop a PHA business.[29] Since then, Danimer has been trying to commercialize PHA. In 2014, Meredian Inc. and Danimer merged under the name Meredian Holdings Group Inc.

66.     In December 2016, Meredian Holdings Group Inc. announced that it would do business as Danimer Scientific, Inc.

67.     In August 2018, Defendants began publishing press releases with promotional claims about the University of Georgia's purported recognition of PHAs as an eco-friendly alternative to traditional plastics.[30]

---

[29] "Meredian Inc. Announces Acquisition of PHA Technology from Procter & Gamble," Oct. 4, 2007. https://news.pg.com/news-releases/news-details/2007/Meredian-Inc.-Announces-Acquisition-of-PHA-Technology-from-Procter--Gamble/default.aspx (last accessed Dec. 10, 2021).

[30] "Study: Danimer PHA Verified as Reliable Biodegradable Alternative to Traditional Plastic Packaging," Aug, 7, 2018. https://ir.danimerscientific.com/news/press-releases/detail/15/study-danimer-pha-verified-as-reliable-biodegradable (last accessed Dec. 10, 2021).

68.     The recent explosion in investor interest in SPACs presented Defendants with a new opportunity to market the technology in such a way to raise hundreds of millions of dollars. In 2020, just as the SPAC trend was taking off, Danimer's press releases increased in frequency.[31]

## B.     Origins of Live Oak

69.     Live Oak was incorporated in May 2019 as a SPAC formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, recapitalization, reorganization or similar business combination with one or more businesses.

70.     Live Oak was organized by Gary K. Wunderluch, Jr. who was been sanctioned by the SEC.  In 2011, Mr. Wunderlich, along with Wunderlich Securities, Inc. ("WSI") and WSI's Chief Compliance Officer, consented, without admitting or denying the findings therein, to the entry of an SEC order finding that, from 2007 to 2009, as WSI was converting hundreds of its existing fee-based brokerage accounts to investment advisory accounts, in response to regulatory changes affecting certain broker-dealers that provided investment advice, WSI willfully violated the Investment Advisers Act of 1940, or the Advisers Act, and its rules by failing to have adequate written policies and procedures and a code of ethics, and Mr. Wunderlich, who was then WSI's Chief Executive Officer, willfully aided and abetted and caused such violations. The order also found that WSI willfully violated the Advisers Act and its rules by overcharging advisory clients for commissions and other transactional fees totaling approximately $120,835 in approximately 6,338 separate transactions, which the SEC stated appeared to have occurred primarily due to back-office errors, and by engaging in principal trading without providing certain required disclosures to its clients.

---

[31] Danimer Scientific, Inc. Press Releases, p. 5. https://ir.danimerscientific.com/news/press-releases?page=5 (last accessed Dec. 10, 2021).

71.     Live Oak completed its initial public offering in May 2020 at $10 per share, raising $200 million.

72.     In October 2020, Live Oak and Legacy Danimer agreed to merge through the De-SPAC Transaction

73.     On October 5, 2020, Legacy Danimer and Live Oak announced a definitive agreement for a business combination by which Live Oak would acquire Legacy Danimer and would result in Legacy Danimer becoming a public company through the De-SPAC Transaction. Upon the closing of the De-SPAC Transaction, the combined company would be renamed Danimer Scientific, Inc. and its common stock would trade under the ticker symbol "DNMR" on the NYSE beginning December 30, 2020.

74.     On December 28, 2020, Live Oak's board of directors unanimously approved the De-SPAC Transaction. Live Oak's stockholders, likewise, approved the De-SPAC Transaction at a special meeting.

75.     On December 29, 2020, Legacy Danimer and Live Oak announced that they had completed the De-SPAC Transaction. Legacy Danimer's senior management team would continue to lead the new combined company. In addition to continuing as CEO, Defendant Croskrey was named Chairman of Danimer's board.

## C.     In the Backdrop of a Worldwide Plastic Pollution Problem, Defendants Presented their Purportedly New Plastic Alternative Product as the Ultimate Solution

76.      In recent years, investors, consumers, companies, environmentalists, and many others have grown increasingly concerned with the environmental impact of the global plastic pollution crisis, including the use of single-use plastics that find their way into oceans, landfills, and the general environment, and the inability of plastic to biodegrade, leading to the proliferation of tiny microplastic particles found in virtually every corner of the world. So too, governments are

increasing cracking down on polluters and passing laws and regulations to prevent pollutions. As such, investors are eager to invest in companies that will step in and meet this growing demand for a solution and compliance with government programs. Danimer claimed to be one of the companies offering a solution to this crisis, and investor demand.

77.     Between October 2020 through the end of the Class Period, Defendants publicized investor presentations that played on these fears and environmental concerns, often featuring a tortoise swimming while trapped in a plastic set of six-pack rings. Yet, as discussed below, that ring might not biodegrade for years, even if made by the product Danimer was peddling.:



78.     In sum, Defendants took advantage of the burgeoning environmental crisis by peddling a purportedly new technology that was supposedly a **100% biodegradable plastic** substitute **which is fully degradable in 12 – 18 weeks even in marine environments and landfills**, the production and adoption of which would scale so massively that it could replace everyday plastic products.



79.     In a video presentation published by AMCREF Community Capital on June 30, 2020, Michael Smith, Danimer's Chief Operating Officer, stated that the new solution to this crisis was an:

> **"absolutely 100% biodegradable plastic that will work to replace your water bottles, your chip bags, your cutlery, things that you see on the side of the road. We can make those go away."**[32]

---

[32] "Danimer Scientific + AMCREF," June 30, 2020. https://www.youtube.com/watch?v= 7m12iAfSEcM (last accessed Dec. 3, 2021).

Defendants perpetuated this myth in their October 2020 Investor Presentation with a slide showing the well-known customers and a large array of products claiming the "[a]bility to convert PHA into articles for a wide range of plastics and specialty applications":



80.     To demonstrate these supposed capabilities, Defendants repeatedly publicized and showed investors images of a plastic bottle seemingly dissolving into thin air:



81.     To demonstrate the Company's ability to scale massively in both production and

adoption, Defendants touted the size and production capacity of its new facilities and new

partnerships with large companies such as Nestlé and PepsiCo.:



82.   Following the De-SPAC Transaction, in which Defendants raised over $380 million dollars for Danimer, it was soon revealed that Defendants' representations concerning the 100% biodegradability of Nodax®, the revolutionary and environmentally friendly nature of the product, the product's scalability, Danimer's production capabilities, the level of product adoption by customers, and the contracts with those customers were materially false and misleading.

**D.   Greenwashing Conveys a False Impression or Provides Misleading Information about a Product's Impact on the Environment.**

83.   Greenwashing is considered an unsubstantiated claim to deceive consumers and investors into believing that a company's products are environmentally friendly. *See e.g.* https://www.ecowatch.com/greenwashing-guide-2655331542.html

84.     Many companies are working hard to change the reputation around their plastic products and boost consumer enthusiasm for them. Bioplastics give a potent example. Made from bio-based polymers instead of petrochemicals, this material is often considered good for the planet because it can break down thousands of years faster than traditional plastics. But what isn't as commonly known is that these "natural" plastics need highly specific conditions to decompose that involve access to oxygen and sunlight — both of which are scarce in landfills.

85.     Furthermore, many of these bioplastics require the use of other plastics in the manufacturing process or even embedded within them to hold different components together. The benefits of using these materials are middling at best, which has led the FTC to challenge manufacturers on their misleading claims about their environmental impacts.

86.     The FTC states in its Green Guides at 16 C.F.R. 260.8 puts the following limitations on the use of degradation claims as follows:

> (b) A marketer making an unqualified degradable claim should have competent and reliable scientific evidence that the entire item will completely break down and return to nature (i.e., decompose into elements found in nature) within a reasonably short period of time after customary disposal.
>
> (c) **It is deceptive to make an unqualified degradable claim for items entering the solid waste stream if the items do not completely decompose within one year after customary disposal**. Unqualified degradable claims for items that are customarily disposed in landfills, incinerators, and recycling facilities are deceptive because these locations do not present conditions in which complete decomposition will occur within one year.
>
> (d) **Degradable claims should be qualified clearly and prominently to the extent necessary to avoid deception about: (1) the product's or package's ability to degrade in the environment where it is customarily disposed; and (2) the rate and extent of degradation**.[33]

---

[33] *See also In The Matter of ECM BioFilms, Inc. als d/b/a Enviroplatics International* https://www.ftc.gov/enforcement/cases-proceedings/122-3118/ecm-biofilms-inc-also-dba-enviro plastics-international-matter; *ECM Biofilms, Inc. v. Federal Trade Commission*, 851 F.3d 599 (6th Cir. 2017); Shahrasbi, Sanya, "Consumers, Plastic, and What It Means to Be 'Biodegradable'"

E.      **Defendants Misrepresented the Biodegradability of PHA and Engaged in Greenwashing**

87.     Defendants materially misrepresented the biodegradability of it Nodax® PHA during the Class Period. According to Danimer, the Company "is a leading producer of PHA, **a 100% biodegradable plastic** feedstock alternative sold under the proprietary Nodax® brand name, for usage in a wide variety of plastic applications including water bottles, straws, food, containers, etc.". During the Class Period, Danimer represented that its signature PHA product, Nodax®, is **100% biodegradable within 12 – 18 weeks in all environments**, and can sustainably replace 80% of plastics that are never recycled or incinerated. Danimer represented that Nodax® could reliably breakdown and quickly disappear in months, if not weeks, in all environments.

88.     In reality, Defendants now acknowledge that these representations concerning the biodegradation of Nodax® were wrong because the products that are made with its Nodax® product are not 100% biodegradable in common marine and soil environments like sealed landfills, and even where they are, it can take years, if ever, before they "disappear."

89.     On March 20, 2021, *The Wall Street Journal* published an article entitled "Plastic Straws That Quickly Biodegrade in the Ocean? Not Quite, Scientists Say--Companies are touting straws and bottles made from a plant-based plastic, but researchers say some claims are overstated" written by Saabira Chaudhuri, challenging Danimer's scientific claims and detailing the true biodegradability of Danimer's technology.

90.     The article noted that Danimer is trying to paint a picture that you can leave your plastic cup and straw on the shore, assured that if washed away they'll quickly disappear, claiming

---

https://www.law.georgetown.edu/environmental-law-review/wp-content/uploads/sites/18/2019/05/GT-GELR190019.pdf

their products can biodegrade in oceans within a few months. But experts say those claims are exaggerated and misleading, and more testing and stricter regulations are needed, warning that marketing products as marine biodegradable could encourage consumers who are increasingly concerned about the environment to not give a second thought to littering. "Biodegradable straws, bottles and bags can persist in the ocean for several years." Moreover, modern landfills are designed to prevent biodegradation since organic matter releases methane, a potent greenhouse gas, when it breaks down. Even if an item does biodegrade in a landfill, it is difficult to predict how long the process will take since landfills differ widely from one another. In addition, Nodax® PHA will only decompose in 18 months where there is microbial activity, such as a composting bin, a landfill with energy recovery, or a body of water. Further, only about 5 million U.S. households had access to curbside composting, and few Americans have access to landfills equipped to ensure that bioplastics degrade.

91.     But when confronted, Danimer CTO Phil Van Trump admitted to the author that Defendant Croskrey's representation on October 5, 2020 that Nodax® would be consumed by bacteria if it ended up in a landfill **were not "wholly accurate," saying that "Nodax products are unlikely to biodegrade in most modern landfills**."

92.     Shortly afterward, on March 26, 2021, *Plastics Today* followed up with an article entitled, "Skepticism Mounts over Utility of Biodegradable Plastics", written by Clare Goldsberry, following up on the *WSJ* article, noting that at an SPE Thermoforming Conference at Michigan State University, professor Ramani Narayan, who has a 30-year history of researching biodegradable plastics, commented that promises of "disappearing" materials made through an

industrial process are not guaranteed.[34] Due to variability in the environment, it is very difficult to promise an 18-month biodegradability time frame, Narayan said. "All of this biodegradable stuff sounds good. The public loves it! But, I ask, in what environment will this degrade? Define environment. The word 'biodegradable' means nothing…"Time? Eventually it will biodegrade, but when? Is some biodegradability better than nothing? No!" Narayan added. "There are serious health and environmental issues connected with biodegradability. It's all or nothing — it must be defined in terms of the environment and time." Chaudhuri also shared viewpoints from Narayan in her *WSJ* article. His perspective on biodegradability hasn't changed much over the past 11 years. Goldsberry finished the article stating; "With skepticism growing over biodegradable and compostable polymers as sustainable solutions to the plastic waste challenge, will these materials — in particular PHA — ever become more than just niche products? That's a question the industry – and its investors – need to answer."

93.     Tellingly, after publication of *The Wall Street Journal* article that questioned Danimer's representations that Nodax® was 100% biodegradable, Danimer made two material changes to Danimer's investor presentation related to the biodegradability of Nodax®. Specifically, Danimer's October 2020 presentation[35] contained the unqualified representation "fully degradable in 12-18 weeks after the product is discarded." But in Defendants' Q4 2020

---

[34] https://www.plasticstoday.com/biopolymers/skepticism-mounts-over-utility-biodegradable-plastics

[35] October 2020 Danimer Investor Presentation https://www.sec.gov/Archives/edgar/data/1779020/000101376220000050/ea127764ex99-3_liveoak.htm

earnings call presentation on March 29, 2021, which was otherwise substantially similar to the October 2020 presentation, Defendants removed this representation. [36]

94.    Similarly, in Danimer's May, 17, 2021 Earnings Call[37], Defendant Croskrey admitted the misleading nature of Danimer's prior representations, again admitting to some of the limits of Defendants' 100% biodegradability of Nodax® claims, while dropping the three-to-six-month representation:

> While the timeframe for complete degradation varies depending on real-world settings, including the dimensions form and application of the material, all of the extensive testing conducted to date, demonstrates that Nodax biodegrades into natural compounds, carbon dioxide, water and biomass. Petrochemical plastics, on the other hand do not biodegrade in any environment.

95.    Former employees further corroborate problems with the biodegradability of Nodax.

96.    CW1 was an engineer at Danimer during the period July 2020-July 2021 at the Company's facility in Bainbridge, Georgia. CW1 was responsible for, *inter alia*, conducting experiments for commercial process scaling, and assisting in fermentation and downstream processing operations. CW1 corroborates that Defendants' representations concerning the biodegradability of Nodax® were misleading. According to CW1, even if raw Nodax® (i.e. white powder) is 100% biodegradable, once you add other elements to the white powder, it changes properties and time to degrade. According to CW1, other Danimer employees and engineers

---

[36]    March 29, 2021 Fourth Quarter Earnings Presentation https://www.sec.gov/Archives/edgar/data/1779020/000121390021018338/ea138515ex99-2_danimersci.htm (last visited on January 19, 2022.)

[37] https://www.sec.gov/Archives/edgar/data/0001779020/000095017021000274/dnmr-20210517-ex99_1.htm

frequently expressed skepticism concerning Danimer's representations that Nodax ®was 100% biodegradable.

97.    Also according to CW1, there is a display within the lobby of the Company's Bainbridge office which shows a plastic fork reportedly sitting in dirt with a message and timeline reportedly touting Nodax's® biodegradable abilities over time. According to CW1, during CW1's tenure, CW1 and other Danimer employees observed that the fork has not changed appearance.

98.    CW2 was a manufacturing manager who worked for Danimer from September 2019 through approximately December 2020. CW2 worked in the manufacturing department in Danimer's Bainbridge, GA facility and was responsible for overseeing the manufacturing and extrusion of polylactic acid ("PLA"), another polymer-based plastic, and PHA.  Like CW1, CW2 observed that after the Nodax® white power is extruded and other chemicals are added, the Nodax® pellets produced are not 100% biodegradable. Specifically, CW2 stated that the reason why Nodax® was not 100% biodegradable was because other elements were added to the white powder to create the final product. CW2 explained that the extrusion process involved melting raw compounds and mixing in additives to create the end product. Once other elements were added, it changed the chemical properties of the white power making it impossible for Nodax® fully degrade. CW2 personally observed Nodax/PHA pellets on Danimer's warehouse floor that stayed there for months and never degraded.

99.    Moreover, to the extent Danimer supports its environmentally friendly claims, they rely heavily on conclusions from research they funded (but have made efforts to hide) conducted at the University of Georgia led by Dr. Jason Locklin. For instance,  in a press release dated January 15, 2019 ("Jan. 19 press release"), Defendants stated that "[i]n 2018, the University of Georgia (U.S.A.) confirmed in a study that Nodax™ is an effective biodegradable alternative to

petrochemical plastics."[38] But both the University of Georgia and Dr. Locklin have significant conflicting financial ties to Danimer. Moreover, Defendants have tried to obscure those financial ties by removing press releases from its website. Danimer's website, for instance, appears to omit press releases between 2012 – 2017, including a removed announcement of funding to University of Georgia Labs.[39] For instance, in a removed August 2015 press release, Defendants stated that the Company provided funding to the University of Georgia on multiple occasions including as follows:

- "a series of funding to the distinguished labs of Dr. Jason Locklin, Dr. Mark Eiteman and Dr. Jenna Jambeck at the University of Georgia;"

- a "second round of funding" given to Dr. Locklin "from his 5 year, $250,000 grant he's receiving from the company";

- a "$41,500 contribution" to Dr. Eiteman's Group "to train students to metabolically engineer organisms;" and

- a "$50,000 contribution [] made to Dr. Jambeck's Research Group."

The August 2015 press release stated that "Dr. Jambeck will allocate her funds towards a comparative study of Nodax™ PHA and several petro-plastics in controlled marine and freshwater environments. While [Danimer]'s PHA is certified by Vinçotte for biodegradability in all environments, continued testing and research will provide a stronger foundation for replacing petro-plastic in order to provide a sustainable future." Defendants also stated that Danimer "opened

---

[38] Press Release, "Nestlé and Danimer Scientific to Develop Biodegradable Water Bottle," https://danimerscientific.com/2019/01/15/nestle-and-danimer-scientific-to-develop-biodegradable-water-bottle/ (last accessed Dec. 7, 2021).

[39] Compare Danimer's current list of press releases (Danimer Scientific, Inc. Press Releases, p. 6, at https://ir.danimerscientific.com/news/press-releases?page=6 (last accessed Dec. 7, 2021)) with a web archived version at https://web.archive.org/web/20150905204205/http://www.mhgbio.com/mhg-ceo-pereira-announces-series-of-funding-to-university-of-georgia-labs/ (last accessed Dec. 7, 2021).

their own specialty labs at the University of Georgia in order to increase R&D opportunities. The funding contributions will allow [Danimer] to further optimize biopolymer applications and formulas through targeted R&D projects." The University of Georgia corroborated the funding in a February 26, 2018 article that announced that Danimer "provided financial support to several UGA faculty members who are working with the company to test and improve their products. Recipients include Jason Locklin, Jenna Jambeck and Mark Eiteman."[40] In a Facebook post made by Danimer on February 4, 2016, Defendants also posted a picture of CTO Phil Van Trump and Dr. Joe Grubbs (of Danimer) accepting an award from the University of Georgia for "broadening R&D support".

100.   While the University of Georgia researchers, supported by Danimer, published articles supportive of Danimer's general PHA environmentally friendly representations, independent research shows that PHAs have limited benefits. These benefits are mostly under non-traditional disposal methods including compost and traditional soil. For instance, an academic paper, "Biodegradation of Wasted Bioplastics in Natural and Industrial Environments: A Review," showed how polyhydroxyalkanoates ("PHAs") – Danimer's key product sold under the brand name Nodax® and derived from plant-based feedstock – actually have limited benefits.[41] The paper noted that PHAs have limited benefits, generally tied to non-traditional disposal methods including compost and traditional soil. In aquatic environments, the researchers observed less than

---

[40] "Plastic Products Are Ubiquitous In The Modern World." https://impact.uga.edu/success_story/plants-to-plastics/ (last accessed Dec. 7, 2021).

[41] "Biodegradation of Wasted Bioplastics in Natural and Industrial Environments: A Review," Jul. 27, 2020. https://www.mdpi.com/2071-1050/12/15/6030 (last accessed Dec. 7, 2021).

10% of biodegradability over a period of one year while biodegradation was in general below 50% after one year in a soil environment.[42]

**F.      Defendants Overstated Production Capacity and Planned Growth of Production Capacity of Its Nodax® PHA**

101.    Throughout the Class Period, Defendants pitched investors on a Phase I nameplate production capacity of 20 million pounds of Nodax® PHA and the Phase II addition of 45 million pounds. For example, in the October 2020 Investor Presentation, Defendants presented touting their 2020E estimated 10 kilotons (or 22 million pounds) "PHA Capacity" compared to their next closest competitor with half that "PHA Capacity" :



---

[42] *Id.*

102.    But both Spruce Point and Muddy Waters called Danimer out on these representations, estimating based on their investigation and analysis that actual production was as low as 18% of Danimer's represented capacity.

103.    Confidential Witnesses corroborated these estimates putting production at less than 500,000 pounds per month by July 2021, without considering waste which could be a third of that amount.

104.    For example, CW5 served as a Quality Assurance /Quality Control Microbiology Technician at Danimer from February 2021 to July 2021. CW5 worked in the Quality Department analyzing Danimer's Nodax® product for any contaminants or impurities, and reported to the Lab Manager, Thomas Anderson, who in turn reported to the Plant Manager, Kevin Welsh. CW5 said that the production goal they were given by management led by Kevin Welsh, the plant manager, was to produce 500,000 pounds of PHA per month. He remembers only reaching this goal one time during his time at Danimer and falling short all the other months he was there. Production goals were discussed at daily meetings, usually led by the Operations/Production Manager, Genia Taylor-Harris. Usually, the Lab Manager and one or two other lab employees were present at the meetings. The production goals were very optimistic and left little room for error. Managers were always trying to shave time off the production process when realistically it required more time than anticipated due to manufacturing problems that would arise such as contamination. CW5 did not think that this compromised the quality of the PHA, but it hurt production goals. If something didn't go as planned, it slowed down the production time.

105.    Similarly, CW4 was a former employee of Danimer from April 2017 through July 2021. In 2021 CW4 worked in the Kentucky facility making the PHA. CW4 stated that at most the three fermenters that made up Phase I of the Kentucky expansion could produce an estimated

80,000 pounds of PHA in one run, and that the Company would have to run 5 runs each fermenter in the month (400,000 pounds). Even then, about a third of the runs were unusable or would not occur due to scheduling push-backs within operations.

106.    CW4 also stated the Danimer gave up on retrofitting the additional fermenters at the Kentucky plant because Danimer could not make the science work for the retrofit. The expansion was aspirational. CW4 stated the intention was there to use the additional fermenters when the plant was bought and retro-fitted, but was not brought online because the retrofit would have been too expensive to make the science work.

107.    According to CW2, who has over 30 years of experience working in extrusion manufacturing since CW2 was 18 years old, Danimer's PHA production was slow and had continuous problems with the science behind it. Specifically, Danimer could not get the heating process right and the product would burn. The properties and color of Nodax® were never consistent after the manufacturing process and a large amount of product had to be discarded. CW2 stated that the product was off-quality, was missing components, and needed to be re-ran through the extrusion process. In sum, CW2 characterized Danimer's operations as a fly by night operation.

108.    After the Class Period and after having been called on discrepancies, Danimer admitted that nameplate production capacity was half the amounts represented, stating that the numbers represented a 50/50 mix of PHA and PLA as the "finished product", not "neat PHA." But investors were not interested in non-biodegradable PLA (it does not readily biodegrade in temperatures below 60 degrees Celsius or 140 degrees Fahrenheit) as a product, and that was not the product that Danimer represented its customers wanted.

**G.    Defendants Misrepresented the Demand for their Nodax® PHA, Including the True Nature of Some of their Most Prominent Customer Relationships and Omitted the Indeterminate Nature of their "Take Of Pay" Contracts**

109.    Throughout the Class Period Defendants pitched to investors that it had "blue chip" customers/partners, including PepsiCo and Nestlé, with whom it was "sitting on over $200 million of take or pay off agreements" that sold out its current production, as well as the capacity of Phase II or its Kentucky expansion, and that based on its current pipeline, the new Georgia plant was on pace to be sold out without any additional customers. In reality these agreements were indeterminate, with escape clauses, for R&D purposes and did not represent true or lasting strong demand as revealed by subsequent revelations.

110.    For example, former employees question the demand representations of the Company. One former employee thought that Danimer was not "sold out" and provided facts to support that conclusion. CW3 was a Warehouse Technician at Danimer from August 2020 to June 2021 and worked in the shipping and receiving department in Danimer's Kentucky facility. CW3 was responsible for packaging and shipping out Nodax® product. CW3 reported to Kevin Welsh, the Plant Manager, and to Tyler Hermenitt, the Maintenance Coordinator.

111.    CW3 stated CW3 did not believe Danimer was sold out of Nodax® product and that when CW3 left in June 2021, Danimer was still "going heavy on production" but a large amount of product was stored in an off-site warehouse in Winchester, Kentucky, which was in poor condition and was contaminated with mice and critters. CW3 stated that these off-site warehouses were so were full it had to be stored in the manufacturing facility when the off-site facilities were full. Sometimes the employees had to maneuver around sacks of Nodax® because the manufacturing facility was over-filled with finished product.

112.    According to another former Danimer employee interviewed by Spruce Point, Danimer's supposed partnerships were "**all about name dropping.** We were already working with

Pepsi back then. ***We had big clients but they were small orders***…. I am amazed the Company is worth so much money now and it's still doing the same thing." Spruce Point also noted that Pepsi and Nestlé's leadership (who had key relationships with Danimer) have departed from their respective companies.

113.    So too, the Muddy Waters Report found evidence that the "purported take or pay contracts reportedly (and logically) do not obligate the customers to purchase material if it does not meet customer requirements or is not produced." Rpt. at 7. Thus, take or pay, is maybe take or maybe pay. Carson Block, Muddy Water's founder, confirmed this in a January interview, which was conducted after Muddy Waters and Danimer had engaged in discussion. See https://www.zer0es.tv/ beginning after the 11-minute mark,

114.    CW1 echoed the finding that being "sold out" was an overstatement, stating that PHA was way too expensive (10 to 20 times costs of traditional plastics) for real commercial usage at scale, and ***customers PepsiCo and Nestlé only purchased PHA for testing purposes, not for mass commercial products***. CW1 stated that customers PepsiCo and Nestlé only purchased PHA for testing purposes, not for mass commercial products. Around the time CW1 left, Nestlé was planning a commercial product, but PHA water bottles made the water taste horrible, so they could not release a commercial product until Danimer improved the quality of the plastic it was giving them. Another large project was getting the quality of the plastic to acceptable levels, which we could only do with small amounts of product, i.e. at the smaller Bainbridge facility not meant for commercial production. CW1 stated that if Nestlé or Pepsi had a biodegradable bottle, you would know about it from them. Nestlé really wanted to improve their public image through using biodegradable bottles.  Rather, CW1 stated that Straws were the only commercial PHA product of which CW1 was aware.

115.    The highly touted relationship with PepsiCo was also misleading. While in the run-up to the De-SPAC Transaction, Defendants boasted about a purported PepsiCo equity stake in the Company, Defendants' March 2021 Investor Presentation inexplicably omitted any mention of PepsiCo's ownership, and Bloomberg records do not list PepsiCo as a major shareholder, suggesting that PepsiCo sold or otherwise no longer holds a significant position in Danimer stock.

116.    Corroborating this, CW4 stated that at the time of the Spruce Point report noting that PepsiCo sold its stake in Danimer, a Danimer executive told CW4 that PepsiCo was rumored to have sold its shares because Danimer was not meeting production it had promised to Pepsi. CW2 appears to corroborate this stating while Danimer had orders from Pepsi and Win Plastics, Danimer could not manufacture it consistently enough to fulfill the orders.

117.    Moreover, as to PepsiCo, the Muddy Waters Report states that Danimer has misleadingly marketed a PepsiCo PLA-based resin bag as actually being made from Danimer PHA. For example, Danimer's "investor presentation misleadingly features a DNMR PepsiCo bag that won a bioplastics award in three slides. DNMR previously developed this bag with PepsiCo, but it uses PLA. The bag reportedly took almost 10 years to develop. One of the misleading slides that strongly implies that this PLA bag is a 'PHA Customer Collaboration Case' is below[.]" Rpt. at 10. Thus PepsiCo's commitment appears to be more PLA related more than that it has found

any    acceptable    use    for    PHA.    For    example,    from    the    investor    presentations[43]:



118.    As to Mars Wrigley, the Muddy Water Report found that "in all likelihood, the earliest Mars Wrigley will purchase commercial quantities of wrapper using DNMR PHA is 2025- if ever." Muddy Waters states that it has a "well-placed source familiar with Mars Wrigley's sustainable packaging development programs" who has stated that "there are critical issues to solve before [Mars Wrigley] can produce packaging using DNMR's PHA at scale" and that "DNMR and Mars Wrigley [will only be] able to do so no sooner than 2025." Id. at 9. Muddy Waters reports that it is "possible that the program never comes to fruition[.]" Id. Muddy Waters had the following

---

[43]https://d1io3yog0oux5.cloudfront.net/_3cd269730dddc0993ea4420eaeff3e8a/danimerscient ific/db/1089/9658/pdf/Project+Green+PIPE+Presentation__Final.pdf (Last visited January 18, 2022).

conversation with its well-place source at Mars Wrigley regarding Danimer's PHA-based compostable packaging:

> MW Analyst: It sounds like a lot more development is needed before there'll be kind of a sample package that can start to be tested. Do you have an idea of what the timeline is?

> Mars Source: So, that's a good question. Because to give you an idea the R&D team internally involved at Mars, that is, brough to the Danimer project, was an R&D team that it's really for a long-term project, like 5 to 10 years.

> MW Analyst: Hmm. Okay, so we're looking at a fairly long time horizon.

> Mars Source: I mean, 2025, I hope we will have something by 2025, yes.

> MW Analyst: Okay, but you're already like two years into it, right?

> Mars Source: Yes, we are, but the two years were mainly negotiating the partnership, so, uh, of course, there were some materials. I mean we already have some materials so that they were tested, et cetera, but, I think like we are not there for having the packaging.

> MW Analyst: Yeah, it's always amazing to learn like how much work is involved in trying to develop a package, which seems like something very simple, but it's actually just amazing how much R&D and development, and how many brains and minds and people; you know how many hours go into these types of projects, it's incredible.

> Mars Source: I can tell you it's huge, its huge. And keep in mind, for a food company. We cannot compromise the quality of our goods. You know, we cannot allow ourselves to go into the market with the packaging that we might have a challenge with the content. It might be easier for other types of packaging that you don't pack food. But in our case, it's extremely complicated.

119.   One former employee noted undisclosed risks that Danimer has not revealed greatly impacting or having impacted many of Danimer's customer relationships involving food packaging. CW3 stated that Danimer lacked food handlers' certifications and also did not have

certain environmental certifications. CW3 stated that the food handlers' certification was necessary because customers such as possibly Bacardi, Pepsi, or Win Cup Plastics requested that Danimer obtain food grade certifications or they would back out of their contracts.

120.   The Muddy Waters Report details evidence that demand for Danimer's PHA products are limited and seemed weak based on a survey of products. Rept. at 5. Specifically, Muddy Waters was only able to find straws and shopping bags made with Danimer's PHA available for sale. *Id*. There was no evidence of other PHA-based products produced by Danimer such as "single-serving coffee pods, water bottles, plastic caps, snack foods packaging, clam shell containers, f&b utensils, diapers, etc." *Id*. at 5-6. Muddy Waters conducted a web search for PHA-based product offerings for Danimer's announced customers (WinCup phade, UrthPact, CPG Biolo, and Eagle Beverage) but only found that these companies only offered PHA-based straws; only one customer company, CPG, offered single use PHA-based bags and films. The logical conclusion is that Danimer's PHA-based products had limited demand because of the Company's limited PHA product application to straws.

121.   Finally, completely contradicting Danimer's claims of "sold out" demand for PHA, is the fact that in just two quarters after the DeSPAC vote and Transaction was complete, Danimer suddenly changed its tune and revamped its course – as so many SPACs do that make outrageous and unsupportable claims. On July 28, 2021, Danimer announced that it was no longer spending the $385 million it received from investors on increasing PHA production capacity. Instead it was going spend $152 million of investors' money on purchasing a small gutted out company with about 10 employees named Novomer with only a pilot plant (and no proven commercial size production capabilities) which made a less environmentally friendly PHA called "p(3HP)" or Rinnovo and in the process would cut its expansion of production capacity of PHA in half. The

new plan substituted Rinnovo of Danimer Nodax® PHA to be used in up to 30% of Danimer's blends, supposedly "freeing up Nodax"?



122.    Even more confounding is the fact that Danimer admits this new Rinnovo product has a "narrower range of properties", fewer applications and can be non-environmentally friendly petro-based. All of this clearly evidences the lack of commitment of customers to PHA and concern by Danimer of scaling its own technology:



**H.  Defendant Failed to Disclose Material Red Flags in Defendant Croskrey's Background Calling Into Question His Honesty and Integrity**

123.    A key element of the Proxy Statement/Prospectus was a description of the proposed management of the Company after the De-SPAC Transactions closed.  Defendant Croskrey would be the CEO and Chairman of Danimer if the De-SPAC Transaction were approved by shareholders.

124.    The background description of Defendant Croskrey portrayed his business experience in a favorable light, was positive and served as an inducement for investors to vote to approve the De-SPAC Transaction.  In particular, the Proxy Statement/Prospectus represented the following positive facts concerning Defendant Croskrey's experience at Armor Holdings Products, LLC ("Armor"), a manufacturer of military and police personal safety equipment:

From 1999 to 2005, Mr. Croskrey served as the president and chief executive officer of Armor . . . During such tenure its annual revenue increased from $45 million to over $300 million as a result of him overseeing the acquisition and integration of 13 companies and implementing associated organic growth initiatives.

125.    However, undisclosed in the Proxy Statement/Prospectus were material, negative facts concerning Defendant Croskrey's tenure as CEO of Armor.  In particular, in 2008, Armor paid $30 million to the U.S. Department of Justice ("DOJ") in 2008 to settle charges that Armor knowingly sold defective bullet-proof vests during Croskrey's tenure.[44] Armor's parent company, Armor Holdings, Inc. was also charged by the SEC with violating the Foreign Corrupt Practices Act ("FCPA") by participating in a bribery scheme from 2001 through 2006 that involved an attempt to obtain contracts to supply armor to U.N. peacekeeping missions.[45] Armor Holdings, Inc. ended up paying nearly $5.7 million in disgorgement, prejudgment interest and penalties and also agreed to pay a $10.29 million fine to settle a parallel criminal investigation announced by the DOJ.[46]

126.    These were material negative facts that a reasonable investor would have wanted to know about the Company's proposed CEO and Chairman.

I.    **Defendants Failed to Disclose Danimer's Internal Control Deficiencies and Weaknesses**

127.    During the Class Period, Defendants warned of the potential, future risk that "if" the Company's "auditors identify a material weakness or significant deficiency in the internal

---

[44] "Armor Holdings Products LLC Pays U.S. $30 Million for the Sale of Defective Zylon Bullet-Proof Vests," Oct. 7, 2008. https://www.justice.gov/archive/opa/pr/2008/October/08-civ-901.html (last accessed Dec. 10, 2021).

[45] "SEC Charges Armor Holdings, Inc. With FCPA Violations in Connection With Sales to the United Nations," July 13, 2011. https://www.sec.gov/news/press/2011/2011-146.htm (last accessed Dec. 10, 2021).

[46] *Id.*

control over financial reporting", the Company *could* incur additional costs rectifying those issues, and the existence of those issues *could adversely affect* Danimer's reputation or investor perceptions of it.

128.   Defendants made this representation in the Registration Statement, the Feb. 2021 Registration Statement, and the 2020 Annual Report, which was filed on March 30, 2021.

129.   Moreover, attached to the 2020 Annual Report were certifications under Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications") that were signed by Defendants Croskrey and Dowdy that represented they disclosed "based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions) . . . All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information . . . ."

130.   On May 14, 2021, just weeks after the filing of the 2020 Annual Report, the Company disclosed that the 2020 Annual Report would be restated due to a material weakness in the Company's internal controls, an admission that the Company's prior representations of a potential, future risk and SOX Certifications were materially false and misleading at the time they were made:

> "we are restating in this Amendment our Consolidated Financial Statements as of and for the period ended December 31, 2020 to reflect the change in accounting treatment (the "Restatement"). In connection with the Restatement, we reassessed the effectiveness of our disclosure controls and procedures for the period affected by the Restatement. As a result of that reassessment, **we determined that our disclosure controls and procedures were not effective because we identified a material weakness in our controls over the accounting for complex financial instruments, such as the Private Warrants**. For more information, see Item 9A."

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

131.    During the Class Period, Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances[47] under which they were made, not misleading, and Defendants knew, or at least recklessly disregarded, that their representations were false and misleading at the time they made their representations, for the following reasons as set forth in more detail in Sections IV E-I above: (i) Defendants misrepresented the biodegradability of its Nodax® PHA product; (ii) Defendants overstated Danimer's production of PHA capacity and planned capacity by at least 50%; (iii) Defendants misrepresented the demand for their Nodax® PHA, including true nature of some of their most prominent customer relationships and omitted the indeterminate nature of their "take of pay" contracts;  (iv) Defendants omitted material adverse information about Defendant Croskrey's background; and (v) Defendants omitted that Danimer had deficient internal controls.[48]

### A.     October 5, 2020 Press Release and 8-K Filing Announcing De-SPAC Transaction Agreement with Live Oak

132.    The Class Period begins on October 5, 2020, when Danimer and Live Oak announced that Danimer had entered into a definitive merger agreement with Live Oak (the "October 5, 2020 press release").  The October 5, 2020 press release, filed as part of the Company's filing on Form 8-K, represented the following concerning the biodegradability of Nodax®:

> The Company's signature polymer, Nodax™ PHA (polyhydroxyalkanoate), is a ***100% biodegradable***, renewable, and sustainable plastic produced using canola oil as a primary feedstock. Nodax™ PHA is the first PHA polymer to be certified as marine

---

[47] To the extent a false or misleading statement by Defendants that is identified in the paragraphs above is not repeated in this section, it is incorporated by reference.

[48] The statements quoted in this section in ***bold and italicized*** typeface are materially false or misleading for the reasons set forth herein. Additionally, as specifically indicated below, many of the identified statements are alleged to have been false or misleading by omission. Thus, additional text is provided for context and in support of these statements' allegedly omissive nature.

degradable, the highest standard of biodegradability, which verifies the material will fully degrade in ocean water without leaving behind harmful microplastics. As a result, Nodax™ offers a better beginning-of-life and end-of-life cycle than any of today's traditional plastics, *eliminates the need for recycling and can replace the 80% of plastics that are never recycled or incinerated*… .

[Defendant Croskrey:] We are well positioned to further expand our *100% biodegradable products* to a wide range of plastic and specialty applications, with a long runway for profitable global growth… .

133.    Defendants' representations concerning the biodegradability of Nodax® was materially false and misleading for the reasons set forth in Section E above.

134.    The October 5, 2020 press release represented the following concerning Danimer's production at its facilities and its relationship with its partners:

> *Danimer is currently producing and shipping Nodax™ at an industrial scale level from its existing facility in Winchester, Kentucky*. *The company has partnered with key plastics manufacturers and consumer products companies such as PepsiCo, Nestlé, Genpak, WinCup, Columbia Packaging Group and Plastic Suppliers Inc.* as they transition a wide variety of plastic applications, including straws, food and beverage containers, flexible packaging, agricultural and medical applications, among others. Based on signed and pending contracts, *the company is fully sold out of all production in its Kentucky facility and will use their increased capital base to significantly increase production, to meet the current and long-term demand of its customer base*.

[Defendant Croskrey:]

We are at an inflection point in our growth trajectory and this transaction will fuel the next phase of our rapid commercial expansion. Our *research-based approach* to creating *environmentally responsible solutions* has *attracted a blue chip, multinational customer base* and our partnership with LiveOak will allow us to further scale production to meet strong customer demand for our technology.

[Defendant Hendrix:]

"Danimer represents a unique and compelling investment opportunity *with take-or-pay contracted revenue from a blue-chip client base for fully bio-degradable plastic* resin that addresses one of the world's most significant environmental challenges. PHA adoption is benefiting from powerful tailwinds as the result of wide-spread corporate commitments and evolving consumer preferences for *eco-friendly packaging solutions that address the worldwide problem of plastic waste*. We believe Danimer is poised for rapid and sustained growth with a fully financed capacity expansion plan and proprietary customer applications."

135.   The foregoing statements were materially false and misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Sections IV F and G above.

**B.    Danimer's October 5, 2020 Investor Presentation and Investor Conference Call [49]**

136.   On October 5, 2020, Danimer and Live Oak disseminated an investor slide presentation ("October 2020 Investor Presentation") and conducted an investor conference call in which Defendants Croskrey and Hendrix participated.[50]  Defendant Hendrix stated:

We are very excited to announce Live Oak's planned business combination with Danimer Scientific which has an implied enterprise value of approximately $525 million. This business combination will bring to market a high growth, next generation bioplastics company with *a fully-commercialized solution t*o the major worldwide environmental issue of single-use plastic driven pollution.

---

[49] Defendants' false or misleading statements in the October 2020 Investor presentation are repeated with some changes in Danimer investor presentations dated February 3, 2021, March 29, 2021, May 17 2021, August 16, 2021, and November 16, 2021, showing a correction or deletion of slides in response to the short-seller reports and are incorporated by reference herein. These presentation can be found at https://ir.danimerscientific.com/financial-information/presentations (Last visited January 18, 2022).

[50] The transcript is filed with the SEC at https://www.sec.gov /Archives/edgar/data/1779020/ /ea127764ex99-2_liveoak.htm   and   posted   on   Live   Oak's   website   at https://www.liveoakacq.com/s/Live-Oak-Danimer-Scientific-Merger-Agreement-Investor-Call-Transcript.pdf. The October Investor Presentation referred to as slides in the transcript is posted on Live Oaks Website at https://www.liveoakacq.com/s/UPDATED_Project-Green-PIPE-Presentation_02032021_vFiling-Part-Consolidated.pdf.

Danimer is a leading producer of materials that offer a better beginning-of-life and end of- life cycle than any of today's traditional plastics. The company's signature polymer is its branded, canola oil-based Nodax PHA. ***PHA is a 100% biodegradable***, renewable, and sustainable plastic feedstock alternative for usage in a wide variety of plastic applications including straws, food and beverage containers, flexible packaging, agricultural and medical applications, among others. ***Importantly, Danimer's PHA polymer is the first commercially available PHA in the world to be certified as marine degradable, which is the highest standard of biodegradability. It means the material will fully degrade in ocean water without leaving behind harmful microplastics***.

This transaction will allow Danimer to advance and accelerate the commercialization of its PHA products ***to meet existing demand from customers and partners***. Upon completion of the transaction, Danimer is expected to have approximately $385 million in cash and be fully financed to expand its currently oversold facilities **to** further address demand within a 500 billion pound market that is growing at an 11% compound rate. The expanded production is expected ***to support organic EBITDA growth to over $165 million by 2025***, resulting in an implied transaction multiple of 3.6 times, an attractive entry point relative to peers…..

One of our consultants, McKinsey, commented early on that PHA is the best end-of-life answer for single use plastics in particular, ***as there are no other marine degradable materials available with the proper performance characteristics***. Even with the clearly visible market acceptance that PHA has achieved, the bioplastics industry has not been able to keep pace with demand resulting from the powerful tailwinds of corporate sustainability commitments, government regulation, and consumer awareness of the environmental impact of plastic waste. ***Whether it's the turtle with a straw in its nose or the pictures of floating islands of plastic in the ocean, virtually everyone recognizes that this is a problem that has to be addressed and regulation is starting to emerge as a result***…..

…It took 13 years working with the patents that they originally acquired from Procter and Gamble ***to get to the point where they have customer applications that are supported by contracts, combined with the ability to produce at commercial scale***…..

Importantly, these and other customer relationships that are in the works, ***provide Danimer with take-or-pay contracts that are a huge differentiator in the polymer world***. This is in an industry that typically does not sell via forward contracts and ***Danimer is***

*currently in receipt of contracts that have fully sold out its current production capacity, as well as the capacity that will come online with the phase two plant expansion we will discuss shortly.*

It was important to both Live Oak and Danimer to **de-risk this opportunity from a capital standpoint so that the in-place customer demand was matched by in-place capital.** Post merger, the company **will be fully financed for the cost of both the phase two expansion and a new greenfield facility that the company believes will allow it to achieve over $165 million of EBITDA by 2025 without the need to go back to the capital markets. Current demand expressed by existing customers is far larger than what's being presented here, but we're putting in front of investors a fully financed business plan that should instill great confidence in the company's ability to execute the plan.**

137.    Defendant Croskrey represented the following concerning the biodegradability of

Nodax:

I'll start off on Slide 7 with a quick background on PHA to give you some context on what we produce….

When we think about polymers for plastics, what you want to know is whether it is renewable or nonrenewable, and what happens at the end of its life. Obviously, fossil fuels are nonrenewable and typically don't go away; they're accumulating in landfills and in nature. And some biopolymers don't go away either. However, those that do can get industry certifications for five different environments. The products that are on the market today are all industrially compostable, which is the easiest standard to achieve, and it means they have to find their way into an industrial compost facility where they can break down in the presence of high heat and moisture. The next and more difficult standard is home compostable, which is the same thing but requires less heat. Then there is soil degradable, where you don't need any heat; it just has to be broken down by bacteria. ***Then fresh water and finally marine degradable are the most difficult and highest standards to achieve because there's less and less bacteria. Danimer PHA products are certified as marine degradable….***

On Slide 11, we talk about are our base business in the upper right hand corner…

The customers understand that it is a symbiotic relationship, so to make it work, they have taken multiyear time horizons and **100% take-or-pay contracts on our products to help us drive costs out**

**of our business as we scale up production to meet their needs.**
We have contracts with large companies underpinning our capacity
build-out and many more contracts in advanced stages of discussion
which we expect will build up our revenues to over **$500 million in
2025**….

At this time, we are the only commercial scale PHA company
building capacity, we believe, globally. ***Our product can be
produced efficiently*, giving us a dependable, user friendly
product with proven applications.** And finally, ***the long-term
customer contracts have allowed us to move forward on our new
capacity***. That's evidenced by the contracts that you'll see on Slide
15.

We'll talk about Kentucky on Slide 16. The contract structures I just
discussed were key to getting the phase one build out of our
Kentucky facility off the ground. We were small, so without a
contract there was no viable way to build a plant, and without a plant
there was no impetus to get the customer to sign. As I mentioned
earlier, in 2018 we partnered with some customers …We used that
money plus advance payments from certain customer contracts to
build out phase one of the project, **which will generate about 20
million pounds** of finished product once fully ramped up. With the
proceeds from this merger transaction we will start on phase two,
**which will bring the plant to its full capacity of about 65 million
pounds** of finished product.

If you look over at the upper right hand corner of that photograph,
you'll see some green space. That's where we're planning to build
the greenfield facility that is expected to add an additional 125
million pounds of finished product. On Slide 17, the site preparation
and engineering work for the greenfield facility are expected to
occur in 2021. We plan to break ground in the first quarter of 2022
and expect to have that facility come online in the fourth quarter of
2023. **Based on our current pipeline, the greenfield plant is on
pace to be sold out without any additional customers.** With
ongoing productivity improvements expected through 2027 and
onsite space for further expansion, we have a long runway for
growth from our facilities.

On Slide 18, we further detail the phasing of our capacity build outs.
**Risk is minimized due to customer production commitments
providing a visible ramp-up in expected PHA demand across a
broadening field of applications and mandates**. Importantly, **our
expected growth will be fully financed from this merger
transaction without the need for additional equity to meet our
targets.**

**On Slide 19, we've got an excellent leadership team.** Our leaders have been with us since the beginning with most having joined us with years of industry experience. They've been here every step of the way and they're the ones that have helped develop our way of doing business to get us this far. **Our team is comprised of acknowledged leaders in the bioplastics space and are recognized for having made a measurable difference in this industry**. I am grateful for this team and all the people at Danimer that have allowed us to build this firm launch pad that we have today.

138.   Defendant Hendrix then continued:

There are several important items to highlight. First, Danimer is not a company that's going to burn cash through operations. All of the transaction proceeds going on the balance sheet will be used to fund the phase two expansion and the greenfield facility. ***Second, demand is in place so this is not a 'build it and they will come' story.*** From a capital market perspective, these two aspects provide a de-risked pathway to over $165 million of projected EBITDA.

139.   The October 2020 Investor Presentation included a slide that represented PepsiCo

was a Danimer PHA customer that would help drive it to 2025E PHA revenue of $403.4 million:



140.   .At that time PepsiCo was not a commercialized PHA customer. Later Pepsi would introduce a bag made with PLA, not PHA[51]. This graphic along with other statements highlighting PepsiCo's soon to be sold equity stake and the R&D work with Danimer created the false impression that Pepsi was using or committed to using Danimer's PHA in its products.  To the extent PepsiCo was using PHA, it was only developmental or R&D work.

141.   Further, on October 5, 2020, Defendants caused LOAK to file with the SEC on its Form 425 an interview with Cheddar News and Danimer CEO Stephen Croskrey.  During the

---

[51] Danimer admits this on September 17, 2021 in responding to Muddy Water Report. https://www.businesswire.com/news/home/20210917005097/en/Danimer-Scientific-Comments-on-Misleading-Muddy-Waters-Report

interview, Croskrey stated that "*[o]ur particular polymer is marine degradable, which means if it finds its way into the ocean, it will still go away.*"

142.   The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Sections IV E-G above.

## C.   Defendants' October 6, 2020 Call with TD Ameritrade

143.   On October 6, 2020, Defendant Croskrey participated in a discussion with TD Ameritrade.[52] Defendant Croskrey represented the following concerning the biodegradability of Nodax®:

> The single use plastics market is part of an 800 billion pound plastic market. About 500 billion pounds of that, we believe, can be replaced with biopolymers. And most of those are single use plastics like what you're showing the video of. These are things that get used once and then they become trash, and a lot of them are not finding their way even into landfills.
>
> And even in the landfill, they won't break down. So, the way that PHA, this polymer that we're producing, polyhydroxyalkanoate, it's renewable and it's made by feeding vegetable oil to bacteria, who store this polymer, PHA, as energy reserve. I call it bug fat. The scientists don't like that, but I call it bug fat, because it works just like humans. If we eat more than we need, we get fat. So, we extract that energy reserve from inside of the microorganism, and that is the plastic resin. ***That's the beauty of this. When you make a fork or a straw or whatever you want to make out of it, if it finds its way into the wrong place, bacteria will consume it. It's awesome.***

144.   The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Sections IV E above.

---

[52] https://ir.danimerscientific.com/sec-filings/all-sec-filings/content/0001213900-20-030358/0001213900-20-030358.pdf

**D.      Danimer's October 5, 2020 Investor Presentation (Attachment to Form 8-K)**

145.     On October 5, 2020, the Company filed its investor presentation as an attachment to a Form 8-K with the SEC ("October 2020 Investor Presentation"). In this presentation, the Company stated that Nodax® is "[*f]ully degradable in 12-18 weeks after the product is discarded*," and that it is "[a]ble to effectively biodegrade in both anaerobic and aerobic environments such as a waste treatment facility or the ocean."[53]

146.     The October 2020 Investor Presentation represented that the Company represented Danimer's "***Rapidly Growing Blue Chip Customer Base with Take-or-Pay Contracts has led to [a] Fully Sold-Out Position,***" and represented that in 2020 Danimer would produce PHA finished products volume of 2 million pounds and $6 million in sales for 2020, implying a PHA average selling price of $3.00 per pound. Moreover, to meet this supposed customer demand, Danimer projected that completion of their Phase I build-out would allow Danimer to produce approximately 20 million pounds of finished PHA product per year and the capacity of the plant can be expanded by another 45 million additional pounds of finished PHA product, bringing total plant capacity up to approximately 65 million pounds per year, by investing another $100 million in the future for the Phase II expansion of such facility.

147.     Defendants also made the following statements regarding Danimer's purported take-or-pay contracts and demand for PHA:

> "Intense demand from blue chip multinational customers has resulted in 100% committed take-or-pay contracts for current production and Phase II capacity build-out"

---

[53]     Investor Presentation, Danimer Scientific Inc. (Oct. 2020), https://www.sec.gov/Archives/edgar/data/0001779020/000101376220000051/ea127764ex99-3_liveoak.htm (last visited January 16, 2022)

"Rapidly Growing Blue Chip Customer Base with Take-or-Pay Contracts has Led to Fully Sold-Out Position through Phase II Capacity Addition"

148.   Defendants also repeatedly touted a supposed equity investment by PepsiCo. The Company's October 2020 Investor Presentation, which was reposted on Danimer's website on February 3, 2021, noted an "Equity Investment from Pepsi". Defendants also stated that PepsiCo "[o]wns 6% of Danimer's common equity."

149.   Defendants also claim a misleading production capacity set forth and touted Danimer's experienced management with a proven track record, including Defendant Croskrey

150.   The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Sections IV E-H above.

**E.   Danimer's October 15, 2020 Press Release Announcing United Soybean Board Grant**

151.   On October 15, 2020, Danimer issued a press release stating that the Company had received a United Soybean Board grant to support biodegradable plastic production. This release provided, in relevant part, that Danimer had received a $350,000 grant to investigate the use of high-oleic soybean oil in the production of PHA and that "PHA was verified as an eco-friendly alternative to petrochemical plastics by the University of Georgia (UGA) and the UGA New Materials Institute in a 2018 study. ***The material reliably degrades without leaving behind harmful microplastics in a wide range of environments, including home compost units, landfills and oceans***."

152.   The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section IV E above.

**F.    Bacardi/Danimer October 21, 2020 Press Release Announcing 100% Biodegradable Spirits Bottle**

153.    On October 21, 2020 Bacardi and Danimer issued a joint press release entitled "Bacardi Fist in Fight Against Plastic Pollution With 100% Biodegradable Spirits Bottle."[54] The subheadings included "World's most eco-friendly spirits bottle will biodegrade in 18 months" and "Bacardi swaps crude oil for seed oil as petroleum-based plastics are replaced by plant-based 'wonder material' – a silver bullet in fight against plastic pollution". The press release stated in part**:**

> Hamilton, Bermuda, October 21, 2020 – Bacardi, the world's largest family-owned spirits company, has made a giant leap forward in the fight against climate change and plastic pollution today, as it unveils plans to put the world's most sustainable spirits bottle on shelf by 2023.
>
> **The new 100% biodegradable bottle** will replace 80 Million plastic bottles – 3,000 tons of plastic – currently produced by Bacardi across its portfolio of brands every year. This revolutionary move by Bacardi is possible thanks to its close collaboration with Danimer Scientific, a leading developer and manufacturer of biodegradable products. Petroleum-based plastics used by Bacardi today will be replaced by Danimer Scientific's Nodax™ PHA, a biopolymer which derives from the natural oil of canola plant seeds. While a regular plastic bottle takes over 400 years to decompose, the new spirits bottle made from **Nodax™ PHA will biodegrade in a wide range of environments, including compost, soil, freshwater and sea water, and after 18 months disappear without leaving behind harmful microplastics**.
>
> **As well as the new 100% biopolymer spirits bottle**, Bacardi is also creating a sustainably sourced paper bottle. **By integrating the Nodax™ PHA polymer, this alternative solution will have equally strong environmental credentials** while ensuring the quality and taste of the spirit inside a bottle made of paper is as exceptional as one made of glass.
>
> Jean-Marc Lambert, Senior Vice President, Global Operations for Bacardi, said: 'When we set ourselves the goal of **being 100%**

---

[54] https://www.bacardilimited.com/media/news-archive/bacardi-first-in-fight-against-plastic-pollution-with-100-biodegradable-spirits-bottle/

**plastic free by 2030**, we knew that it would take ground-breaking advances in packaging design to make it achievable, **and that's exactly what's happening through our partnership with Danimer.'** … …

Nodax™ PHA **was verified as a truly biodegradable alternative to petrochemical plastics by the University of Georgia (UGA) and the UGA New Materials Institute in a 2018 study.** Danimer Scientific currently uses the material for a wide range of applications, including thermoformed trays, drinking straws, flexible and multi-layer film packaging, coatings, disposable cutlery, and more.

"Nodax™ PHA is one of the most promising eco-friendly materials in the world today because **it delivers the biodegradability that consumers demand** without losing the quality feel they receive from traditional plastic," said Scott Tuten, Chief Marketing & Sustainability Officer at Danimer Scientific. **"The material provides the best of both worlds,** and we look forward to working with Bacardi and incorporating PHA into their iconic packaging."

154.    The press release contains an "about" paragraph of Danimer Scientific and a link to its website. Danimer also posted a link to the press release on its Facebook page on October 22, 2020 stating, "Danimer Scientific is working with Bacardi in development of the world's first fully biodegradable spirits bottle, which is just the beginning of their journey to be ***100% plastic-free*** by 2030! Want to know more about the world's most sustainable spirits bottles set to be on shelves by 2023? Click here: https://www.bacardilimited.com/media/news-archive/bacardi-first-in-fight-against-plastic-pollution-with-100-biodegradable-spirits-bottle/."[55]

155.    The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section IV E above.

---

[55]    https://www.facebook.com/danimersci/photos/a.484872841544714/3714839435214689) (last accessed January 10, 2022).

**G.    Danimer's November 17, 2020 Press Release Announcing Eagle Beverage Products Partnership**

156.    On November 17, 2020, Danimer issued a press release announcing that the Company "will produce biodegradable drinking straws for the quick service restaurant (QSR) industry" along with Eagle Beverage Products.[56] The press release stated in relevant part:

> Eagle Beverage will manufacture the straws using Danimer Scientific's proprietary biopolymer, Nodax™ polyhydroxyalkanoate (PHA). Tested by University of Georgia (UGA) researchers and the UGA New Materials Institute, PHA is made from sustainable materials, such as canola oil, to produce a **proven biodegradable alternative to traditional petrochemical plastics.** The straws are expected to be available for Eagle Beverage's QSR customers to purchase in early 2021. After launching the straws, Eagle Beverage plans to explore expanding its offerings to include compostable food containers, packaging and more.
>
> …
>
> ***The straws will degrade in environments ranging from industrial composting facilities to home compost units and oceans without leaving behind microplastics.***
>
> **"**PHA has become the go-to material for sustainable alternatives to single-use plastic that do not sacrifice reliability or quality," said Danimer Scientific CEO Stephen Croskrey.

157.    The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section IV E above.

**H.    Danimer's Registration Statement and Proxy Statement/Prospectus**

158.    On October 28, 2020, Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet caused Live Oak to file a registration statement on Form S-4 with the SEC.  The

---

[56] https://www.businesswire.com/news/home/20201117005256/en/Danimer-Scientific-and-Eagle-Beverage-to-Produce-Biodegradable-Drinking-Straws-for-Quick-Service-Restaurants

registration statement was amended on November 30 and December 15, and the final registration statement was filed with the SEC on Form S-4/A on December 16, 2020.  These all contained or repeated the same false or misleading statements, or omitted the same material information. On December 16, 2020, the SEC declared the registration statement effective.

159.    On December 16, 2020, Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet caused Live Oak to file the Proxy Statement/Prospectus on Form 424(b)(3) with the SEC (the "Proxy Statement/Prospectus").  Collectively, the Proxy Statement/Prospectus and registration statement declared effective by the SEC on December 16, 2020 are referred to as the "Registration Statement".

160.    Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet signed the Registration Statement.

161.    The Proxy Statement/Prospectus represented and repeated many of the false statements above, and included the October Investor Presentation. In addition, it included the following concerning the biodegradability of Nodax®:

> *Highly Attractive PHA Technology.*  Live Oak's management and board of directors believe that Danimer is a high-growth next generation eco-tech company that produces ***100% biodegradable polymers for use in plastic applications***. Its polyhydroxyalkanoates ("PHA") serve as a best end-of-life solution for plastics and Danimer is the leading PHA innovator with patent protected technology and 13 years of production knowhow;

162.    The Proxy Statement/Prospectus represented the following concerning Danimer's customers and demand for Nodax®:

> *Strong Partnerships.*  Live Oak's management and board of directors considered Danimer's ***strong partnerships with industry leaders, such as CPG brands including Pepsi and Nestlé*** and key converters such as Wincup and Genpak, which it believes contribute to Danimer's rapidly growing blue chip customer base with take-or-pay contracts that has led to fully sold-out position through Phase II capacity addition;

163.    The Proxy Statement/Prospectus represented the following concerning Defendant

Croskrey's background:

> **Stephen E. Croskrey** has been Danimer's chief executive officer
> and a member of Danimer's board of directors since February 2016.
> Mr. Croskrey is a business leader with over 30 years of experience
> in overseeing the strategic direction and operations of companies
> that manufacture and market a variety of products such as industrial
> fibers, and law-enforcement gear. **From 1999 to 2005,
> Mr. Croskrey served as the president and chief executive officer
> of Armor Holdings Products, LLC, a major manufacturer of
> military, law enforcement, and personnel safety equipment.
> During such tenure its annual revenue increased from
> $45 million to over $300 million as a result of him overseeing the
> acquisition and integration of 13 companies and implementing
> associated organic growth initiatives.** Mr. Croskrey has also held
> senior executive positions at Allied Signal and Mobil Oil… **He is
> well-qualified to serve on the New Danimer Board due to his
> extensive leadership, operational and advisory background as
> well as his significant strategic experience in acquiring and
> integrating companies.**

164.    The Proxy Statement/Prospectus warned of the potential, future risk that "if" the

Danimer's "auditors identify a material weakness or significant deficiency in the internal control

over financial reporting", the Company *could* incur additional costs rectifying those issues, and

the existence of those issues *could adversely affect* Danimer's reputation or investor perceptions

of it.   Moreover, Defendants warned that "Danimer *may not* have adequate personnel with the

appropriate level of knowledge, experience and training in the accounting policies, practices or

internal controls over financial reporting required of public companies in the United

States." Defendants' representations warned of a potential risk concerning internal controls

weaknesses that created the false impression that Danimer was not suffering from a material

weakness in internal controls at that time, when in fact, this risk had already materialized.

165.     The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Sections IV E-I above.

I.    **Danimer's December 29, 2020 Press Release Announcing Completion of De-SPAC Transaction with Live Oak**

166.     On December 29, 2020, Danimer announced the completion of its business combination with Live Oak, after the transaction was unanimously approved by Live Oak's board of directors and Live Oak's shareholders at a special meeting held on December 28, 2020. In this release, Danimer announced that its shares would begin trading under the ticker symbol DNMR on the NYSE the following day, December 30, 2020.

167.     In the December 29, 2020 release, Danimer also repeated the same or nearly identical statements as made in previous communications to the investing public including:

> "The completion of our business combination **represents a pivotal milestone in the global fight against one of the world's biggest environmental problems – single use plastic waste and pollution**," said Stephen E. Croskrey, Chief Executive Officer of Danimer Scientific. "**We are now fully financed to expand production capacity and meet the considerable expected demand from our blue chip, multinational customer base. Our customers view our Nodax™ PHA technology as a core component of their corporate sustainability strategy and a key vehicle to achieve their ESG commitments of reducing plastic waste by making their plastic packaging fully biodegradable.** We are excited to become a publicly traded company and enter the next phase of growth as we broaden the reach of our remarkable Nodax™ technology."
>
> Danimer Scientific is a pioneer in creating environmentally responsible and natural alternative solutions to traditional petroleum-based resins. **The Company's signature polymer, Nodax PHA (polyhydroxyalkanoate), is a 100% biodegradable, renewable, and sustainable plastic** produced using canola oil as a primary feedstock. Nodax PHA is the first PHA polymer to be **certified as marine degradable, the highest standard of biodegradability, which verifies the material will fully degrade in ocean water without leaving behind harmful microplastics.**

As a result, Nodax offers a better beginning-of-life and end-of-life cycle than any of today's traditional plastics and can replace the 80% of plastics that are never recycled or incinerated.

Danimer Scientific is currently **producing and shipping Nodax at a commercial scale** level from its existing facility in Winchester, Kentucky. The Company has partnered with key manufacturers and consumer products companies such as PepsiCo, Nestlé, Bacardi, Genpak, WinCup, Columbia Packaging Group, Kemira and Plastic Suppliers Inc. as they introduce more sustainable alternatives to straws, food and beverage containers, and flexible packaging, among others. **Based on signed and pending contracts, the Company is fully sold out of all production in its Kentucky facility** and will use its increased capital base to significantly increase production in seeking to meet the expected current and long-term demand of its customer base.

Rick Hendrix, outgoing Chief Executive Officer of Live Oak and now a member of the Board of Directors of Danimer Scientific, commented, **"Danimer Scientific's 100% biodegradable products put the Company at the forefront of sustainability and ESG leadership with innovative technologies that minimize exploitation of natural resources and enable customers to incorporate environmentally responsible products into their supply chains.** Danimer Scientific represents a unique and compelling ESG investment opportunity with what we believe is a clear path to profitable growth. We are delighted to complete this business combination to accelerate the Company's growth and create value for Danimer Scientific's team members, customers, shareholders and the environment."

168.    The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Sections IV E-G above.

**J.      Defendant Croskrey's December 30, 2020 Statement on CNBC that it was "sitting on over $200 million of take or pay off agreements."**

169.    On December 30, 2020, Defendant Croskrey appeared on CNBC's widely watched investor program "Squawk Box" televised program with host Joe Kernen, which in December of

2020 had a monthly average audience of 329, 900.[57] The segment was entitled "THE YEAR OF THE SPAC, 2020 ENDS WITH PLASTICS DEAL"[58] In the interview Defendant Croskrey repeated claims that Danimer achieved the "Holy Grail of Plastics" that would completely go away in the ocean in 8 weeks, and added that Danimer had been sitting on over $200 million of take or pay agreements and had customers like PepsiCo, Nestlé, and Bacardi, that were expecting Danimer to be able to grow its capacity:



**Danimer Scientific CEO Stephen Croskrey on going public through a SPAC**

KERNEN: You were flying high in march uh and then came the pandemic and you were ready to just roll out this really interesting stuff which we'll talk about in a second steve but then the pandemic hit uh so this back right now is the right way for you to go uh because

---

[57] Cable Rankings https://ctv.kwayisi.org/networks/cnbc/squawk-on-the-street/ (last accessed January 15, 2021.)

[58] Danimer Scientific CEO Stephen Croskrey on going public through a SPAC, https://www.cnbc.com/video/2020/12/30/danimer-scientific-biodegradable-plastic-spac-squawk-box.html

you can immediately put some cash on the balance sheet to **honor the contracts you have with these big uh with these big companies**.

CROSKREY: That's right joe thank you for having me on uh that's a you you've answered the question for me there. …so we had a we've always kind of taken a stepladder approach to financing and **we launched the holy grail of plastic in March** and two days later the covid shutdown came so that kind of blew up our expansion plans from a financing standpoint **even though we were sitting on uh over 200 million dollars to take our payoff ticket agreements and we had customers like Pepsico Nestle Bacardi you know expecting us to be able to grow our capacity so we had to find a way to find a lot of cash fast** and that's what we did.

KERNEN: You said holy grail in looking at into the PHA what's it called PHA uh the compound yeah the compound yep it h**as the highest level of biodegradability which is called marine biodegradable** because like and I'm learning from just looking into your company all plastics need bacteria to eventually decompose but it doesn't happen quickly and it may not happen completely *and that's what your stuff looks like after eight weeks even if it was in the ocean it goes to it doesn't leave any micro plastic pieces around at that point* .



CROSKREY: That's right it is consumed enzymatically by bacteria. … it's kind of nature's uh recycling uh plan when **if these products get in into places that they don't belong like the ocean they will be**

> *consumed by bacteria and go away completely.* There is no there
> are the preferred food source for bacteria so there is no plastic.

170.     The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Sections IV E-G above.

**K.     Danimer's Registration Statement on Form S-1 and Prospectus for the February 2021 Offering**

171.     On January 28, 2021, Danimer filed a Registration Statement on Form S-1 with the SEC seeking to issue up to 32,435,961 shares of common stock and up to 16,279,253 shares of Class A common stock issuable upon the exercise of warrants and options previously issued by Legacy Danimer and Live Oak, which consists of up to 6 million shares of common stock that are issuable upon the exercise of 6 million warrants originally issued in a private placement in connection with Live Oak's IPO, up to 10 million shares of common stock issuable upon the exercise of 10 million warrants originally issued in Live Oak's IPO, and up to 279,253 shares of common stock issuable upon exercise of "Non- Plan Legacy Danimer Options." According to the Company, Danimer "will receive the proceeds from any exercise of any Warrants for cash." The January registration statement repeats many of the false or misleading statements identified above, and omits the material information identified above.

172.     On February 16, 2021, Danimer filed a Prospectus/Registration Statement on Form 424B3 with the SEC (the "February Registration Statement") to consummate the offering, and the SEC declared the Registration Statement effective the same day. Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt caused Danimer to file a prospectus on Form 424(b)(3) with the SEC (the "February 2021 Prospectus").  The February 2021 Registration Statement was signed by Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt. The February 2021 Registration Statement repeats many of the same false or

misleading statements made above by Defendants, and omitted the material information identified above. In particular, the February 16 Registration Statement contained the same or nearly identical statements as those alleged in the January 28 Registration Statement regarding the biodegradability of Nodax®, the size of Danimer's operations, and Danimer's internal controls.

173. For example, the February 2021 Registration Statement stated in relevant part:

> **Having successfully scaled up PHA production from the laboratories to a contract manufacturer and later to its own commercial development plant, Danimer recently has begun making PHA on a commercial scale. … Once Phase I is producing at full capacity, Danimer expects to produce approximately 20 million pounds of finished product per year. Danimer believes that the capacity of the plant can be expanded by another 45 million additional pounds of finished product, bringing total plant capacity up to 65 million pounds per year, ….**

174. The February 2021 Registration Statement represented the following concerning Defendant Croskrey's background:

> ***Stephen E. Croskrey.*** Mr. Croskrey has served as chairman of the Board and chief executive officer of Danimer since December 2020. Prior to that, Mr. Croskrey was Legacy Danimer's chief executive officer and a member of the board of directors of Legacy Danimer since February 2016. **Mr. Croskrey is a business leader with over 30 years of experience in overseeing the strategic direction and operations of companies that manufacture and market a variety of products such as industrial fibers, and law-enforcement gear. From 1999 to 2005, Mr. Croskrey served as the president and chief executive officer of Armor Holdings Products, LLC, a major manufacturer of military, law enforcement, and personnel safety equipment. During such tenure its annual revenue increased from $45 million to over $300 million as a result of him overseeing the acquisition and integration of 13 companies and implementing associated organic growth initiatives… He is well-qualified to serve on the Board due to his extensive leadership, operational and advisory background as well as his significant strategic experience in acquiring and integrating companies.**

175.   The February 2021 Registration Statement also represented the following concerning Danimer's internal controls:

> Danimer will face increased legal, accounting, administrative and other costs and expenses as a public company that Danimer does not incur as a private company. The Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act"), including the requirements of Section 404, as well as rules and regulations subsequently implemented by the SEC, the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 and the rules and regulations promulgated and to be promulgated thereunder, the PCAOB and the securities exchanges, impose additional reporting and other obligations on public companies. … *if* any issues in complying with those requirements are identified (for example, *if* the auditors identify a material weakness or significant deficiency in the internal control over financial reporting),***Danimer could*** incur additional costs rectifying those issues, and the existence of those issues could adversely affect Danimer's reputation or investor perceptions of it. …

> Danimer's failure to timely and effectively implement controls and procedures required by Section 404(a) of the Sarbanes-Oxley Act could have a material adverse effect on its business.

> Danimer is required to provide management's attestation on internal controls. The standards required for a public company under Section 404(a) of the Sarbanes-Oxley Act are significantly more stringent than those required of Danimer as a privately-held company. Management ***may not be able to effectively and timely implement controls*** and procedures that adequately respond to the increased regulatory compliance and reporting requirements. ***If*** Danimer is not able to implement the additional requirements of Section 404(a) in a timely manner or with adequate compliance, ***it may not be able to assess whether its internal controls over financial reporting are effective***, which may subject it to adverse regulatory consequences and could harm investor confidence and the market price of its securities.

176.   The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Sections IV E-I above.  Also, Danimer was producing and could produce less than a quarter of the 20 million pounds of finished PHA as represented , and the end of Phase II would bring production well less than half the stated

65 million pounds; and Danimer was suffering from internal control deficiencies and Danimer's

disclosure controls and procedures were not effective because of a material weakness in Danimer's

controls over the accounting for certain financial instruments.  Defendants' representations warned

of a potential risk concerning internal controls weaknesses that created the false impression that

Danimer was not suffering from a material weakness in internal controls at that time, when in fact,

this risk had already materialized.

## L.     Danimer Press Release about Mars Wrigley Partnership

177.    On March 16, 2021, Danimer issued a press release announcing that it had entered

into an agreement with Mars Wrigley "to develop an innovative home compostable packaging for

a more sustainable planet."[59] In this release, Danimer stated:

> Danimer Scientific's signature packaging - Nodax® polyhydroxy–
> alkanoate (PHA) – is produced through natural fermentation
> processes using plant oils such as soy and canola and biodegrades in
> both soil and marine environments. Mars will continue to evaluate
> opportunities to scale this novel, innovative and sustainable
> packaging technology across its portfolio of brands and categories.
>
> **Danimer Scientific and Mars Wrigley plan to introduce
> Nodax®PHA into flexible and rigid packaging that reliably
> breaks down in both industrial composting facilities and
> backyard compost units, offering an enhanced value proposition
> for environmentally conscious consumers and retailers.** Sourced
> from the seeds of plants such as canola and soy, Nodax®PHA can
> serve as an alternative to traditional petrochemical plastic and **has
> been certified as biodegradable in soil and marine
> environments.** In addition to better end-of-life options, Nodax®
> PHA is renewably sourced, making it a truly circular material that
> helps eliminate waste.

---

[59] https://danimerscientific.com/2021/03/16/mars-wrigley-and-danimer-scientific-help-
environmentally-conscious-consumers-to-compost-at-home-by-developing-biodegradable-
packaging-from-natural-ingredients/

178.    These representations were materially false or misleading, or omitted material information for the reasons set forth in Section IV G above.

179.    As set out below, Muddy Waters learned the Mars Wrigley contract will likely not be using in scale a DNMR plastics wrapper before 2025 – if ever.

**M.    Danimer's March 29, 2021 Fourth Quarter and Full Year 2020 Financial Results**

180.    On March 29, 2021, the Company announced its fourth quarter and full year 2020 financial results. In the March 29, 2021 press release, Danimer further stated that:

> **Facility Network Expansion  Updates**
>
> ***Market demand remains robust*** for Danimer's signature polymer, Nodax™ PHA (polyhydroxyalkanoate), a ***100% biodegradable***, renewable,  and  sustainableplastic produced using canola oil as a primary  feedstock. ***Expanding commitments from  blue  chip multinational consumer packaging customers*** support Danimer's ***announced nameplate capacity*** additions to collectively produce and deliver up toan estimated 315 million pounds of finished PHA product per year.
>
> Today  the  Company  announced  that  it  plans  to  double  the anticipated capacity of its previously disclosed greenfield facility from 125 million to 250 million finished pounds of PHA products annually. … ***Based on the current demand pipeline, the Company continues to forecast that capacity at the greenfield plant will be sold out.***

181.    The  foregoing  statements  were  materially  false  or  misleading  and/or  failed  to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Sections IV E-G above.

**N.    Danimer's March 29, 2021 Earnings Call**

182.    On March 29, 2021, Danimer held an earnings call with analysts to discuss its fourth quarter and full year 2020 financial results. On this call, Defendant Croskrey stated:

> I'm extremely pleased with our numerous accomplishments during 2020 to end the year with an outstanding customer base and an unrivaled ***commercial-scale bioplastic technology*** platform. …

On today's call, we are going to address 4 key takeaways: First, the depth and capabilities of our high-growth next-generation eco-tech company that produces ***100% biodegradable*** polymers for use in plastic applications; second, our massive addressable market spanning 500 billion pounds; third, our unrivaled growth potential from ***intense demand by blue-chip multinational customers***; and finally, the progress we have made to significantly expand our business to meet ***customer demand***.

…

***Bioplastics, particularly PHA, are a viable end-of-life solution to truly address the growing need to reverse the global plastics crisis.*** …

We have entered into new partnerships, including our March announcement of a ***2-year partnership with Mars to develop biodegradable packaging as part of their supply chain. We entered into an agreement with Bacardi to make a biodegradable and compostable spirits bottle to help Bacardi replace 80 million plastic bottles.*** And more recently, we announced that we intend to double the size of our planned greenfield facility to further capture the growing demand from customers.

183.    Also on this call, Defendant Dowdy stated:

[Recall] today that we are currently producing PHA-based resins out of our Kentucky facility, having ***recently completed the first of a 2-phase expansion for PHA production. Phase I added 20 million pounds of finished product nameplate[60] production capacity*** *with fermentation runs starting in March 2020*, at the same time the pandemic-related lockdowns began. Phase II construction has commenced in December of 2020, and i*s* ***expected to add an additional 45 million pounds of finished product nameplate capacity in the second quarter of 2022***, with production ramping up thereafter. ***The completion of both phases will bring our total***

---

[60] Nameplate capacity, also known as the rated capacity, nominal capacity, installed capacity, or maximum effect, is the intended full-load sustained output of a facility such as a power station, electric generator, a chemical plant, fuel plant, mine, metal refinery, and many others. Nameplate capacity is the theoretical output registered with authorities for classifying the unit. For electric power stations, the power output is expressed in Megawatt electrical (MWe). For fuel plants, it is the refinery capacity in barrels per day. https://en.wikipedia.org/wiki/Nameplate_capacity#:~:text=Nameplate%20capacity%2C%20also %20known%20as,metal%20refinery%2C%20and%20many%20others (last accessed January 16, 2022.)

> *nameplate PHA capacity up to 65 million pounds of finished*
> *product per year.*

184.   During the March 29, 2021 earnings Croskrey further stated:

> During 2020, we completed construction of the world's first
> commercial PHA facility, and went through a rigorous destocking
> process all during a pandemic, while simultaneously negotiating
> development agreements with Mars and Bacardi.
>
> […]
>
> We have already built our first commercial scale production facility,
> and we have a significant pipeline of new capacity to extend our
> leadership position. We have aligned the majority of our expansion
> plans based on long-term partnerships with customers. Our
> customers are mainly major blue-chip multinational brands that
> have all made long-term commitments to make their plastic
> packaging recyclable, reusable or biodegradable.

185.   The foregoing statements were materially false or misleading and/or failed to

disclose material facts necessary to make the statements made, in light of the circumstances under

which they were made, not misleading, for the reasons identified in Sections IV E-G above.

**O.   Danimer's March 30, 2021 Annual Report on Form 10-K**

186.   On March 30, 2021, Danimer filed the 2020 Annual Report, which was signed by

Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt, and

repeated many of the false or misleading statements above and omitted the material information

stated above.

187.   The 2020 Annual Report included the same warnings of potential material

weakness or significant deficiency in internal control as alleged above, and SOX Certifications

that were signed by Defendants Croskrey and Dowdy that represented the following:

> 1. I have reviewed this Annual Report on Form 10-K of
> Danimer Scientific, Inc.;
>
> 2. Based on my knowledge, this report does not contain any
> untrue statement of a material fact or omit to state a material fact

necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) *All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information*; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

188.    The foregoing statements were materially false or misleading and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, for the reasons identified in Section IV I above.

## VI.    THE TRUTH BEGINS TO EMERGE

A.    **The *Wall Street Journal* Report**

189.    On March 20, 2021*, The Wall Street Journal* published an article entitled: "Plastic Straws That Quickly Biodegrade in the Ocean? Not Quite, Scientists Say" The article provided, in relevant part:

Imagine you're walking along a beach sipping a cool lemonade. When you finish, there's no trash can in sight, so you leave your plastic cup and straw on the shore, assured that if washed away they'll quickly disappear.

That's the image **touted** by a growing number of companies using Nodax—a plant- based plastic—to make straws, bottles and bags that they claim can biodegrade in oceans **within a few months**.

Nodax's owner, Danimer Scientific Inc., counts Nestlé SA and Bacardi Ltd. among its customers and PepsiCo Inc. as an investor.

Nodax breaks down far more quickly than fossil-fuel plastics, which can last for hundreds of years. But many claims about Nodax are exaggerated and misleading, according to several experts on biodegradable plastics. They say more testing and stricter regulations are needed, and warn that marketing products as marine biodegradable could encourage littering. Biodegradable straws, bottles and bags can persist in the ocean for several years, they say.

"The claims are what I would call sensationalized," Jason Locklin, a University of Georgia professor, said of Danimer's Nodax marketing. Mr. Locklin directs the university's New Materials Institute and co-authored a study cited by Danimer as validating its material.

Until now, Danimer says. Its chief executive, Steven Croskrey, has described Nodax as "the holy grail of plastic," highlighting that the material has been certified by TUV Austria—a leading international certification body whose logo is found on items like compostable food waste bags—as able to biodegrade in seawater. Danimer's share price has more than doubled since it went public through a deal with a so-called blank-check company in late December.

Nodax is the brand name of a resin that belongs to a family of plastics known as PHAs. It is made by feeding canola oil to bacteria, from which carbon is extracted and turned into plastic. Unlike conventional plastics, Nodax is consumed by microorganisms when thrown away, Danimer says.

Mr. Locklin's study—described in marketing material by Danimer and its customers as verifying Nodax as "a truly biodegradable alternative to petrochemical plastics"—showed that Nodax in powdered form breaks down quickly, but that the rate is much more variable when tested as a film, the form used to make bags, straws and bottles.

Making broad claims about Nodax's biodegradability "is not accurate," said Mr. Locklin, adding: "I think that's greenwashing."

\*      \*      \*

Nodax doesn't have any certification indicating it biodegrades in landfills. However, Mr. Croskrey on an investor call in October said the product would be consumed by bacteria if it ended up in a landfill. Responding to questions from The Wall Street Journal, Mr. Van Trump said the claim by the Danimer chief wasn't wholly accurate, saying Nodax products are unlikely to biodegrade in most modern landfills.

> Few laws exist to address claims about biodegradability. California bans the sale of plastic products that use the terms "biodegradable" or "degradable," saying such claims can be misleading. Last year the state passed a separate law barring products from using the term "marine degradable."
>
> Making claims about soil biodegradability—as Bacardi and Columbia do—is tricky, too, since products need to be fully buried in soil rather than simply littered to break down entirely, Mr. Narayan said.
>
> "Everything biodegrades at some point," including fossil-fuel plastics, he said. "The question is how soon."

190.    *The Wall Street Journal* article also cited a Michigan State University professor with over 30 years' experience researching biodegradable plastics, who noted that "**variations in temperature and microorganisms in the ocean make it very difficult to promise a bottle made from Nodax will biodegrade in 18 months**." According to the same expert, even though Danimer lauds Nodax® as being certified by TUV Austria, an international certification body for compostable items, "[t]he marine biodegradability test used to gain certification from TUV is conducted in a lab using seawater at a temperature of 30 degrees Celsius (86 Fahrenheit)," whereas "the average ocean temperature is 4 degrees Celsius (39.2 Fahrenheit), which means items could degrade more slowly in real life." The same expert noted that "[a]t some ocean temperatures, Nodax straws could take between five and 10 years to biodegrade," whereas "[b]ags and bottles could take even longer."

191.    On this news, Danimer's stock price fell $6.43 per share, or approximately 13%, to close at $43.55 on March 22, 2021. Shares continued to plummet, falling to a March 30, 2021 close of just $34.15 per share.

B.     **Spruce Point Reports**[61]

192.    Analyst Spruce Point Capital Management issued the April 22 Report about Danimer, writing that Danimer represented "Another Go Around at Plastic Alternatives with Several Corporate Governance Red Flags: 65%-100% Downside Risk." In this report, Spruce Point revealed for the first time material background facts about the past and current CEOs, the CTO and current Danimer executives and Directors. Spruce Point continued: "[w]e question the independence of Danimer's scientific research as Danimer has been a financial backer of the University of Georgia Lab and several professors who authored the supporting research… . We also believe Danimer has concealed, through numerous website changes and omission of past press releases, a pattern of conflicting and irreconcilable statements on capacity, facility size, and capex costs … ."

193.    The April 22 Report revealed that the "[c]urrent Danimer CEO [Defendant] Stephen Croskrey, previously President of Armor Holdings Product Division … was directly involved in a potential cover up of defective body armor." Spruce Point continued that "[e]vidence in a DOJ case against Honeywell shows Croskrey was aware of the defect and threatened a supplier that they should '*stick together*' to '*overcome the threat*' or else he would have no choice but to issue a release blaming the supplier for the defect."

194.    The April 22 Report also raised the March 20, 2021 *Wall Street Journal* article, writing: "[h]ow can investors trust management when Danimer's CTO is challenging the CEO's claims? 'Mr. Van Trump said the claim by the Danimer chief wasn't wholly accurate, saying Nodax products are unlikely to biodegrade in most modern landfills.' Red Flag: Danimer's

---

[61] The Spruce Point Reports date April 22, May 4 and May 21, 2022 are incorporated by reference in this Complaint.

scientific support and rebuttal to the *WSJ* article is based on research conducted by University of Georgia professors who have received financial backing from Danimer and have had their students hired by the Company."

195.    The April 22 Report continued: "Danimer's story continues to change. We have found multiple inconsistent descriptions of the size of its facility, production capacity, and costs that differ from other Company statement or government documents." The April 22 Report also noted that "[o]n Danimer's Q4 2020 earnings call, Croskrey and Dowdy have walked back recently issued expectations. 'In the near term, I would expect less profitability at the bottom line than what was previously disclosed.' … Phase II expansion: 'now expected to be completed in the second quarter of 2022 compared to our initial assumption of late 2021.'" (Emphasis omitted).

196.    Moreover, The April 22 Report highlighted that "Pepsi likely sold its stake in Danimer as the Company's recent presentation no longer lists Pepsi as a shareholder. Based on Pepsi's 10-Q filed in April 2021, they disclosed 'these equity securities were subsequently sold in the second quarter of 2021.' … . Shortly after the WSJ released its article challenging Danimer's claims, the Company removed statements claiming 'derived from 100% renewable source' and 'fully degradable in 12-18 weeks after the product is discarded' from its investor presentation." In sum, "Spruce Point believes Danimer's current share price is unsustainable, and a result of hype around ESG businesses and unrealistic financial assumptions."

197.    On this news, Danimer's stock price fell from its April 21, 2021 close of $25.00 per share to an April 22, 2021 close of $22.99 per share, representing a one-day drop of $2.01 per share, or approximately 8%.

198.    A few days after the Spruce Point report, on April 26, 2021, analyst Jefferies

lowered Danimer's price target to $42, down from a previous high of $66.[62]

199.    Spruce Point issued the May 4 Report as a follow up report to its April 22 Report,

writing "insights from Danimer FOIA show smoking gun evidence of pricing inflation and

slackness in capacity."  The May 4 Report continued that "with the benefit of a recently released

[FOIA] request from the Kentucky Department of Environmental Protection, we have evidence

that suggests Danimer's production figures, its pricing, and rosy financial projections are wildly

overstated. Monthly Kentucky PHA production figures have been restated by up to 100% after

coming public. Danimer's PHA average selling price appears to be 30% - 42% below

management's claims. Moreover, Danimer's recently reported production figures are so far below

their actual capacity, that it calls into question why Danimer is telling investors it needs hundreds

of millions of dollars in capacity expansion?

200.    The May 4 Report alleged that "Danimer's SEC disclosures on revenue drivers are

insufficient in our view. As a manufacturer of essentially two products in two locations, Danimer

fails to provide clear and transparent information on the following to investors: Production by

location; Total volumes sold of PHA and PLA; Average sales price of PHA and PLA." According

to the May 4 Report, "[n]ewly released FOIA provides actual biopolymer production figures by

location. We find that Danimer's monthly PHA biopolymer production and natural gas usage for

its Kentucky facility have been materially misreported, in some months by 100%. By law, Danimer

must provide semi-annual and annual production figures in Kentucky. In its 2020 annual filing,

signed in January 2021 after closing its SPAC deal on the NYSE in December 2020, we observe

---

[62] Jefferies: *"A Lower Bar For The Q1 Call. Simple Steps Likely Suffice For A Double"*, April
26, 2021.

it reported material errors that overstated Kentucky's figures in some months by up to 100% by including Georgia's production. We are able to extrapolate Georgia's monthly production in H1 2020 and find mathematically impossible results, implying negative monthly production in April and June 2020. What's clear is that Georgia's production was trending negative in H1 2020. **Warning:** The compliance reports are produced by an independent environmental consultant. We find the reports have been signed off on by three different Danimer employees. The 'corrected' filing was signed by CTO Phil Van Trump, after previously being signed by Plant Manager Kevin Walsh … and David Mazzei … . Why hasn't the CFO or COO signed off on these figures? There are legal implications, including potential imprisonment, for filing false information."

201.    The May 4 Report continued: "[n]ow with certified production figures from Danimer, we estimate PHA Average Selling Prices (ASPs) are overstated by 30% - 42%. Danimer's October 2020 Investor Presentation implied PHA ASPs of $3.00/lb. and the CEO alluded to pricing in the $2.50-$2.70 range on the year end conference call in March 2021. However, based on Danimer's 2.5m lbs. of certified actual production, and $4.4 of reported PHA sales, we estimate PHA ASPs were closer to $1.74/lb, or 30% - 42% lower than discussed by management. Danimer's Investor Presentation said it was in a 'Fully Sold-Out' position. Even if we assume a one-month lag between production and shipment, ASP would still be $2.01/lb or 20% - 33% below management's claims… . We believe Danimer is set to vastly disappoint investors and suffer severe price target cuts."

202.    In a slide titled "Notable Omissions From Recent SEC Filings," the May 4 Report stated: "Actual production implied from Danimer's reported monthly numbers is so far below stated capacity that it severely calls into question why it is telling investors it needs more capacity? … If Danimer's business were booming to the degree it suggests exists through 'Fully Sold-Out'

customer demand, why isn't it operating at full capacity with its existing manufacturing base before adding more capacity"

203.    On this news, Danimer's shares further plummeted, falling from its May 3, 2021 close of $23.63 per share to a May 4, 2021 close of $22.14, representing a one-day drop of $1.49 per share, or approximately 6.3%.

204.    On April 25, 2021, following the Spruce Point allegations, analyst Jeffries further downgraded its price target of Danimer stock.

**C.    Muddy Waters Corroborates Spruce Point and Goes Beyond**

**1.    Muddy Waters' History of Accurately Uncovering Fraud**

205.    Muddy Waters is an American privately-held due-diligence-based investment firm, owned by Carson Block that conducts investigative research on public companies while also taking publicly disclosed short positions that reflect their research. The firm has exposed accounting problems and fraud at several companies, primarily in China but also in other countries in Asia, Europe and North America. Muddy Waters' founder Carson Block appears frequently as a commentator on Bloomberg Television, CNBC and the BBC. He has written op-eds in The Wall Street Journal, Financial Times, and The New York Times on various topics related to improving corporate governance and market transparency. Unlike other short sellers, such as those who anonymously post on crowd sourced online resources, such as SeekingAlpha.com, Muddy Waters and Carson Block publish their analyses in their name.

206.    Muddy Waters was first known for spotting fraud at Sino-Forest Corp, a Canadian-listed Chinese company. In 2011 Muddy Waters published a research report on the company, which was then accused of fraud by the Royal Canadian Mounted Police and the Ontario Securities Commission. On August 15, 2011, Sino-Forest announced that the results of a PwC probe into the allegations would be delayed to the end of the year due to difficulties in gathering data from the

Chinese companies involved. On March 30, 2012, Sino-Forest filed for bankruptcy protection in Canada and its auditors resigned. In 2015, the firm's auditors Ernst and Young, a group of financial institutions and former Sino-Forest chief executive David Horsley paid $117 million, $32.5 million and $5.6 million respectively to settle investor's lawsuits. On July 13, 2017, the OSC released its decision finding that "Sino-Forest, Chan, Ip, Hung and Ho engaged in deceitful or dishonest conduct related to Sino-Forest's standing timber assets and revenue they knew constituted fraud." The OSC also found that the individual respondents violated Ontario securities law by misleading commission staff during the investigation.

207.    In October 2013, Muddy Waters published a research report that NQ Mobile had "fictitious" customers and revenues. In April 2015, the securities fraud suit settled for $5.1 million and the CEO stepped down after the stock had fallen nearly 84 percent. A Court Receiver was appointed over the company in February 2019 in the United States in the federal district court in the Southern District of New York by Judge Victor Marrero.

208.    In August 2016, Muddy Waters released a report claiming that pacemakers and other implantable medical devices made by St. Jude Medical were highly vulnerable to hacking. St. Jude Medical denied the claims made by Muddy Waters, stating that they were "false and misleading" and sued the firm for defamation. In January 2017, the U.S. Food & Drug Administration and the Department of Homeland Security released the results of an investigation into St. Jude's cybersecurity vulnerabilities, which confirmed the findings of Muddy Waters.

209.    On June 29, 2017, Muddy Waters opened research into Prothena Corp. PLC, a biotech company whose leading product the short seller claimed was commercially unviable. In 2019, the ensuing securities fraud class action was settled for $15,759,000.

210.    In January 2020, Muddy Waters warned that Luckin Coffee, what they termed a "fundamentally broken business", fabricated its sales and expenses while management cashed out on the stock. Shortly thereafter, on April 2, the Luckin Coffee Company admitted that its COO and subordinates significantly fabricated corporate metrics, sending the stock down over 70%. Later, Luckin Coffee reached a settlement with the SEC, agreeing to pay a $180 million penalty for accounting fraud.  In February Luckin filed for Chapter 15 protections and for recognition of its international bankruptcy.

211.    One of Lead Counsel here, Hagens Berman, has had direct experience investigating and litigating cases based on Muddy Waters' reports. Based on one of Muddy Watters's reports, Hagens Berman litigated a securities fraud suit against China Media Express, which was delisted. Hagens Berman settled for millions against the accountants and lawyers and obtained a $535 million default judgment against China Media Express. A court also entered a default judgement for the SEC and a permanent injunction against China Media and its founder.

## 2.    The September 15, 2021 Muddy Waters Report Reveals Unrebutted Inconsistency in Danimer's Production Capacity and Customer Relationships[63]

212.    On September 15, 2021, Muddy Waters issued a report significantly corroborating the Spruce Point findings and going beyond. In its report, Muddy Waters found, among other things, that Defendants "significantly misrepresented the state of its customer relationships, demand, product development, readiness to scale, and TAM for PHAs.":

> Because it's nearly impossible to effectively evaluate early stage tech, we look for behaviors that indicate a company is not "real" and likely won't be. One example would be a company rolling a truck down a hill, or a company claiming that it has numerous "binding" commitments when in reality, there are very few.

---

[63] The Muddy Wates Reports of September 12, 2021 is incorporated by reference in this Complaint.

DNMR gives us a lot of these flags. In our view, **DNMR has misled investors about having over $200 million of "take or pay" agreements**. We feel it has misled investors by stating that its only impediment to selling more product is lack of capacity when the products it hopes to sell do not yet exist. I**t expressly claimed that it can sell everything it produces, but in actuality the demand for its products appears to be quite weak.** DNMR has announced four iterations of its capacity expansion plan in eight months, which indicates that it is likely to waste significant time and money trying to scale. Yet, **DNMR's purchase of Novomer seems to be a tacit admission that its fermentation might not scale**.[64] In 2015, DNMR claimed that Bainbridge had 60 million pounds per year of capacity; but, today it's supposedly just a demonstration plant. **DNMR has tried to mislead investors into believing that bag developed with PepsiCo is PHA when it is really PLA based**.

213. In discussing production and demand the report states:

What DNMR can produce seems to have limited demand, which is in stark contrast to CEO Stephen Croskrey's pronouncement that DNMR can sell all the PHA it produces and the company's claim that it is "fully sold-out of [2022E] Kentucky capacity from overwhelming customer demand"[65]. I**nstead, DNMR seems unable to make PHA for the products for which there seems to be a significant potential market. DNMR has likely not produced PHA for products sold to end users, other than straws and possibly plastic shopping bags.**

Supporting our conclusion that demand for DNMR's existing products seems quite weak are **DNMR's apparent significant (but below the radar) PHA production misses in each of Q1 and Q2 this year.** Using company favorable assumptions, we estimate that DNMR has been operating at only approximately 28% of capacity, rather than the expected 50%. **Less company favorable, but still reasonable, assumptions yield estimates as low as 18% of**

---

[64] This is consistent with CW statements of limited production capacity and issues in producing PHA, in both the upstreaming and downstreaming process, as well as the need to dump large quantities of product.

[65] This is consistent with CW3's statements that Danimer stockpiled product in offsite storage warehouses, and when that got crowded the product was moved to another offsite location in Georgia, as well as CW2's statement that inventory just sat and collected dust.

**capacity.**[66] Moreover, DNMR's slow-turning inventory (~3x) consistently shows zero to de minimis amounts of work in process while having **material balances of both raw materials and finished goods**, which we think shows that there is not much demand for what DNMR is capable of producing. A subset of this concern is that DNMR could be producing significant amounts of non-salable product due to production issues.

…

DNMR has greatly misled investors about its partnerships. When DNMR went public, Mr. Croskrey said on CNBC that the company was "sitting on over $200 million of take or pay off take agreements, and we had customers like PepsiCo, Nestlé, Bacardi, you know, expecting us to be able to grow our capacity, so we had to find a way to find a lot of cash fast." We believe that the products DNMR hopes to produce for these partners are in the very early stages of development, and that production capacity was not even close to being an issue for these products. These purported "take or pay" agreements reportedly have outs for the customers if DNMR has been unable to develop product that meets customer requirements. **Moreover, we understand that the PepsiCo take or pay was for pilot plant scale, and that DNMR likely has not finalized a commercial-scale agreement with PepsiCo.**[67] We also understand that Mars Wrigley will likely not be using in scale a DNMR plastics wrapper before 2025 – if ever; and, **that PepsiCo is probably many years away (if ever) from any sizable PHA compound purchases from DNMR**.

214.   On this news, Danimer's shares further plummeted, falling from a close on September 14, 2021 of $17.24 per share to close on September 15, 2021 at $14.73 per share, a decline of $2.51 per share, or approximately 14.5% on heavier than usual volume.

---

[66] This number is consistent with CW4's estimation that at best the Winchester Plant could produce 400,000 pounds of PHA if running all three fermenters on 5 shifts per month, whereas the claim of 20 million pounds per year would yield 1.6 million pounds per month of PHA.

[67] This is consistent with CW1 stating that PHA for Pepsis and Nestlé were only for testing purposes.

3.      **Defendant's Rebuttal to the Muddy Waters Report Ignores Most of the Report and for the First Time Admits its Nameplate Production Capacity and Expansion in Half the Amount Stated**

215.    On September 17, 2021, Danimer issued a 5-page press release entitled "Danimer Scientific Comments on Misleading Muddy Waters Report" in response to the Report (the "Response"). The Response does not rebut the detailed findings of the Report and fails to address the Report's findings on a point-by-point basis. Rather, the Response makes general statements and conclusions in an attempt to undermine the Report's credibility. The Response is also an attempt by Danimer to continue to promote its bioplastics business.

216.    Specifically, Danimer's response does not attempt to rebut Muddy Waters' findings that there is only limited demand for Danimer's PHA product for use in straws.[68]

217.    Danimer's response does not attempt to rebut Muddy Waters' findings that the customer relationships are merely developmental and have not reached the stage of commercialization.[69]

---

[68] Muddy Waters was only able to find straws and shopping bags made with Danimer's PHA available for sale. *Id.* There was no evidence of other PHA-based products produced by Danimer such as "single-serving coffee pods, water bottles, plastic caps, snack foods packaging, clam shell containers, f&b utensils, diapers, etc." *Id.* at 5-6. Muddy Waters conducted a web search for PHA-based product offerings for Danimer's announced customers (WinCup phade, UrthPact, CPG Biolo, and Eagle Beverage) but only found that these companies only offered PHA-based straws; only one customer company, CPG, offered single use PHA-based bags and films.

[69] Instead, the Response states the general proposition that "Global consumer brands are actively seeking compostable and biodegradable alternatives to their traditional plastic products[.]" *Id.* The Response then goes on to state that its customer partnerships "including PepsiCo, Mars Wrigley, Bacardi, Nestle, WinCup, Eagle Beverages, Columbia Packaging Group [(CPG)] and UrthPact are currently working with Danimer to produce biodegradable and compostable alternatives to plastic products." *Id.* No details are provided on what "biodegradable and compostable alternatives to plastic products" are being worked on with these alleged customers and/or whether these products are actually being offered.

218.    Danimer's response does not attempt to rebut Muddy Waters' findings that Danimer's production capacity is much less than stated or, alternatively, demand is weak.[70]

219.    Finally, Danimer admits that it's nameplate production capacity of PHA is actually half that represented and for the first time disclosing its anemic production of PHA:

> The Company discusses production volumes in terms of finished pounds, rather than neat PHA (a.k.a. "Nodax®"), because finished product is what is sold to customers. Prior to considering the integration of Rinnovo™ in its formulations, Danimer has stated that finished capacity at its Kentucky Phase I facility is 20 million finished pounds per year, ***which means that the Kentucky Phase I facility's capacity is 10 million pounds of Nodax®.***

> The Company has previously noted that, on average, Nodax® comprises approximately 50% of the formulation for finished product. Through repetition and continuous improvement, Danimer is scaling its production capacity and will continue to manufacture as much Nodax® as possible. Because the Muddy Waters analysis conflates these figures, below are the correct figures for Danimer's Kentucky Phase I facility:

> - In Q1 2021, Danimer produced approximately 1.4 million pounds of Nodax®, which equates to approximately 55% capacity utilization for the three-month period.

---

[70] Muddy Watters estimated that Danimer "utilized only approximately 18% to 28% of its PHA production capacity in Q1 and Q2, depending on the percent of neat PHA in the finished products as well as how much PHA production ended up in inventory. [Additionally, t]he consistent zero to de minimis value of work-in progress inventory, compared to material amounts of finished goods and raw materials, also indicates that the demand for DNMR's products is weak." Report at 5. In other words, production capacity for PHA-based products was low (at most 28%), the level of production for work-in progress inventory was low, and there were "material amounts" of finished goods and raw materials. The inference from this is that large amounts of inventory were sitting, production was minimal, and customer orders were lacking. *See also* Report at page 6. Muddy Waters states that "the apparent low production volume and persistently high finished goods inventory is due to weak demand for DNMR's PHA compounds…. Our interpretation is that DNMR's sub-scale production of PHA compounds consistently outstrips demand, as there is a significant, persistent finished product balance and essentially no work in process. One subset of this concern is the possibility that DNMR is producing significant amounts of non-salable product." *Id.*

- In Q2 2021, during which time Danimer completed the debottlenecking of its facility, the Company produced approximately 1.2 million pounds of Nodax®, which equates to approximately 47% capacity utilization for the three-month period.

- In July 2021, Danimer produced approximately 0.6 million pounds of Nodax®, which equates to approximately 69% capacity utilization for the one-month period.

As previously detailed and prior to considering the integration of Rinnovo™ in the Company's formulations, Phase II construction in Kentucky is underway with production expected to commence in Q2 2022, adding an expected 45 million pounds of finished product (or approximately 22.5 million pounds of Nodax®) to annual nameplate PHA capacity.

## VII.   CLASS ACTION ALLEGATIONS

220.   Plaintiffs brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of shares of Danimer stock were publicly traded during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Danimer or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

221.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.   Whether Defendants violated the Exchange Act and Securities Act;

b.   Whether Defendants omitted and/or misrepresented material facts;

c.   Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.   Whether Defendants acted with the requisite state of mind;

e.   Whether the price of the Company's stock was artificially inflated; and

f.   The extent of damage sustained by Class members and the appropriate measure of damages.

222.   Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct alleged herein.

223.   Plaintiffs will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiffs have no interests that conflict with those of the Class.

224.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## VIII.   FRAUD ON THE MARKET

225.   Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a.   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.   The omissions and misrepresentations were material;

c.   The Company's securities traded in an efficient market;

d.   The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e. Plaintiff and other members of the class purchased the Company's securities between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

226. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's securities, which reflected all information in the market, including the misstatements by Defendants.

## IX.    NO SAFE HARBOR

227. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

228. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## X.    ADDITIONAL SCIENTER ALLEGATIONS

229. This Section only relates to claims based on fraud allegations and is not incorporated into the non-fraud claims. Based on both the facts alleged above and in this section, Defendants Croskrey, Hendrix and Dowdy acted with scienter in that each of these Defendants knew, or recklessly disregarded, or were negligent in not knowing that the public documents and

statements issued or disseminated in the name of the Company were materially false and misleading or omitted material information.  The subject matter was core information that was or should have been known to executives in their position and indeed, would have or should have been learned in the De-SPAC due diligence processes Defendants represented they undertook.

230.    In addition, Defendants were motivated either by the need for Danimer to have money to finance production facilities than would allow the Company to go forward, and/or the need of Live Oak to find an acquisition or return the money Defendants had raised.

231.    Moreover, Defendants were motivated to mislead investors and inflate the price of Danimer securities in order to reap the benefits from the sale of Danimer warrants.  At the time of the closing of the De-SPAC, there were 10,000,000 outstanding publicly traded warrants to purchase shares of Danimer common stock with an exercise price of $11.50 per share ("Public Warrants"). The Public Warrants were exercisable and potentially redeemable after May 7, 2021.  Defendants Croskrey, Hendrix and Dowdy could redeem the Public Warrants at a price of $0.01 per warrant upon a minimum of 30 days' prior written notice of redemption, if and only if the last sale price of Danimer's common stock equaled or exceeded $18.00 per share for any 20-trading days within a 30-trading day period ended three business days before we sent the notice of redemption to the warrant holders.

232.    As a result of Defendants Croskrey, Hendrix and Dowdy's wrongful conduct that inflated the price of Danimer's common stock, this requirement was met and on May 14, 2021, Defendants Croskrey, Hendrix and Dowdy notified holders of the Public Warrants of their intent to redeem them on June 16, 2021. As a result, 12,033,169 Public Warrants, including some Public Warrants that had initially been Private Warrants, were exercised and 50,965 Public Warrants were

redeemed. Net of fees, Danimer collected $138.2 million in connection with the exercises and redemptions.

## XI.   LOSS CAUSATION

233.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Danimer securities and operated as a fraud or deceit on purchasers of Danimer securities. As detailed above, when the truth about Defendants' misconduct began to be revealed, the value of the Company's securities declined precipitously as the prior artificial inflation no longer inflated the stock's prices. The decline in the price of Danimer securities were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the losses suffered by Plaintiffs and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members, was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of the Company's securities and the subsequent significant decline in the value of the Company's stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

234.    At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs and other Class members. Those statements were materially false and misleading as alleged herein. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the prices of Danimer securities to be artificially inflated. Plaintiffs and other Class members purchased Danimer securities at those artificially inflated prices, causing them to suffer damages.

235.    The following revelations contradicted statements and/or revealed omissions made by Defendants during the Class Period and were a causal element of the concurrent decline in the price of the Company's securities.

236.    On March 20, 2021, *The Wall Street Journal* published an article concerning Danimer as alleged herein. On this news, Danimer's stock price fell $6.43 per share, or approximately 13%, to close at $43.55 on March 22, 2021.

237.    On April 22, 2021, analyst Spruce Point Capital Management issued its report as alleged herein. On this news, Danimer's stock price fell from its April 21, 2021 close of $25.00 per share to an April 22, 2021 close of $22.99 per share, representing a one-day drop of $2.01 per share, or approximately 8%.

238.    On May 4, 2021, Spruce Point issued a follow up report as alleged herein. On this news, Danimer's shares further plummeted, falling from its May 3, 2021 close of $23.63 per share to a May 4, 2021 close of $22.14, representing a one-day drop of $1.49 per share, or approximately 6.3%.

239.    On September 15, 2021, Muddy Waters issued a report significantly corroborating the Spruce Point findings and going beyond.

240.    On this news, Danimer's shares further plummeted, falling from a close on September 14, 2021 of $17.24 per share to close on September 15, 2021 of $14.73 per share, a decline of $2.51 per share, or approximately 14.5%, on heavier than usual volume.

## COUNT ONE

### VIOLATIONS OF § 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER
### (AGAINST DEFENDANTS DANIMER, CROSKREY, HENDRIX, AND DOWDY)

241.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

242.     During the Class Period, Defendants named in this Count disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

243.     Defendants named in this Count violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

244.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's securities. Plaintiff and the Class would not have purchased the Company's securities at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT TWO

### VIOLATIONS OF § 20(A) OF THE EXCHANGE ACT IN CONNECTION WITH THE § 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 CLAIMS (AGAINST DEFENDANTS CROSKREY, HENDRIX, AND DOWDY)

245.     Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

246.     Defendants Croskrey, Hendrix and Dowdy acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, Defendants Croskrey, Hendrix and Dowdy had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained

of herein. Defendants Croskrey, Hendrix and Dowdy were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

### COUNT THREE

### VIOLATIONS OF § 14(A) OF THE EXCHANGE ACT
### (AGAINST DEFENDANTS DANIMER, CROSKREY, HENDRIX, TARBOX, AMBOIAN, BRAHAM, FURER, FORD AND SWEET)

247.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, however, for purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

248.    The Proxy Statement/Prospectus, documents attached thereto and/or incorporated by reference therein, and other solicitations described above contained misstatements of material facts and omitted material facts required to be stated in order to make the statements contained therein not misleading.

249.    Defendants Danimer, Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet ("Proxy Claims Defendants") did not update the solicitations or the Proxy Statement/Prospectus before the shareholder vote on December 28, 2020.

250.    The Proxy Claims Defendants, jointly and severally, solicited or permitted use of their names in solicitations set forth above in Section V.

251.    Live Oak and Danimer are issuers of the Proxy Statement/Prospectus.

252.    Live Oak and Danimer permitted the use of their names in the Proxy Statement/Prospectus by allowing the Proxy Statement/Prospectus to make false and misleading representations set forth above in Section V.H.

253.    Defendant Hendrix signed the Proxy Registration Statement and subsequent amendments, signed the cover letter for the Proxy Statement/Prospectus and otherwise permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the October 5, 2020 press release and 8-K filing and Investor Call, the Proxy Registration Statement, and the Proxy Statement/Prospectus.

254.    Defendant Croskrey solicited the votes of Live Oak shareholders, including in the October 5, 2020 press release and 8-K filing and Investor Call, the October 6, 2020 Call with TD Ameritrade, and the October 2020 Investor Presentation (Attachment to Form 8-K) and in oral communications to the media.

255.    Defendant Amboian signed the Proxy Registration Statement and subsequent amendments, and otherwise permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

256.    Defendant Tarbox signed the Proxy Registration Statement and subsequent amendments, and otherwise permitted the use of her name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

257.    Defendant Braham signed the Proxy Registration Statement and subsequent amendments, and otherwise permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement /Prospectus.

258.    Defendant Furer signed the Proxy Registration Statement and subsequent amendments, and otherwise permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

259.   Defendant Ford signed the Proxy Registration Statement and subsequent amendments, and otherwise permitted the use of his name in the Proxy Statement/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

260.   Defendant Sweet signed the Proxy Registration Statement and subsequent amendments, and otherwise permitted the use of his name in the Proxy/Prospectus, and solicited the votes of shareholders in the Proxy Statement/Prospectus.

261.   By means of the Proxy Statement/Prospectus and documents attached thereto or incorporated by reference therein, the Proxy Claims Defendants sought to secure Class members' approval of the merger, and solicited proxies from members of the Class.

262.   Each of the Proxy Claims Defendants acted negligently in making false and misleading statements of material facts, omitting material facts required to be stated in order to make the statements contained therein not misleading, and failing to update their statements, which were false at the time they were issued.

263.   The solicitations described herein were essential links in the accomplishment of the merger.  As a result of these solicitations, the Live Oak shareholders approved the De-SPAC Transaction on December 28, 2020.  Had the true financial condition and operations of Danimer been known, members of the Class eligible to vote on the De-SPAC Transaction would have voted against it and/or sold their Live Oak common stock.

264.   Class members eligible to vote on the De-SPAC Transaction were denied the opportunity to make an informed decision in voting on the De-SPAC Transaction and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

265.   This claim is brought within the applicable statute of limitations.

266.    By reason of the foregoing, the Proxy Claims Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9 promulgated thereunder, 17 C.F.R. 240.14a-9.

267.    For the purposes of this Count, Plaintiffs do not allege that any Defendant acted with fraudulent intent and expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct. This Count is based solely on negligence.

268.    The Defendants named herein violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from members of the Class by means of a Proxy Statement/Prospectus that through Defendants' negligence contained statements which, at the time and in light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary to make the statements therein not false or misleading.

269.    Defendants named in this Count, jointly and severally, solicited and/or permitted use of their names in solicitations contained in the Proxy Statement/Prospectus and other proxy solicitation materials.

270.    Defendants named in this Count were required to ensure that the Proxy Statement/Prospectus and all other proxy solicitation materials fully and fairly disclosed all material facts to allow an investor to make an informed investment decision. Defendants named in this Count were also required to but did not accurately update these statements between dissemination of these documents and the shareholder vote on December 28, 2020.

271.    By means of the Proxy Statement/Prospectus and documents attached thereto or incorporated by reference therein and other proxy solicitation materials, Defendants named in this

Count sought to secure Class members' approval of the De-SPAC Transaction and solicited proxies from members of the Class.

272.   The false and misleading statements and omissions in the Proxy Statement/Prospectus and other proxy solicitation materials are material in that a reasonable stockholder would consider them important in deciding how to vote on the De-SPAC Transaction and/or whether to exercise their cash conversion right(s). In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement/Prospectus, additional proxy solicitation materials, and in other information reasonably available to stockholders.

273.   Members of the Class eligible to vote on the De-SPAC Transaction were misled by the false and misleading statements and omissions made by Defendants named in this Count, were denied the opportunity to make a fully informed decision in voting on the De-SPAC Transaction with Live Oak without having been advised of material facts. Accordingly, members of the Class suffered foreseeable damages and were damaged as a direct and proximate result of the untrue statements and omissions set forth herein.

274.   By reason of the foregoing, Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and Rule 14a-9, promulgated thereunder, 17 C.F.R. § 240.14a-9.

## COUNT FOUR

**VIOLATIONS OF § 20(A) OF THE EXCHANGE ACT
IN CONNECTION WITH THE § 14(A) CLAIMS
(AGAINST DEFENDANTS CROSKREY, HENDRIX,
TARBOX, AMBOIAN, BRAHAM, FURER, FORD AND SWEET)**

275.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, however, for purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless

misconduct.  The underlying violation of Section 14(a) alleged in Count Three is based solely on negligence.

276.    During their tenures as officers and/or directors Danimer or Live Oak, each of Defendants Croskrey, Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet was a controlling person of Danimer or Live Oak within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers and/or directors of Danimer or Live Oak, these Defendants had the power and authority to cause Danimer or Live Oak to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the Proxy and the other solicitations described herein made by Danimer or Live Oak during the Class Period, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

277.    Defendants named in this Count participated in Danimer or Live Oak Board meetings and conference calls, reviewed the De-SPAC Transaction Agreement and voted to approve the De-SPAC Transaction, signed the Proxy Registration Statement, and solicited approval of the De-SPAC Transaction through the Live Oak Board's recommendation to vote in favor of the De-SPAC Transaction, which repeatedly appeared throughout the Proxy Statement/Prospectus.  Defendants named in this Count also signed numerous other filings with the SEC.

278.    In their capacities as senior corporate officers and/or directors of Danimer or Live Oak, and as more fully described above, these Defendants participated in the misstatements and omissions set forth above.  Indeed, Defendants named in this Count had access to information regarding the circumstances surrounding the De-SPAC Transaction, including the terms of the De-SPAC Transaction, the due diligence that had and had not been performed, and analyses of the

financial conditions, technology, and public representations of both Live Oak and Danimer.  As a result of the foregoing, Defendants named in this Count, as a group and individually, were control persons within the meaning of Section 20(a) of the Exchange Act of Danimer or Live Oak.

279.    As set forth above, the Defendants named in Count Three violated Section 14(a) of the Exchange Act by their negligent acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Danimer or Live Oak, and as a result of their own aforementioned conduct, Defendants named in this Count are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as Danimer or Live Oak are liable under Section 14(a) of the Exchange Act, to members of the Class.  Moreover, as detailed above, during the respective times these Defendants served as officers and/or directors of Danimer or Live Oak, each of these Defendants is responsible for the material misstatements and omissions made by Danimer or Live Oak.

280.    Class members eligible to vote on the De-SPAC Transaction were denied the opportunity to make an informed decision in voting on the De-SPAC Transaction and were damaged as a direct and proximate result of the untrue statements and omissions in the Proxy Statement/Prospectus and other solicitations described herein.

281.    This claim is brought within the applicable statute of limitations.

282.    By reason of the foregoing, Defendants named in this Count violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

## COUNT FIVE

### FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT (AGAINST DEFENDANTS DANIMER, HENDRIX, TARBOX, AMBOIAN, BRAHAM, FURER, FORD AND SWEET)

283.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, however, for purposes of this claim, Plaintiffs expressly exclude and disclaim any

allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on strict liability or negligence.

284.    Defendants' liability under this Count is predicated on the participation of each Defendant named in this Count in conducting the De-SPAC Transaction pursuant to the Registration Statement, which contained untrue statements of material fact, or omitted to disclose material facts.

285.    On December 29, 2020, Live Oak and Danimer issued a press release that stated the De-SPAC Transaction was completed, and that it was unanimously approved by the board of directors of Live Oak and was approved at a special meeting of Live Oak stockholders on December 28, 2020.

286.    In connection with the closing of the De-SPAC Transaction, Live Oak changed its name to Danimer and the common stock of Danimer Scientific would trade under the ticker symbol "DNMR" on the NYSE beginning December 30, 2020.

287.    On December 30, 2020, Danimer opened at $30.50 per share at on the NYSE.

288.    In violation of the Securities Act, the Registration Statement contained untrue statements of material fact and omitted to state material facts required to be disclosed or necessary to make the statements not misleading as alleged above.

289.    This Cause of Action does not sound in fraud.  Plaintiffs do not allege that Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

290.    This Count is brought by Plaintiffs pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against the Defendants named in this Count on behalf of themselves and members of the Class who purchased or otherwise acquired Danimer securities pursuant and/or traceable to

the Registration Statement issued in connection with the De-SPAC Transaction and were damaged by the acts alleged herein.

291.    Live Oak was the issuer, within the meaning of Section 11 of the Securities Act and pursuant to the Registration Statement, of the registered securities offered in the De-SPAC Transaction. As part of the De-SPAC Transactions, Live Oak changed its name to Danimer.

292.    Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet signed the Registration Statement within the meaning of Section 11 of the Securities Act.

293.    The Danimer securities described in this Count were issued and offered pursuant to the Registration Statement.

294.    All investors who purchased or otherwise acquired the registered securities after IPO are traceable to the Registration Statement.

295.    As alleged above in Section V.H, the Registration Statement contained untrue statements of material fact.

296.    Defendants named in this Count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statement, as set forth above.

297.    In connection with offering the registered securities to the public and the sale of those securities, Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

298.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Registration Statement contained untrue statements of material fact or failed

to disclose material facts when they purchased or otherwise acquired Danimer securities pursuant and/or traceable to the De-SPAC Transaction.

299.     As a direct and proximate result of the acts and omissions of Defendants in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase or acquisition of Danimer securities in the De-SPAC Transaction.

300.     By reason of the foregoing, Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet are liable under Section 11 of the Securities Act to the members of the Class who purchased or otherwise acquired Danimer securities pursuant and/or traceable to the Registration Statement.

301.     This claim is brought within one year of the discovery of the untrue statements in the Registration Statement, and within three years after the issuance of the Registration Statement.

302.     On May 14, 2021, Danimer's common stock closed at $17.72 per share.

## COUNT SIX

### FOR VIOLATION OF SECTION 12(A)(2) OF THE SECURITIES ACT
### (AGAINST DEFENDANTS HENDRIX, TARBOX,
### AMBOIAN, BRAHAM, FURER, FORD AND SWEET)

303.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, however, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on negligence.

304.     This Cause of Action is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2), on behalf of the Class, against Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet.

305.    This Cause of Action does not sound in fraud.  Plaintiffs do not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

306.    Defendants named in this Count promoted, offered or sold Danimer securities to Plaintiffs and other members of the Class for Defendants' financial benefit and the benefit of their associates by means of the Prospectus and oral communications which, as alleged above, included untrue statements of material fact or omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading.

307.    The Defendants named in this Count owed Plaintiffs and the other members of the Class who purchased or otherwise acquired Danimer securities pursuant to the Proxy Statement/Prospectus the duty to make a reasonable and diligent investigation of the statements contained in the Proxy Statement/Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading.  Defendants named in this Count, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Proxy Statement/Prospectus and oral communications as set forth above.

308.    Plaintiffs did not know, nor in the exercise of reasonable diligence could Plaintiffs have known, of the untruths and omissions contained in the Proxy Statement/Prospectus or oral communications at the time Plaintiffs acquired Danimer securities.

309.    The Defendants named in this Count, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

310.     By reason of the conduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act.

311.     As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased or otherwise acquired Danimer securities pursuant to the Proxy Statement/Prospectus or oral communications sustained substantial damages in connection with their purchases of stock.   Accordingly, Plaintiffs and the other members of the Class who purchased or otherwise acquired Danimer securities issued pursuant to the Proxy Statement/Prospectus or oral communications, seek damages to the extent permitted by law or seek to rescind and recover the consideration paid for their shares, and hereby tender their Danimer securities to Defendants named in this Count.

312.     This claim is brought within one year of the discovery of the untrue statements in the Registration Statement, and within three years after the issuance of the Registration Statement.

## COUNT SEVEN

### FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### (AGAINST DEFENDANTS HENDRIX, TARBOX, AMBOIAN, BRAHAM, FURER, FORD AND SWEET)

313.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, however, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  The underlying violations of the Securities Act are based solely on strict liability or negligence.

314.     This Count is brought by Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet on behalf of themselves and members of the Class who purchased or otherwise acquired Danimer

securities pursuant and/or traceable to the Registration Statement and were damaged by the acts alleged herein.

315.    As set forth in Counts 5 and 6, Live Oak is strictly liable under Sections 11 and 12(a)(2) of the Securities Act for untrue statements of material fact in the Registration Statement.

316.    This Cause of Action does not sound in fraud.   Plaintiffs do not allege that Defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

317.    At all relevant times, Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet were controlling persons of Live Oak within the meaning of Section 15 of the Securities Act.

318.    As set forth herein, by virtue of their positions, voting power, ownership, rights as against Live Oak, and/or specific acts, Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet had the requisite power to directly or indirectly control or influence Live Oak to engage in the acts described herein, including by causing Live Oak to issue the Registration Statement and close the De-SPAC Transaction, and exercised such power.

319.    By virtue of their positions as senior officers, or members of Live Oak's board, or their status as signatories of the Registration Statement, each of Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet had the power to control, and did control, Live Oak in closing the De-SPAC Transaction IPO, including controlling the contents of the Registration Statement, which contained materially false statements.

320.    By reason of the aforementioned conduct and by virtue of their positions as controlling persons of Live Oak, Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet are liable under Section 15 of the Securities Act, jointly and severally with, and to the same

extent as Live Oak is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired Danimer securities pursuant and/or traceable to the Registration Statement.

321.    As a direct and proximate result of the conduct of Defendants Hendrix, Tarbox, Amboian, Braham, Furer, Ford and Sweet, members of the Class suffered damages in connection with their purchase or acquisition of Danimer securities.

**COUNT EIGHT**

**FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT
(AGAINST DEFENDANTS DANIMER, CROSKREY, DOWDY,
AMBOIAN, HENDRIX, BASCO, CALHOUN, HUNT, NODA AND PRATT)**

322.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, however, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  This claim is based solely on strict liability or negligence.

323.    Defendants' liability under this Count is predicated on the participation of each Defendant in conducting the February 2021 Offering pursuant to the Feb. 2021 Registration Statement, which contained untrue statements of material fact, or omitted to disclose material facts.

324.    Danimer was the issuer, within the meaning of Section 11 of the Securities Act and pursuant to the Feb. 2021 Registration Statement, of the registered securities offered.  Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt signed the Feb. 2021 Registration Statement within the meaning of Section 11 of the Securities Act.

325.    The Danimer securities described in this Count were issued and sold pursuant to the Feb. 2021 Registration Statement. According to the Feb. 2021 Registration Statement, on February 12, 2021, the closing price of Danimer's Common Stock was $57.81 and the closing price for Danimer's publicly traded warrants was $40.26.

326.    As alleged above, the Feb. 2021 Registration Statement contained untrue statements of material fact.

327.    Defendants named in this Count issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Feb. 2021 Registration Statement, as set forth above.

328.    In connection with offering the registered securities to the public and the sale of those securities in the February 2021 Offering, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails and a national securities exchange.

329.    Class members did not know, nor in the exercise of reasonable diligence could they have known, that the Feb. 2021 Registration Statement contained untrue statements of material fact or failed to disclose material facts when they purchased or acquired Danimer securities pursuant and/or traceable to the February 2021 Offering.

330.    As a direct and proximate result of the acts and omissions of Defendants named in this count in violation of the Securities Act, the Class suffered substantial damage in connection with its purchase or acquisition of Danimer securities in the February 2021 Offering.

331.    By reason of the foregoing, Defendants Danimer, Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt are liable under Section 11 of the Securities Act to the members of the Class who purchased or otherwise acquired Danimer securities pursuant and/or traceable to the Feb. 2021 Registration Statement.

332.    On May 14, 2021, Danimer's common stock closed at $17.72 per share, and Danimer warrants closed at $6.81.

333.     This claim is brought within one year of the discovery of the untrue statements in the Feb. 2021 Registration Statement, and within three years after the issuance of the Feb. 2021 Registration Statement.

## COUNT NINE

### FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT (AGAINST DEFENDANTS CROSKREY, DOWDY, AMBOIAN, HENDRIX, BASCO, CALHOUN, HUNT, NODA AND PRATT)

334.     Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein, however, for purposes of this claim, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging or sounding in fraud or intentional or reckless misconduct.  The underlying violations of the Securities Act are based solely on strict liability or negligence.

335.     This Count is brought by Plaintiffs pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, against Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt on behalf of themselves and members of the Class who purchased or otherwise acquired Danimer securities pursuant and/or traceable to the Feb. 2021 Registration Statement and were damaged by the acts alleged herein.

336.     As set forth in Counts 7 and 8, Danimer is strictly liable under Sections 11 and 12(a)(2) of the Securities Act for untrue statements of material fact in the Feb. 2021 Registration Statement.

337.     This Cause of Action does not sound in fraud.  Plaintiffs do not allege that Defendants named in this Count acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

338.     At all relevant times, Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt were controlling persons of Danimer within the meaning of Section 15 of the Securities Act.

339.     As set forth herein, by virtue of their positions, voting power, ownership, rights as against Danimer, and/or specific acts, Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt had the requisite power to directly or indirectly control or influence Danimer to engage in the acts described herein, including by causing Danimer to close the February 2021 Offering, and exercised such power.

340.     By virtue of their positions as senior officers, or members of Danimer's board, and their status as signatories of the Feb. 2021 Registration Statement, Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt had the power to control, and did control, Danimer in closing the Feb. 2021 Offering, including controlling the contents of the Feb. 2021 Registration Statement, which contained materially false statements.

341.     By reason of the aforementioned conduct and by virtue of their positions as controlling persons of Danimer, Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt are liable under Section 15 of the Securities Act, jointly and severally with, and to the same extent as Danimer is liable under Sections 11 and 12(a)(2) of the Securities Act, to members of the Class who purchased or otherwise acquired Danimer securities pursuant and/or traceable to the Feb. 2021 Registration Statement.

342.     As a direct and proximate result of the conduct of Defendants Croskrey, Dowdy, Amboian, Hendrix, Basco, Calhoun, Hunt, Noda and Pratt, members of the Class suffered damages in connection with their purchase or acquisition of Danimer securities pursuant to or traceable to the Feb. 2021 Offering.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.      Determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and certifying Plaintiffs as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and designating Lead Counsel as Class Counsel;

B.      awarding compensatory and punitive damages in favor of Plaintiffs and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon, or rescission or a recessionary measure of damages;

C.      awarding Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.      awarding Plaintiffs and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated:  January 19, 2022                 Respectfully submitted,

                                         HAGENS BERMAN SOBOL SHAPIRO LLP

                                         By    */s/ Reed R. Kathrein*
                                                  REED R. KATHREIN
                                         Reed R. Kathrein (admitted *Pro Hac Vice*)
                                         Lucas E. Gilmore (admitted *Pro Hac Vice*)
                                         Wesley A. Wong (*Pro Hac Vice* forthcoming)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP

715 Hearst Avenue, Suite 202
Berkeley, CA  94710
Telephone: (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com
lucasg@hbsslaw.com
wesleyw@hbsslaw.com

Nathaniel A. Tarnor
HAGENS BERMAN SOBOL SHAPIRO LLP
322 8th Avenue, Suite 802
New York, NY10001
Telephone: (212) 752-5455
Facsimile:  (917) 210-3980
nathant@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

*Lead Counsel*

KAPLAN FOX & KILSHEIMER LLP
Jeffrey P. Campisi
850 Third Avenue, 14th Floor
New York, NY  10022
Telephone: (212) 687-1980
Facsimile:  (212) 687-7714
jcampisi@kaplanfox.com

*Additional Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am the ECF User whose ID and password are being used to electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the e-mail addresses registered, as denoted on the Electronic Mail Notice List, and I hereby certify that I have caused to be mailed a paper copy of the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List generated by the CM/ECF system.

*/s/ Reed R. Kathrein*
REED R. KATHREIN