UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Danimer Scientific, Inc. Securities Litigation | Master File No. 1:21-cv-02708-HG-RLM |
| | CLASS ACTION |
| This Document Relates To: | Honorable Hector Gonzalez |
| ALL ACTIONS | ORAL ARGUMENT REQUESTED |

## DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone: 212.351.4000

-and-

KANE KESSLER, P.C.
600 Third Avenue
New York, NY 10016-1901
Telephone: 212.541.6222

*Attorneys for Defendants*

**TABLE OF CONTENTS**

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 3

I.   PLAINTIFFS' ABANDONED CLAIMS (COUNTS 3–9) SHOULD BE
     DISMISSED WITH PREJUDICE ......................................................... 3

II.  THE OPPOSITION CONFIRMS THAT THE CAC PLEADS NO
     ACTIONABLE MISSTATEMENTS OR OMISSIONS OF MATERIAL
     FACT ................................................................................................... 4

     A.   Plaintiffs Have Not Alleged That Any Of The Challenged
          Statements About The Biodegradability Of Nodax Are False.................. 4

     B.   Defendants' Statements Regarding Production Capacity And
          Planned Growth Are Protected Forward-Looking Statements ............... 10

     C.   The Opposition Fails To Identify Any Facts Contradicting
          Statements Regarding Customers And Demand..................................... 12

     D.   Plaintiffs Identify No Duty To Disclose Decade-Old Settlements
          To Which Mr. Croskrey Was Not A Party .............................................. 14

III. THE OPPOSITION CANNOT CURE THE CAC'S FAILURE TO
     ADEQUATELY PLEAD SCIENTER .................................................. 15

     A.   Plaintiffs Do Not Identify Any Particularized Improper Motive............. 15

     B.   The Opposition Confirms Plaintiffs Have Not Pled Strong
          Circumstantial Evidence Of Conscious Misbehavior Or
          Recklessness ....................................................................................... 19

IV.  THE COURT SHOULD DISREGARD OR STRIKE THE EXTENSIVE
     FOOTNOTES IN PLAINTIFFS' OPPOSITION BRIEF, WHICH FLOUT
     APPLICABLE PAGE LIMITS............................................................. 24

CONCLUSION....................................................................................................... 25

# TABLE OF AUTHORITIES

Page

C<span>ASES</span>

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) .................................................................16

*Alix v. McKinsey & Co.*,
404 F. Supp. 3d 827 (S.D.N.Y. 2019) *vacated*, 23 F.4th 196 (2d Cir. 2022) .........................24

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)...................................................22

*Arkansas Pub. Employees Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ...............................................................10

*C.D.T.S. No. 1 & A.T.U. Local 1321 Pension Plan v. UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom.*
*Westchester Teamsters Pension Fund v. UBS AG*, 604 Fed. App'x 5 (2d Cir. 2015) .............15

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) ...........................................................22

*Chill v. Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996)...........................................................3, 18

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010).....................................................22

*Cornwall v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010).....................................................22

*Cortese v. Skanska Koch, Inc.*,
2021 WL 429971 (S.D.N.Y. Feb. 8, 2021)...............................................17

*ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...............................................................18

*ECM Biofilms, Inc. v. Fed. Trade Comm'n*,
851 F.3d 599 (6th Cir. 2017) ..............................................................9

*In re Emex Corp. Sec. Litig.*,
2002 WL 31093612 (S.D.N.Y. Sept. 18, 2002)..........................................16

*In re EVCI Colleges Holding Corp. Sec. Litig.*,
469 F. Supp. 2d 88 (S.D.N.Y. 2006)......................................................22

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Fed Ex Corp. Sec. Litig.*,
    517 F. Supp. 3d 216 (S.D.N.Y. 2021)...................................................................11

*Fries v. Northern Oil & Gas, Inc.*,
    285 F. Supp. 3d 706 (S.D.N.Y. 2018)...................................................................15

*Geiger v. Solomon-Page Grp., Ltd.*,
    933 F. Supp. 1180 (S.D.N.Y. 1996).......................................................................18

*In re Gilat Satellite Networks, Ltd.*,
    2005 WL 2277476 (E.D.N.Y. Sept. 19, 2005) .......................................................16

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)...................................................................22

*Glickman v. Alexander & Alexander Servs., Inc.*,
    1996 WL 88570 (S.D.N.Y. Feb. 29, 1996).............................................................16

*In re HEXO Corp. Sec. Litig.*,
    524 F. Supp. 3d 283 (S.D.N.Y. 2021)...................................................................11

*Jackson v. Abernathy*,
    960 F.3d 94 (2d Cir. 2020)............................................................................17, 21

*Janus Capital Group, Inc. v. First Derivative Traders*,
    564 U.S. 135 (2011)..........................................................................................6

*Lipow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)...................................................................23

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010)...................................................................22

*In re Manulife Fin. Corp. Sec. Litig.*,
    276 F.R.D. 87 (S.D.N.Y. 2011) .........................................................................23

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ...........................................................................6

*In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*,
    272 F. Supp. 2d 243 (S.D.N.Y. 2003)...................................................................14

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000)..........................................................................19, 21

**TABLE OF AUTHORITIES**
(continued)

Page

*Oklahoma Firefighters Pension & Ret. System v. Lexmark Int'l., Inc.*,
    367 F. Supp. 3d 16 (S.D.N.Y. 2019)............................................................................8

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................................10

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)............................................................................14

*In re OSG Sec. Litig.*,
    971 F. Supp. 2d 387 (S.D.N.Y. 2013)............................................................16

*Patel v. L-3 Commc'ns Holdings Inc.*,
    2016 WL 1629325 (S.D.N.Y. Apr. 21, 2016)..................................................23

*Russo v. Bruce*,
    777 F. Supp. 2d 505 (S.D.N.Y. 2011)............................................................17

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)............................................................................23

*Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*,
    339 F. Supp. 3d 169 (S.D.N.Y. 2018)............................................................21

*Set Capital LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)............................................................................18

*Sinay v. CNOOC Ltd.*,
    554 F. App'x 40 (2d Cir. 2014) ......................................................................21

*St. Francis Holdings, LLC v. MMP Capital, Inc.*,
    2022 WL 991980 (S.D.N.Y. Mar. 31, 2022) ..................................................12

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008)......................................................................17, 21

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................................................15

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)............................................................................10

*Turner v. MagicJack VocalTec. Ltd.*,
    2014 WL 406917 (S.D.N.Y. Feb. 3, 2014)......................................................19

**TABLE OF AUTHORITIES**
(continued)

Page

*U.S. v. Matthews*,
    787 F.2d 38 (2d Cir. 1986).................................................................15

*Universal Health Servs., Inc. v. U.S.*,
    579 U.S. 176 (2016)...........................................................................8

*Varda, Inc. v. Ins. Co. of N. Am.*,
    45 F.3d 634 (2d Cir. 1995)................................................................25

*In re Vivendi Universal, S.A. Sec. Litig.*,
    2004 WL 876050 (S.D.N.Y. Apr. 22, 2004).....................................16

*Wright v. Ernst & Young LLP*,
    152 F.3d 169 (2d Cir. 1998)..............................................................17

**STATUTES**

15 U.S.C. § 78u-5(b)(1)(B).....................................................................11

**OTHER AUTHORITIES**

TÜV Austria, Doc Center, *available at* https://www.tuv-at.be/green-marks/doc-center/ ..............9

**REGULATIONS**

16 C.F.R. § 260.8...................................................................................9

17 C.F.R. § 230.419...............................................................................11

17 C.F.R. § 240.3a51-1...........................................................................11

## PRELIMINARY STATEMENT

Plaintiffs have abandoned virtually all of their claims.  The only remaining claims—a Section 10(b) securities fraud claim, and a tag-along control person claim under Section 20(a)—are subject to the stringent pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure.  Notwithstanding their opposition, Plaintiffs failed to assert allegations in the CAC demonstrating any material misstatement of fact necessary to support a fraud claim, nor did Plaintiffs allege particularized facts demonstrating that any of the remaining few Defendants intentionally lied to investors or were highly reckless in not knowing that the statements challenged in Plaintiffs' complaint were false.  Thus, the CAC should be dismissed because it fails to meet the strict standard for pleading the essential falsity and scienter elements of a securities fraud claim.  And with no primary violation of the federal securities laws, the control person claim fails as well.

Defendants demonstrated in their motion to dismiss that the crux of Plaintiffs' claim—that Defendants lied when saying that forks, straws, and other products manufactured using Nodax® would biodegrade within weeks—was based on a misleading conflation of the Nodax raw material manufactured and sold by Danimer, and the end products manufactured and sold by third parties that merely incorporated Nodax.  Plaintiffs offer no persuasive response to this argument in their opposition brief.  Instead, Plaintiffs point to short seller reports and articles cited in their pleading, which say that third-party products manufactured using Nodax *as a component* may take longer to break down than Nodax in its raw form.  But the actual statements challenged in the CAC—read in full and in context—make clear Defendants never said products made using Nodax would "disappear within weeks, in all environments."  In fact, Defendants never even said *Nodax* would "disappear within weeks, in all environments."  Defendants said that Nodax itself would biodegrade in various timeframes and under certain environmental

1

conditions based on certifications provided by independent, third-party scientific organizations that tested and certified the biodegradability of Nodax.

Plaintiffs' other efforts to manufacture a misstatement in their opposition brief are without merit. Plaintiffs failed to refute that sales projections were protected forward-looking statements. Similarly, while Plaintiffs argue that Danimer's statements concerning its key partnerships were misleading because those agreements were for the development of products, not the sale of Nodax, the facts demonstrate that Danimer never said otherwise, but repeatedly identified the types of partnerships it entered into with PepsiCo, Bacardi, and others, including both supply agreements and agreements for the research and development of consumer products. Further, Plaintiffs have no response to the black letter law cited in Defendants' motion to dismiss holding that Danimer had no duty to disclose a long-ago, publicly-available settlement involving a company where Danimer's CEO used to work.

Plaintiffs cannot glean from their pleading the necessary particularized facts to plead scienter. They must identify particularized factual allegations that ***each of*** Messrs. Croskrey, Hendrix, and Dowdy consciously misled investors—meaning that ***each of them*** made public statements knowing that they were false or misleading or they were highly reckless by ignoring contradictory information. Plaintiffs fail to identify a single factual allegation indicating that any one of them knew any statement was false when made.

There is no evidence of a deliberate falsehood, reckless conduct, or any allegation that at the time the challenged statements were made any Defendant possessed contradictory information, had access to data that would refute their statements, or otherwise had reason to believe their statements were misleading. To the contrary, the CAC and incorporated documents

2

make clear that Defendants relied upon certifications, test reports, and scientific studies supporting their statements.

Finally, Plaintiffs fail to adequately plead motive.  At most, Plaintiffs argue that the individual defendants wanted Danimer to succeed, but that is far from the kind of particularized and individualized factual allegations required to plead scienter.  *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (allegations that defendant was motivated by "the appearance of corporate profitability, or of the success of an investment" were insufficient to plead scienter).  Nor do Plaintiffs claim any individual benefitted personally or financially from the alleged fraud.

Plaintiffs have withdrawn more than three-quarters of their claims.  Having declined to amend when given the opportunity, those claims should be dismissed with prejudice.  What remains is a scattershot attack on Danimer's business with no serious allegation that any of the remaining Defendants made a misstatement with the intent to deceive.  The CAC should therefore be dismissed in its entirety.

## ARGUMENT

## I.   PLAINTIFFS' ABANDONED CLAIMS (COUNTS 3–9) SHOULD BE DISMISSED WITH PREJUDICE

By withdrawing most of their claims, Plaintiffs concede that their CAC was wildly overbroad—asserting nine claims against fifteen defendants, many of whom had no connection to Danimer's business and made none of the statements alleged to have been untrue.  Plaintiffs elected to proceed with their overbroad pleading despite the Court's invitation that Plaintiffs could amend their complaint before engaging in motion practice.  *See* ECF 49 at 1–2; Docket Order re ECF 49.[1]  In response to the motion to dismiss, Plaintiffs have now voluntarily whittled

---

[1]  Plaintiffs state in their opposition that they are withdrawing all Securities Act claims and reference Counts 5–8.  Opp'n Br. at 1 n.2.  Count 9 necessarily is withdrawn as well, since that

their nine-count CAC down to a lone Section 10(b) Exchange Act claim and a tag-along control person claim.  Opp'n Br. at 1 n.2.[2]  Plaintiffs had the opportunity to amend these claims, pursued them instead, and now have withdrawn them.  The Court should dismiss these seven counts with prejudice.

## II.     THE OPPOSITION CONFIRMS THAT THE CAC PLEADS NO ACTIONABLE MISSTATEMENTS OR OMISSIONS OF MATERIAL FACT

Plaintiffs' Section 10(b) claim must be dismissed with prejudice because Plaintiffs failed to plead facts demonstrating that any of the statements challenged in the CAC were false or misleading and Plaintiffs declined the Court's invitation to amend these claims prior to Defendants' motion to dismiss.

### A.     Plaintiffs Have Not Alleged That Any Of The Challenged Statements About The Biodegradability Of Nodax Are False

Plaintiffs' Opposition merely repeats the same shortcomings as the CAC:  Plaintiffs conflate Nodax—the raw material Danimer manufactures and tests for biodegradability in various environments—with consumer products manufactured by third parties that incorporate Nodax.  Plaintiffs refuse to address this important distinction between Nodax and end products that incorporate the raw material.  Instead, Plaintiffs badly mischaracterize their own pleading in a failed attempt to manufacture a misstatement.

Plaintiffs cite to more than 30 CAC paragraphs to argue that "Defendants repeatedly made false representations to investors that Nodax (and products with which it was made) was

---

Count is a Section 15 Securities Act claim for secondary liability that depends on a primary violation under Count 8.

[2]  References to "Opp'n Br." are to Plaintiffs' brief in opposition to the motion to dismiss.  ECF 62.  References to "Appendix" are to the appendices filed therewith.  References to "Op. Br." are to Defendants' opening brief in support of their motion.  ECF 61-1.  References to "Ex." are to the exhibits filed therewith.

100% biodegradable and would reliably breakdown and quickly disappear in weeks, in all environments including landfills and the ocean."  Opp'n Br. at 14.  However, the actual language in the cited paragraphs makes clear that Defendants ***never promised*** that "products with which [Nodax] was made" would "quickly disappear in weeks, in all environments. . . ."  *See id.*  Seven of the cited paragraphs do not discuss biodegradability at all.[3]  Several other paragraphs refer to conclusions made by the Plaintiffs themselves, not Defendants.[4]  Other statements refer to ongoing product development projects with third parties involving products that do not yet exist.[5]  Yet other statements refer to Nodax only and *not* to any then-existing end product.[6]  In the CNBC interview of Mr. Croskrey that Plaintiffs highlight in their brief, the network displayed an image of a spoon accompanied by the language "After Eight Weeks of Composting."  *Id.* at 15.  However, Mr. Croskrey said nothing about the time it takes Nodax or third-party products manufactured using Nodax to biodegrade, nor have Plaintiffs even alleged that the image was visible to Mr. Croskrey during the interview.  And Plaintiffs cite no law suggesting that Mr. Croskrey had a duty to explain or correct an image or statement offered by the CNBC anchor.

---

[3]  *See* CAC ¶¶ 138 (discussing product demand), 146–47 (discussing take-or-pay contracts), 148 (discussing Pepsi's equity investment), 149 (discussing production capacity), 162 (discussing Danimer's partnerships), 163 (discussing Defendant Croskrey's background), 164 (discussing internal controls).

[4]  CAC ¶¶ 78 (summarizing Plaintiffs' characterization of biodegradability statements without providing specific statement, speaker, or time of statement), 87 (same), 172 (referencing Danimer's SEC filings generally).

[5]  CAC ¶¶ 153 (referring to an ongoing development project with Bacardi); 156 (discussing ongoing development project with Eagle Beverage); 177 (discussing ongoing development project with Mars Wrigley).

[6]  CAC ¶¶ 3 (discussing biodegradation of Nodax and separately discussing its use in a wide variety of products), 132 & 136 (same), 134 (referring to "resin"); 10, 141, 161, 167, 180 & 182 (referring to Danimer's "polymer" and not end products), 143 (describing Mr. Croskrey's general description of PHA biodegradation that he provided to a news anchor), 137, 139, 151, 182 & 196 (referring to PHA).

Nothing in the opposition cures the fatal flaws in the CAC:  Plaintiffs failed to point to a single statement in which Defendants made any representation about the biodegradability of third-party products manufactured using Nodax.  And Plaintiffs failed to respond or address the evidence referenced in the CAC and the documents it incorporates demonstrating that Defendants' statements about the biodegradability of Nodax were not false or misleading, and indeed were supported by rigorous third-party scientific testing.  *See* Op. Br. at 19.

Plaintiffs fail to explain or cite any authority to support how press releases about a *future product* are actionable.  Opp'n Br. at 15–16.  Instead, Plaintiffs simply state—without any support—that Danimer is responsible for statements made by third parties about their future goals of developing biodegradable bottles, CAC ¶ 153 (Bacardi bottle expected in 2023), straws, *id.* ¶ 156 (Eagle Beverage expected to launch in the year after the statement), and packaging, *id.* ¶ 177 (Mars Wrigley project aimed at developing compostable packaging).  Opp'n Br. at 15–16.  As explained in the opening brief, Op. Br. at 18 n.13, it is black letter law that Danimer is not responsible for statements made by third parties.  *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) (under Rule 10b-5(b), only "the maker of a statement," i.e., "the person or entity with ultimate authority over the statement," can be held liable for it).  Moreover, even if the challenged statements could be attributable to any of the remaining Defendants, they are inactionable opinions about future projects.  *See Martin v. Quartermain*, 732 F. App'x 37, 40 n.1 (2d Cir. 2018) ("Expressions of optimism and projections about the future are quintessential opinion statements.").

Plaintiffs fare no better arguing that Defendants misstated the biodegradability of Nodax itself.  Plaintiffs argue that Defendants lied when representing that Nodax was fully biodegradable, and lied when repeating test results showing the time in which Nodax

biodegrades in various environments.  Opp'n Br. at 16–18.  The bases for Plaintiffs' argument are certain press reports which Plaintiffs allege show that Nodax is not fully biodegradable.  *Id.* However, Plaintiffs mischaracterize these press reports and ignore other, leading scientific testing.  For example, Plaintiffs misleadingly quote an excerpt from the *Wall Street Journal* article reporting that Dr. Locklin said "making broad claims about Nodax's biodegradability 'is not accurate.'"  *Id.* at 16.  But even a cursory read of the article makes clear that Dr. Locklin was referring to statements about products made from Nodax—which may biodegrade more slowly than Nodax, and not Nodax itself.  *See id.*; *see also* Ex. 13.  The same is true of the quote from Professor Narayan, cited in the *Wall Street Journal* article.  By its plain language, that quote makes clear that Professor Narayan is discussing the biodegradability of "a bottle made from Nodax," not the biodegradability of Nodax itself.  Opp'n Br. at 16.  Nothing in the article (or the CAC as a whole) supports Plaintiffs' baseless theory that Nodax itself is not fully biodegradable—a fact confirmed by numerous studies referenced in the CAC.  Op. Br. at 5.

Plaintiffs' final gambit is to argue that the TÜV certifications and numerous test reports do not support Danimer's biodegradability claims.  Plaintiffs' arguments are contrary to the plain language of the referenced documents and cannot be accepted upon a motion to dismiss. Because the TÜV certifications plainly reflect that Nodax is fully degradable in various scenarios, Op. Br. at 5 n.3, Plaintiffs instead focus on challenging the underlying methodologies—and not the findings—of TÜV.  Opp'n Br. at 17–18.  But Plaintiffs' claim that the methodologies underlying TÜV certifications somehow undercuts the accuracy of Defendants' statements about Nodax is spurious.  Defendants consistently referenced *certifications* as the bases for support for stating Nodax will degrade in certain environments. Op. Br. at 19; *see, e.g.*, CAC ¶¶ 136 (explaining PHA is "certified as marine degradable" which

"means the material will fully degrade in ocean water without leaving behind harmful microplastics"), 137 (describing certifications), 167 (same).  Plaintiffs cannot allege fraud because they are dissatisfied with the methodology used by these internationally-recognized testing facilities.

Whether an end product made with Nodax may biodegrade at a different speed than Nodax is irrelevant to the question of whether the certifications support Defendants statements about Nodax.  Nodax has received six certifications from TÜV, and Defendants accurately represented this fact.  Plaintiffs do not allege that these certifications did not exist or say something different than what Danimer reported.  Plaintiffs' only argument is that when referencing these certifications in summary public statements, Defendants should have disclosed all details underlying the testing, *e.g.*, that the testing was conducted under particular circumstances and that the timing of Nodax biodegradability may be affected by different circumstances.  *See* Opp'n Br. at 19 n.16.  Of course, Plaintiffs ignore the fact that the TÜV testing protocols and standards are publicly available and do not cite any authority mandating that Defendants disclose the underlying details of the testing protocols and standards in order to rely on or refer to the TÜV certifications.  Regardless of any criticism Plaintiffs have of TÜV's certification standards, the certifications confirm Nodax's biodegradability and the truth of Defendants' statements.

Further undermining Plaintiffs' argument, Defendants provided the public *exactly* the information that Plaintiffs accuse them of withholding.[7]  Danimer's SEC filings describe that

---

[7]   Plaintiffs cite a False Claims Act case about a medical provider claiming to be eligible for payment while simultaneously withholding violations that would affect its qualification, *Universal Health Servs., Inc. v. U.S.*, 579 U.S. 176, 188 (2016), and a case where the Defendants issued a rosy statement about global inventory while withholding information—that only the defendant knew— about inventory in a key market, *Oklahoma Firefighters Pension & Ret.*

Nodax holds six TÜV certifications.  *See*, *e.g.*, Ex. 2 at 6.  The TÜV certifications standards are publicly available: the methodologies and testing requirements are included on the company's website, and these standards incorporate standards of three of the largest international standardization groups.  TÜV Austria, Doc Center, *available at* https://www.tuv-at.be/green-marks/doc-center/ (last visited Sept. 6, 2022) (providing certification schemes, which incorporate procedures and requirements of the American Society for Testing and Materials International, International Organization for Standardization, and European Standards).  Plaintiffs fail to show that Defendants overstated or contradicted the TÜV certifications.

Lacking any support in the applicable securities law, Plaintiffs instead rely on inapposite FTC guidance and case law.  Opp'n. Br. at 17, 19 (citing 16 C.F.R. § 260.8 and *ECM Biofilms, Inc. v. Fed. Trade Comm'n*, 851 F.3d 599 (6th Cir. 2017)).  Title 16 of the Code of Federal Regulations Section 260.8 (Guides for the Use of Environmental Marketing Claim: Degradable) is an FTC guide concerning marketing of end products—not raw materials like Nodax—to consumers.  This FTC guidance has no bearing on the question of whether a putative securities class action plaintiff has met the standard for pleading a misstatement made to investors under the federal securities laws, and Plaintiff cites no authority suggesting otherwise.

Plaintiffs' reliance on FTC case law is equally unpersuasive.  The single case Plaintiffs cited, *ECM BioFilms*, has nothing to do with pleading a false statement under the federal securities laws.  *See* Opp'n. Br. at 19.  Instead, it upholds FTC findings applying its own regulations regarding green representations to consumers.  *ECM BioFilms*, 851 F.3d at 612.

---

*System v. Lexmark Int'l., Inc.*, 367 F. Supp. 3d 16, 31 (S.D.N.Y. 2019).  Opp'n Br. 19 n.16. Neither of these cases are analogous because Danimer did not hide, but rather publicly touted, the science-backed certifications that supported the biodegradability statements about Nodax.

In sum, Plaintiffs failed to plead particularized facts demonstrating that Defendants made a material misstatement about the biodegradability of Danimer's Nodax product.

## B.  Defendants' Statements Regarding Production Capacity And Planned Growth Are Protected Forward-Looking Statements

Plaintiffs argue that the statements about production capacity at Danimer's Kentucky facility fall outside the safe harbor for forward looking statements because "a statement about current capacity . . . is not forward looking." Opp'n Br. at 20.  Yet again, Plaintiffs mischaracterize the statements at issue.  The PowerPoint slides containing the information Plaintiffs claim was misleading make clear that Defendants were stating their *opinions* about the Kentucky facility's anticipated future production capacity, not Danimer's existing production levels.  *E.g.,* CAC ¶¶ 81 (slide titled Organic Growth **Opportunity**, and referring Danimer's **plans** to produce ~20mm of annual product), 101 (showing **estimates** of future growth between Phase 1 and Phase 2).  Defendants qualified other statements about production capacity in forward-looking terms:  they "**expected**" to reach the goal of goal of 20 million pounds "**once**" Phase 1 was producing at full capacity and "**believe[d]** that the capacity of the plant [**could**] be expanded." *Id.* ¶ 173 (emphasis added).  These statements about future production milestones are forward-looking because they were contingent on Danimer reaching new production goals following its Phase 1 and Phase 2 expansion.  *See Arkansas Pub. Employees Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) ("Forward-looking statements, such as predictions regarding the trial's success and [the company's] speed to market, are protected under the PSLRA."); *see also Tongue v. Sanofi*, 816 F.3d 199, 211–14 (2d Cir. 2016) (affirming dismissal of challenge to forward looking statements under *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2015)); Op. Br. at 22–24.

Nor can Plaintiffs push the statements outside the safe-harbor by arguing, in a single conclusory sentence without citation to the record, that "there is no question Defendants had actual knowledge of their overstatement."  Opp'n Br. at 21.  This type of conclusory assertion comes nowhere close to facts demonstrating actual knowledge of falsity, as required to plead around the protection of the safe harbor for forward-looking statements.  *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 232 (S.D.N.Y. 2021) ("To meet the safe harbor's actual knowledge standard for forward-looking statements, which is stricter than for statements of current fact, a Plaintiff must show knowing falsity.") (internal citation omitted).

Plaintiffs also fail to plead (or argue in their brief) that the cautionary language that accompanied Defendants' statements regarding production capacity was insufficient or boilerplate.  *See* Op. Br. at 21.  Because Danimer's disclosures warned "a reasonable investor that supply projections were not guaranteed," *see id.* (discussing Danimer's risk factors), even if they "constituted misstatements — and they do not — they would be protected under the PSLRA Safe Harbor."  *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 310–11 (S.D.N.Y. 2021).

Finally, Plaintiffs cannot overcome the safe harbor by claiming it does not apply to statements made "in connection with the offering of securities by a blank check company." 15 U.S.C. § 78u-5(b)(1)(B); *see* Opp'n Br. at 21 n.19.  This limited exception applies to companies issuing "penny stock," which was not the case here.  17 C.F.R. § 230.419 (defining a blank check company as "a development stage company that is issuing 'penny stock.'"); 17 C.F.R. § 240.3a51-1 (excluding from the definition of "penny stock" securities with a price of $4 or more, and stock issuers with net tangible assets greater than $5 million or securities listed or approved for listing on a national stock exchange).  Further, the statements Plaintiffs challenge were *not* made in the de-SPAC offering materials.  *See* CAC ¶¶ 132–37, 146, 167.

**C.** **The Opposition Fails To Identify Any Facts Contradicting Statements Regarding Customers And Demand**

In the CAC, Plaintiffs alleged that Defendants misrepresented the existence and strength of partnerships with "blue chip" companies, including PepsiCo and Bacardi, as well as the demand for Danimer's products. *See* CAC ¶¶ 109–22. In the motion to dismiss, Defendants pointed out that, first, the CAC failed to plead any facts demonstrating that Danimer lied when reporting the existence of its relationships with these "blue chip" companies, and, second, that statements about demand for Danimer's products were forward looking. Op. Br. at 25–26. Plaintiffs fail to address Defendants' arguments head on. Further, Plaintiffs ignore the argument that the demand statements were forward looking, and therefore have waived this argument. *See generally St. Francis Holdings, LLC v. MMP Capital, Inc.*, 2022 WL 991980, at *16 (S.D.N.Y. Mar. 31, 2022) (collecting cases).

While acknowledging that Danimer did in fact have partnerships with "blue chip" companies such as PepsiCo, Nestle, and Bacardi, among others, Plaintiffs claim it was misleading for Danimer to tout these partnerships because they were for the development of commercial products rather than "commercial supply agreement[s]." Opp'n Br. at 21–22. But Danimer never said that its relationships with these companies were solely through commercial supply agreements. To the contrary, Danimer repeatedly described the various types of customer relationships, including supply agreements as well as agreements for the development of commercial products. For example, in an October 5, 2020 Investor Presentation, Danimer discussed the "R&D Agreement with PepsiCo" and the "R&D Agreement with Nestle (water bottles, labels & caps)." Appendix E at 8. Slide 13 of the same presentation described the "[j]oint R&D [with PepsiCo] to design, manufacture, and evaluate PHA based resins for

12

individual layers suitable for flexible food packaging,"[8] and the "[s]ix year R&D agreement [with Nestle] to develop PHA for Nestle's PureLife water business."  *Id.* at 13; *see also* Ex. 8 at 126 ("Danimer has a number of PHA research and development ("R&D") contracts with . . . PepsiCo, Nestlé and Genpak."); Ex. 2 at 7 ("We have successfully executed multiple contracts for the development and production of PHA-based resins. . . . In October 2020, we and Bacardi Limited entered into an agreement. . . .").  Plaintiffs cannot manufacture a misstatement by hiding from the Court what Defendants actually said.

Plaintiffs also claim it was misleading for Defendants to discuss demand based on "take or pay contracts" because, according to Plaintiffs, "in truth . . . these contracts were not 100%" and "had outs if Danimer could not meet customer requirements."  Opp'n Br. at 22–23.  But Danimer is not alleged to have ever said that its contracts were "100%"—a clear mischaracterization of a statement that "customers . . . have taken multiyear time horizons and 100% take-or-pay contracts on our products," *see* CAC ¶ 137—or that agreements with PepsiCo, Bacardi, and others required these companies to purchase Nodax in any amount.  Indeed, Plaintiffs simply ignore Danimer's warnings to investors about "the speed at which potential customers qualify our biopolymers for use in their products."  *See* Ex. 11 at 5–6.  Plaintiffs point

---

[8]  Relying on the false premise that Danimer "tout[ed] production of PepsiCo snack bags in their investor presentations," Plaintiffs argue that the picture of a potato chip bag that won a bioplastics award "strongly implie[d]" that the bag was made with PHA, rather than PLA, and thus misrepresented the customer relationship.  *See* CAC ¶ 117; Opp'n Br. at 21; Appendix E at 13.  This argument ignores the actual language on the slide, describing the "[j]oint *R&D to design, develop, manufacture and evaluate* PHA based resins for individual layers suitable for flexible food packaging."  Appendix E at 13 (emphasis added).  This argument also ignores Danimer's public disclosures that make clear the anticipated future use of PHA resins for products like bags: "Danimer has successfully executed multiple contracts for the development and production of PHA-based resins. . . . Danimer and PepsiCo, Inc. entered into a joint development agreement that provides for the *development of Danimer's biodegradable film resins* to meet the packaging requirements of PepsiCo's global food and beverage business, including compostable films *to be used* in Frito Lay chip bags."  Ex. 8 at 127 (emphases added).

to no facts or law demonstrating that Defendants had a duty to disclose details of customer contracts, and Plaintiffs' vague reference to "outs" fails to meet the particularity requirement in pleading a material misstatement of fact.

Further, Plaintiffs fail to point to any facts alleged in the CAC demonstrating that, at the time of these statements, Danimer did not anticipate strong demand. Instead, to plead falsity, Plaintiffs again rely on short sellers and confidential witnesses who say that at unspecified times, such persons or entities "believe[d]" demand for Danimer's products was not strong.[9] *See* Op. Br. at 25; Opp'n Br. at 22–23. These allegations in no way demonstrate that the statements in question concerning sales progress at a particular point in time were false.

### D.   Plaintiffs Identify No Duty To Disclose Decade-Old Settlements To Which Mr. Croskrey Was Not A Party

Plaintiffs failed to refute that Defendants' argument that Danimer had no duty to disclose nine- and ten-year old settlement agreements entered into by Mr. Croskrey's former employer. Plaintiffs identify no legal obligation to disclose publicly-available information about Mr. Croskrey's former employer and its parent company related to conduct for which he was neither implicated nor charged. *See, e.g.*, *In re Merrill Lynch & Co. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243, 248 (S.D.N.Y. 2003). Even the short seller upon which Plaintiffs heavily rely merely speculates that Mr. Croskrey "*potentially attempted* to cover up" information. *See*

---

[9] Plaintiffs do not dispute that under a corrective disclosure theory, they must plausibly allege that the stock price dropped because of the disclosure of new information that actually contradicts the challenged statements. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511–12 (2d Cir. 2010). Plaintiffs simply assert that the standard is low and met, but fail to contradict that the so-called corrective disclosures are insufficient to plead a "causal link," *see* Opp'n Br. at 24, n.31, because the supposedly new information was either already public (i.e., Mr. Croskrey's former employer's parent company's settlement) or did not correct any statement (i.e., assertions regarding end products as opposed to Nodax).

Appendix A at 12 (emphasis added).  In other words, the short seller concedes that Mr. Croskrey

was never even accused of wrongdoing.  *See id.* at 13.

Unsurprisingly, Plaintiffs cite no authority supporting their argument—because none

exists.  Plaintiffs simply ignore the cases cited by Defendants for the well-established proposition

that there is no obligation to disclose uncharged conduct.  *See* Op. Br. at 26–27 (citing *U.S. v.

Matthews*, 787 F.2d 38, 49 (2d Cir. 1986); *Fries v. Northern Oil & Gas, Inc.*, 285 F. Supp. 3d

706, 718–19 (S.D.N.Y. 2018)).

## III.    THE OPPOSITION CANNOT CURE THE CAC'S FAILURE TO ADEQUATELY PLEAD SCIENTER

Plaintiffs' Section 10(b) claim must be dismissed on the independent ground that

Plaintiffs plead no particularized and individualized facts giving rise to a cogent or compelling

theory of scienter.  The standard for pleading scienter in a Section 10(b) claim is high.  Op. Br. at

29–30.  Plaintiffs must plead a "strong inference" of scienter that is "cogent and at least as

compelling as any opposing inference," *id*. at 29 (quoting *Tellabs, Inc. v. Makor Issues & Rights,

Ltd.*, 551 U.S. 308, 314 (2007)), by alleging particularized facts that show Defendants acted with

the "intent to deceive, manipulate, or defraud," *id.* (quoting *Tellabs*, 551 U.S. at 319).  Plaintiffs'

opposition cannot salvage the utterly deficient scienter allegations in the CAC.

### A.    Plaintiffs Do Not Identify Any Particularized Improper Motive

Defendants' motion to dismiss explained that Plaintiffs failed to adequately plead scienter

because the CAC did not contain particularized allegations of motive and opportunity on a

defendant-by-defendant basis.  *See* Op. Br. at 29–31; *C.D.T.S. No. 1 & A.T.U. Local 1321

Pension Plan v. UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013) ("Scienter must be

separately pled and individually supportable as to each defendant; scienter is not amenable to

group pleading."), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 Fed.

App'x 5 (2d Cir. 2015).  Generalized allegations about a desire to raise capital or for a business to succeed are insufficient to plead individualized scienter—yet that is all Plaintiffs can muster. *See Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995).

As to Defendants Croskrey and Dowdy, Plaintiffs argue in the opposition that they were "desperate for cash."  Opp'n Br. at 26.  A "'desire to raise much needed capital,'" though, is one that "[c]ourts have . . . described . . . as amongst the broadest, most generalized, and most commonplace motives of corporate motivation for any action." *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *19 (E.D.N.Y. Sept. 19, 2005) (quoting *Glickman v. Alexander & Alexander Servs., Inc.*, 1996 WL 88570, at *6 (S.D.N.Y. Feb. 29, 1996)); *see also In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 407–08 (S.D.N.Y. 2013) (noting that a desire to complete an offering, even one "critical to . . . survival," did not support an inference of scienter); *In re Emex Corp. Sec. Litig.*, 2002 WL 31093612, at *6 (S.D.N.Y. Sept. 18, 2002) ("[A] desire to raise much needed capital is an insufficient generalized motive to support an inference of scienter.") (citation omitted).[10]  Although the CAC mentions this purported desire to raise capital, CAC ¶¶ 230–31, it does not specifically attribute that motive to either Croskrey or Dowdy and instead refers generically to "Defendants." *Id.* ¶¶ 230–31.  Plaintiffs inexplicably attempt to cure their failure in the CAC to make defendant-by-defendant allegations by using the opposition to attribute generic motives to specific defendants. *See* Opp'n Br. at 26–28.  But Plaintiffs cannot

---

[10]  Plaintiffs' reliance on *In re Vivendi Universal, S.A. Sec. Litig.*, 2004 WL 876050, at *8 (S.D.N.Y. Apr. 22, 2004), is misplaced. *See* Opp'n Br. at 27.  In *Vivendi*, plaintiffs alleged that the key individual defendant wanted to create an entertainment empire and defrauded a counterparty, Liberty Media, into entering into an agreement in order to achieve that goal—and pled specific facts evidencing such.  The *Vivendi* court distinguished such fact-based allegations from more generic allegations of a desire to "prop up stock prices." *See* 2004 WL 876050 at *8. Notably, the *Vivendi* court did not anywhere address or approve generic allegations, like those in the CAC, about a need—desperate or otherwise—to raise capital, which cannot suffice to plead motive. *Vivendi* is plainly inapposite.

amend their deficient pleading through a memorandum of law.  *See Cortese v. Skanska Koch, Inc.*, 2021 WL 429971, at *18 n.4 (S.D.N.Y. Feb. 8, 2021) ("[The] [p]laintiffs' argument fails for the simple reason that it was not pleaded and a party cannot amend its complaint through a brief.") (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)).

Plaintiffs also argue that Danimer itself had its own improper motive that is indicative of scienter—namely, that the Company stood to receive a substantial capital influx by maintaining a stock price high enough to trigger the redemption of Danimer warrants.  Opp'n Br. at 27–28.  This argument fails for at least two reasons.  First, "[w]here a defendant is a corporation, this requires pleading facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020) (citation omitted).  While "it is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant" where, for example, there are specific facts demonstrating a wide-spread corporate fraud or facts linking non-specified officers to the widespread fraud, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008), the CAC is devoid of any such allegations.  Instead, the CAC disavows scienter as to all directors and officers, other than Defendants.  *See, e.g.*, CAC ¶ 289.  This case, therefore, is nothing like the cases Plaintiffs cite discussing the limited circumstances when corporate scienter is separate from scienter of the individual defendants through whom the corporation acts.  Opp'n Br. at 27 n.36.  Second, Plaintiffs' allegation that Danimer was motivated to inflate its stock price in order to trigger warrants and secure additional capital is just another form of the same generalized motive that courts routinely reject as a basis for pleading scienter.  *Russo v. Bruce*, 777 F. Supp. 2d 505, 520 (S.D.N.Y. 2011) ("A company issuing stock 'always has a generalized motive to ensure the

success of the issue and to raise as much money as possible.'") (quoting *Geiger v. Solomon-Page Grp., Ltd.*, 933 F. Supp. 1180, 1189 (S.D.N.Y. 1996)); *cf. ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) ("'[T]he desire to [inflate stock price to] achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired' . . . or to acquire another.") (citation omitted).

As to Defendant Hendrix, all Plaintiffs argue is that he had a purported desire for the SPAC his Live Oak company created to find an acquisition target within a two-year window rather than be forced to return capital to investors.  Opp'n Br. at 28.  This argument fails right out of the gate:  a desire to see the success of Live Oak is, again, common to all corporate insiders, so cannot form the basis for an illicit motive to commit fraud.  *See, e.g.*, *Chill*, 101 F.3d at 268 (holding claim that defendant was motivated by "the appearance of corporate profitability, or of the success of an investment" insufficient to plead scienter).  Plaintiffs' "time pressure" theory makes little sense and does not salvage Plaintiffs' pleading failures.  Live Oak was formed in May 2020 and the Danimer transaction took place in late-2020, *see* Op. Br. at 6–7, so even if the Danimer acquisition did not occur, Live Oak still had a year-and-a-half to find a different target.[11]  Thus, as a matter of fact, there was no "time pressure" for Live Oak—or Mr. Hendrix—to do the Danimer deal.[12]  Plaintiffs' argument regarding the success of the SPAC also fails

---

[11]  Plaintiffs cite *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 80–81 (2d Cir. 2021), in support of their novel claim that a limited time-horizon for an investment constitutes an improper motive.  Opp'n Br. at 28.  But *Set Capital* says not a single word about SPACs or limited time-horizon investment vehicles.

[12]  Plaintiffs have abandoned their false narrative surrounding Danimer's exercise of the Public Warrants and fundraising.  The CAC implied that "Croskrey, Hendrix and Dowdy" stood to gain financially because they could "redeem the Public Warrants at a price of $0.01 per warrant." CAC ¶ 231.  However, as Plaintiffs now concede, it was Danimer that held the right to redeem the Public Warrants, thereby admitting that the individual defendants received no personal financial gain from that redemption.  *See* Opp'n Br. at 27–28.

because the CAC generically casts it as one possessed by all of the "Defendants," CAC ¶ 230, which is a sharp contrast to Plaintiffs' opposition brief that specifically ties this allegation solely to Mr. Hendrix.  Opp'n Br. at 28.  Again, Plaintiffs are not permitted to amend their pleading through a brief.

Likewise, the clearest evidence of a defendant acting on motive and opportunity to commit fraud—selling stock before the alleged fraud is revealed—is completely absent here. *See Turner v. MagicJack VocalTec. Ltd.*, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) (absence of insider sales rebuts inference of scienter).  Plaintiffs have no response to this irrefutable fact that strongly undercuts any inference of fraud.  The bottom line is that the CAC lacks any particularized, well-pled, defendant-specific factual allegations demonstrating that any defendant had an improper motive and opportunity to commit fraud.

### B.   The Opposition Confirms Plaintiffs Have Not Pled Strong Circumstantial Evidence Of Conscious Misbehavior Or Recklessness

Plaintiffs also fail to satisfy the heightened standard for pleading scienter by claiming that the remaining Defendants knew or were highly reckless in not knowing that their challenged statements were false.  *See* Op. Br. at 31–34.  Plaintiffs argue that five categories of purported circumstantial evidence suffice to plead the required strong showing of conscious wrongdoing or recklessness:  (1) so-called "admissions," (2) the "core operations" doctrine, (3) CW statements, (4) preliminary regulator investigations, and (5) funding of scientific research.  These allegations, standing alone or taken together, come nowhere close to particularized allegations of "knowledge of facts or access to information contradicting [the individual defendants'] public statements."  *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

First, Plaintiffs point to so-called "admissions" they claim support an inference of scienter.  But the allegations they point to in no way suggest that the individual defendants knew

or were highly reckless in not knowing that the challenged statements about the biodegradability of Nodax were false or misleading when made. Opp'n Br. at 29–31. For example, Plaintiffs mischaracterize a statement by Danimer's CTO Van Trump—who is not even a Defendant—in response to questions from the author of the *Wall Street Journal* article. Opp'n Br. at 29. Van Trump's statement was in response to a question about the ability of **<u>end products</u>** containing Nodax to biodegrade in what the article's author called "modern landfills" (which the author defined as being explicitly "designed to prevent biodegradation"), and the context makes clear that Van Trump responded that the end products discussed were unlikely to biodegrade in such biodegradation-preventing landfills. CAC ¶¶ 89–91; Ex. 13.[13] Even a cursory review of the *Wall Street Journal* article makes clear that Van Trump did *not* "admit" Nodax is not 100% biodegradable. In fact, Plaintiffs concede in the CAC that Nodax decomposes "where there is microbial activity, such as . . . a landfill with energy recovery." CAC ¶ 90.

Plaintiffs also focus on changes made to Danimer's investor presentations over time— specifically, the removal of timing regarding the biodegradability of Nodax. Opp'n Br. at 30. Again, this is not an "admission" of anything, and in no way suggests that the individual defendants (who are not alleged to have even been involved in drafting or editing the investor presentation) knew that statements about the biodegradability of Nodax were false or misleading. Plaintiffs' other examples of so-called "admissions" are nothing more than impermissible attempts at pleading "fraud by hindsight." For example, Plaintiffs argue that Defendants' statements about estimated production specifications and plans articulated in 2020 were somehow admitted to be false because Danimer's actual production levels did not meet the

---

[13]  Given that there was no "admission" by Danimer's CTO, the cases Plaintiffs cite (Opp'n Br. at 29–30 n.41) regarding explicit corporate corrections have no bearing here.

Company's projections.  Opp'n Br. at 20–21.  That is not evidence of scienter; it is evidence that,

unfortunately, the Company's performance did not pan out as the Company had projected.

Second, Plaintiffs invoke the "core operations" doctrine.  Opp'n Br. at 31–32.  But it is

settled law that the "core operations" doctrine cannot suffice, standing alone, to plead scienter.

*See Sachsenberg v. IRSA Inversiones y Representaciones Sociedad Anónima*, 339 F. Supp. 3d

169, 183–84 (S.D.N.Y. 2018).  Even if particularized "core operations" allegations could

constitute part of a "holistic analysis" of scienter, the allegations in the CAC come nowhere close

to demonstrating that the individual defendants had access to unspecified "core information," nor

do Plaintiffs "specifically identify the reports or statements containing [contradictory]

information," or provide allegations showing how or why the data to which they allegedly had

access would have undermined their belief in the veracity of their statements.  *See id.* at 183;

*Teamsters Local 445*, 531 F.3d at 196.  Plaintiffs' conclusory assertion that unspecified

defendants "must have known" that the challenged statements were false is plainly insufficient to

support an inference of scienter.  *Sinay v. CNOOC Ltd.*, 554 F. App'x 40, 42 (2d Cir. 2014)

(finding that plaintiff failed to adequately allege scienter based on what defendant "must have

known"); *see Jackson*, 960 F.3d at 99 ("Such a naked assertion, without more, is plainly

insufficient to raise a strong inference of collective corporate scienter."); *see also Novak*, 216

F.3d at 309 (pleading scienter with allegations of "access to contrary facts" requires

"identify[ing] the reports or statements containing this information").

Third, the allegations attributed to confidential witnesses are likewise unavailing.  Opp'n

Br. at 32–33.  The CWs' statements cannot be indicative of scienter, because they do not

demonstrate that the individual defendants believed their statements to be false at the time they

were made.  At most, the allegations attributed to CWs reflect the same improper conflation of

Nodax and end products that infects the entire CAC.  *See, e.g.*, CAC ¶ 97 (CW1 discussing a

fork in a display case in Danimer's building lobby that did not appear to degrade quickly).  Even

more, none of the CWs are alleged to have met with, reported to, worked with, or had any

interaction whatsoever with the individual defendants—and as such the statements from the CWs

do not reflect the state of mind of the individual defendants.  "[C]onfidential source allegations

must show that individual defendants actually possessed the knowledge highlighting the falsity

of public statements; conclusory statements that defendants 'were aware' of certain information,

and mere allegations that defendants 'would have' or 'should have' had such knowledge is

insufficient."  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590–91 (S.D.N.Y. 2011); *see Campo v.

Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010) (agreeing with district court's

minimal consideration of CW allegations where the source claimed that individuals *could* access

conflicting information, not that they did); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206,

245 (S.D.N.Y. 2010) (rejecting allegations from CWs about disputed issues being "common

knowledge" as "too vague and conclusory"); *Local No. 38 Int'l Bhd. of Elec. Workers Pension

Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010) (holding that "a close

examination of [the CWs'] statements reveals the absence of any allegation that such data had

been presented to management" and a failure to "establish what specific contradictory

information the Individual Defendants received or when they received it").[14]

---

[14]  Not one of the cases Plaintiffs cite is on point (Opp'n Br. at 33 n.48), as they feature CW
allegations about specific reports provided to senior executives (*Cornwall v. Credit Suisse Grp.*,
689 F. Supp. 2d 629, 637–38 (S.D.N.Y. 2010)), CW allegations concerning announcements
executives made to employees (*In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 504 (S.D.N.Y.
2005)), or CWs who held senior roles and recounted specific conversations with the CEO (*In re
EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 95–97 (S.D.N.Y. 2006)).  No such
facts are pled here because there are no allegations of any interaction whatsoever between or
among the CWs and the individual defendants.

Fourth, Plaintiffs argue that the existence of two regulatory investigations somehow means the defendants acted with scienter.  Opp'n Br. at 34.  Nonsense.  "[G]overnment investigations cannot bolster allegations of scienter that do not exist."  *Lipow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 167 (S.D.N.Y. 2015); *see Patel v. L-3 Commc'ns Holdings Inc.*, 2016 WL 1629325, at *10 n.31 (S.D.N.Y. Apr. 21, 2016) ("Government investigations on their own do not create a strong inference of scienter."); *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 102 (S.D.N.Y. 2011) ("[T]he fact that a regulator is fulfilling [its obligation to examine public companies] cannot be sufficient to allege scienter.").

Fifth, Plaintiffs make the puzzling argument that Danimer's funding of scientific research on its products—hardly surprising given the nature of Danimer's business—supports an inference that Danimer's senior-most officers lied to investors.  Opp'n Br. at 34.  Not surprisingly, Plaintiffs cite no case law holding that funding research by a third party supports an inference of scienter.  Notably, Plaintiffs do not challenge the academic integrity of the multiple authors who participated in the research and publication of the peer-reviewed study in the *Environmental Science & Technology* journal, nor the efficacy of its findings.  Regardless, Defendants' statements about Nodax are also supported by extensive testing and certifications from independent third parties, not simply the one UGA study that Plaintiffs focus on in the CAC.  Danimer's funding of research into its key products does not move the needle on scienter.

Plaintiffs must plead particularized facts demonstrating that Defendants acted with such "an extreme departure from the standards of ordinary care to the extent that the danger [of making an untrue statement] was either known to the defendant or so obvious that the defendant must have been aware of it."  *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (citation omitted).  This is an exacting standard for any plaintiff to meet, and the CAC

fails to plead the required particularized facts supporting a strong inference that any of the remaining Defendants knew or were highly reckless in not knowing that any of the challenged statements were false.  This applies not only with respect to the statements about the biodegradability of Nodax, but especially so with respect to the other categories of alleged misstatements, about which Plaintiffs do not even try to plead facts demonstrating that any defendant acted intentionally or recklessly.  The Section 10(b) claim should be dismissed on the independent ground that Plaintiffs' have failed to plead scienter as to any of the remaining Defendants.[15]

## IV.   THE COURT SHOULD DISREGARD OR STRIKE THE EXTENSIVE FOOTNOTES IN PLAINTIFFS' OPPOSITION BRIEF, WHICH FLOUT APPLICABLE PAGE LIMITS

Plaintiffs' 35-page opposition brief contains 50 footnotes, spanning 360 lines and including 5,079 words—or 38% of the 13,300 total words in Plaintiffs' brief—including a three-column chart in 10-point font.  Including the content of these footnotes in the body of a properly formatted brief would add nearly 15 pages to Plaintiffs' brief.  Plaintiffs included these voluminous footnotes in response to the arguments raised in only a single claim—Count I— while forcing Defendants to spend extensive portions of their opening brief responding to baseless claims Plaintiffs have now abandoned.  This is improper gamesmanship at best, and an abuse of process at worst.  Regardless, the Court should strike or disregard Plaintiffs' footnotes, which flout the page limitations set forth in this Court's Individual Practices.  *See, e.g.*, *Alix v. McKinsey & Co.*, 404 F. Supp. 3d 827, 832 n.3 (S.D.N.Y. 2019) *vacated*, 23 F.4th 196 (2d Cir. 2022) ("[T]he Court would be on firm ground either in striking Alix's brief or in disregarding all

---

[15]   The control-person claim also should be dismissed based on Plaintiffs' failure to plead a primary violation, and nothing in Plaintiffs' opposition suggests otherwise.  Op. Br. at 34–35.

arguments relegated to footnotes."); *see also Varda, Inc. v. Ins. Co. of N. Am.*, 45 F.3d 634, 640 (2d Cir. 1995) (denying costs on appeal due to appellee's "brazen[]" use of "textual footnotes to evade page limits") (citation omitted).

## CONCLUSION

For these reasons, and the reasons set forth in Defendants' opening brief, the CAC should be dismissed in its entirety, and with prejudice.

Dated:   New York, New York
         September 6, 2022

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Brian M. Lutz
    Brian M. Lutz
      blutz@gibsondunn.com
    Jonathan D. Fortney
      jfortney@gibsondunn.com
    David F. Crowley-Buck
      dcrowleybuck@gibsondunn.com
    200 Park Avenue
    New York, NY  10166-0193
    Telephone: 212.351.4000

    Lissa M. Percopo (*pro hac vice*)
      lpercopo@gibsondunn.com
    1050 Connecticut Avenue, N.W.
    Washington, DC 20036-5306
    Telephone: 202.955.8500

    -and-

    Dana M. Susman
      dsusman@kanekessler.com
    Jeffrey H. Daichman
      jdaichman@kanekessler.com
    KANE KESSLER, P.C.
    600 Third Avenue
    New York, NY 10016-1901
    Telephone: 212.541.6222

    *Attorneys for Defendants*