UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

In Re: Danimer Scientific, Inc. Securities
Litigation

**MEMORANDUM & ORDER**
21-CV-02708 & 21-CV-02824

**HECTOR GONZALEZ**, United States District Judge:

In these consolidated cases, Plaintiffs have commenced a putative class action lawsuit

asserting claims under the Securities and Exchange Act (the "Exchange Act") against Danimer

Scientific, Inc. ("Danimer"), its Chief Executive Officer, and its Chief Financial Officer.

Plaintiffs also assert claims against a member of Danimer's board of directors, who was

previously the Chief Executive Officer of a company named Live Oak Acquisition Corp. ("Live

Oak"), with which Danimer merged during the events giving rise to this case.  For the reasons set

forth below, although Plaintiffs have adequately alleged that Defendants made some statements

that were materially misleading, the Court grants Defendants' motion to dismiss in full and

dismisses Plaintiffs' claims with prejudice because Plaintiffs have failed adequately to allege

scienter.

## FACTUAL BACKGROUND

Live Oak was a publicly-traded company, known as a special purpose acquisition

company ("SPAC"), that did not operate a business and that was formed solely for the purpose of

merging with another company, thereby making the acquired company a publicly-traded

company.  ECF No. 44 ¶ 60.  Live Oak was formed in May 2019 and became a publicly-traded

company through an initial public offering ("IPO") in May 2020.  *Id.* ¶¶ 69, 71.  The class period

in this case begins on October 5, 2020, when Live Oak and Danimer jointly announced that they

had entered into a definitive agreement for a future merger between the two companies. *Id.* ¶ 73. That merger was, however, contingent on Live Oak's shareholders voting to approve it. *Id.* ¶ 8. The merger would not only take Danimer public, but also would provide Danimer with additional cash to help finance its operations, particularly an expansion of its primary production facility in Kentucky. *Id.* ¶ 15. Live Oak had raised $200 million through its IPO that, when combined with private investors who planned to help finance the merger, would provide Danimer with a total of $385 million. *Id.* ¶¶ 9, 71. Since the merger would have the effect of transforming Live Oak from a shell company with no meaningful operations into a company that carried on Danimer's business, the parties refer to the merger as a "de-SPAC" merger. *Id.* ¶ 7; ECF No. 61-1 at 6.

Danimer is a company headquartered in Georgia that focuses on producing bioplastics as an alternative to "traditional petrochemical-based plastics." ECF No. 44 ¶ 47. According to Plaintiffs, bioplastic "is often considered good for the planet because it can break down thousands of years faster than traditional plastics." *Id.* ¶ 84. Danimer produces a specific bioplastic called polyhydroxyalkanoate that it sells under the brand name "Nodax," which Plaintiffs describe as Danimer's "key product." *Id.* Defendant Stephen Croskrey has served as Danimer's Chief Executive Officer and chairman of the company's board of directors since 2016. *Id.* ¶ 48. Defendant John Dowdy has served as Danimer's Chief Financial Officer since May 2014. *Id.* ¶ 50.

During the period between announcing the merger agreement and receiving approval from Live Oak shareholders, Defendants made various investor presentations and issued press releases promoting Danimer's business. ECF No. 44 ¶¶ 132–57. Live Oak also provided a

proxy statement and prospectus to its shareholders in order to provide them with information they needed to exercise their votes on the merger. *Id.* ¶¶ 158–65.

Live Oak's shareholders approved the merger on December 28, 2020, and Danimer's previously-private shares and warrants began trading publicly on the New York Stock Exchange the next day. ECF No. 44 ¶¶ 74–75. Danimer's existing executive team, including Defendants Croskrey and Dowdy, continued to serve as executives for the merged company, and Defendant Richard Hendrix, who was previously Live Oak's CEO, was added to the merged company's board of directors. *Id.* ¶¶ 16, 48, 50. Following the merger, Danimer continued publicly to promote its business through additional press releases, interviews, and a registration statement and prospectus filed with the Securities and Exchange Commission ("SEC") in February of 2021, in connection with the company's plans to issue additional shares of stock. *Id.* ¶¶ 166–74.

Plaintiffs allege that the misleading nature of Defendants' prior positive statements about Danimer began to be revealed publicly on March 20, 2021, when the Wall Street Journal published an article about Danimer. ECF No. 44 ¶ 189. That article explained that products that incorporate Danimer's Nodax bioplastic compound would likely take much longer to biodegrade than the raw compound itself and that the environments, particularly the ocean, in which plastic products are often discarded would cause even the raw compound to biodegrade more slowly than in a laboratory environment. *Id.* ¶¶ 189–90. The article expressly stated that "many claims about Nodax are exaggerated and misleading, according to several experts on biodegradable plastics." *Id.* ¶ 189.

Danimer also became the subject of reports published by investment firms that follow a business model of taking short-sale positions in various companies and publishing negative information about those companies that the firms believe justify the short position. ECF No. 44

¶¶ 23, 35, 205.  One such firm, Spruce Point Capital Management ("Spruce Point"), published an article on April 22, 2021, criticizing Defendant Croskrey's prior tenure as the President and CEO of Armor Holdings, which previously entered into settlements with the SEC and the U.S. Department of Justice ("DOJ") related to the company's violations of the Foreign Corrupt Practices Act and the sale of defective body armor.  *Id.* ¶¶ 192–93.  In that same report, along with follow-up reports published in May 2021, Spruce Point raised concerns about the completeness and anticipated production capacity of Danimer's primary production facility in Kentucky.  *Id.* ¶¶ 195, 199–202.

Another short-selling firm, Muddy Waters Research ("Muddy Waters"), published a report on September 15, 2021, that similarly criticized Danimer's production capacity.  ECF No. 44 ¶ 212.  Muddy Waters also criticized the overall demand for Danimer's products and the strength of its customer relationships, asserting that Danimer's supposedly "take or pay" contracts with customers "reportedly have outs for the customers if [Danimer] has been unable to develop product that meets customer requirements."  *Id.* ¶¶ 212–13.  The per-share price of Danimer's stock fell on the trading days that immediately followed the Wall Street Journal article, the first two Spruce Point reports, and the Muddy Waters report.  *Id.* ¶¶ 236–40.

## **LEGAL STANDARD**

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[1]  "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d

---

[1]     Unless noted, case law quotations in this order accept all alterations and omit internal quotation marks, citations, and footnotes.

Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Although all allegations

contained in a complaint are assumed to be true, this tenet is "inapplicable to legal conclusions."

*Iqbal*, 556 U.S. at 678.

Plaintiffs have asserted their claims under Section 10(b) of the Exchange Act and Rule

10b-5, which was promulgated by the SEC pursuant to the authority granted by Section 10(b).

ECF No. 44 ¶¶ 241–44.  With respect to the individual Defendants, Plaintiffs have asserted

claims of control person liability, pursuant to Section 20(a) of the Exchange Act, based on those

Defendants' alleged ability to control Danimer.  *Id.* ¶¶ 245–46.  In order to succeed on these

claims, "a plaintiff must allege that each defendant (1) made misstatements or omissions of

material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon

which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its

injury."  *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, No. 20-

1643-cv, 2023 WL 5419147, at *12 (2d Cir. Aug. 23, 2023).  To succeed on their control person

claims, Plaintiffs must additionally "show (1) a primary violation by the controlled person, (2)

control of the primary violator by the defendant, and (3) that the defendant was, in some

meaningful sense, a culpable participant in the controlled person's fraud."  *Schwab v. E*TRADE

Fin. Corp.*, 752 F. App'x 56, 58 (2d Cir. 2018) (affirming dismissal of control person claim).

Claims asserting securities fraud under the Exchange Act are subject to heightened

pleading standards.  "Under the Private Securities Litigation Reform Act ('PSLRA') and Federal

Rule of Civil Procedure 9(b), allegations of material misstatements must be stated with

particularity and must specify each statement alleged to have been misleading, and the reason or

reasons why the statement is misleading.  In other words, a complaint must, among other

requirements, explain with particularity *why* the statements were fraudulent."  *Ark. Pub. Emps.*

*Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 353 (2d Cir. 2022) (emphasis in original). Additionally, "a plaintiff must state with particularity facts giving rise to a strong inference that the defendant acted with scienter." *New England Carpenters*, 2023 WL 5419147, at *12. Although these pleading standards are high, the Second Circuit has emphasized that courts "must be careful not to mistake heightened pleading standards for impossible ones." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021). As with any other type of case, the Court "must accept all factual allegations in the complaint as true and must consider the complaint in its entirety" and "draw all reasonable inferences in favor of the plaintiff." *Id.*

"[A]t the motion to dismiss stage, courts may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *In re Synchrony Fin. Secs. Litig.*, 988 F.3d 157, 171 (2d Cir. 2021). The Court may also take judicial notice of publicly-available documents such as news articles or reports by investment analysts, so long as the Court only "take[s] judicial notice of the fact that press coverage, prior lawsuits, or regulatory filings contained certain information, without regard to the truth of their contents." *Bristol-Myers Squibb*, 28 F.4th at 352.

## DISCUSSION

### I.   The Court Dismisses with Prejudice the Securities Act Claims that Plaintiffs Have Voluntarily Withdrawn

Plaintiffs' amended complaint initially asserted claims under Sections 11, 12, and 15 of the Securities Act, which, unlike Plaintiffs' Exchange Act claims, are not subject to a scienter requirement. Defendants argued in their opening brief that Plaintiffs had not adequately alleged standing to support a Section 11 claim because millions of Live Oak shares were already publicly trading before Live Oak filed a registration statement in connection with the December

2020 de-SPAC merger, and millions of Danimer shares were publicly trading before Danimer filed a registration statement in February 2021 in connection with its issuance of additional shares. ECF No. 61-1 at 12–13. Defendants contend that Plaintiffs, therefore, cannot demonstrate that the shares they purchased were connected to those registration statements, as opposed to the shares already trading in the market. *Id.* For largely the same reasons, Defendants argued that Plaintiffs' Section 12 claims also fail since Plaintiffs cannot demonstrate that they purchased shares directly from Defendants, as opposed to in the secondary market. *Id.* at 24–25. Plaintiffs responded to these arguments by withdrawing all of their Securities Act claims via their opposition brief, and they purported to do so "without prejudice." ECF No. 62 at 1 n.2. Defendants, in turn, responded by arguing that the dismissal should be with prejudice. ECF No. 63 at 3–4.

Dismissing Plaintiffs' Securities Act claims with prejudice is appropriate. With respect to Plaintiffs' Section 11 claims, the U.S. Supreme Court has recently held that Section 11 "requires a plaintiff to plead and prove that he purchased shares traceable to the allegedly defective registration statement." *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 770 (2023). Additionally, to assert a claim under Section 12 of the Securities Act, "[P]laintiffs must have purchased securities directly from the [D]efendants" and not in "secondary market transactions." *Freidus v. Barclays Bank PLC*, 734 F.3d 132, 141–42 (2d Cir. 2013). Lead Plaintiff Swanson and additional Plaintiff Burtner cannot satisfy these requirements because only Burtner purchased shares on one of the offering dates related to the two pairs of registration statements and prospectuses at issue, but not at the price Plaintiffs allege was the opening trading price. ECF No. 12-1; ECF No. 14-3; ECF No. 44 ¶ 287; *see Garnett v. RLX Tech. Inc.*, 632 F. Supp. 3d 574, 614 (S.D.N.Y. 2022) (holding that plaintiffs lacked standing to assert Section 12 claim

because shares they purchased on offering date were not purchased at opening price).  The Court also dismisses with prejudice Plaintiffs' control person claims under Section 15 of the Securities Act because "the success of a claim under section 15 relies, in part, on a plaintiff's ability to demonstrate primary liability under sections 11 and 12."  *Winter v. Stronghold Digital Mining, Inc.*, No. 22-cv-3088, 2023 WL 5152177, at *5 (S.D.N.Y. Aug. 10, 2023).

## II.   Plaintiffs Have Identified Some Materially Misleading Statements Related to Their Exchange Act Claims

Plaintiffs premise their Exchange Act claims on alleged misrepresentations by Defendants that, at a high level, relate to four different topics:  (i) the rate at which Danimer's bioplastic compound would biodegrade and the completeness with which it would biodegrade; (ii) Danimer's production capacity; (iii) the current demand for Danimer's products, including specific relationships with widely-recognized companies such as Pepsi, Nestlé, and Bacardi; and (iv) the track record of managerial success of Danimer's CEO, Defendant Croskrey, while working at other companies.  ECF No. 62 at 1–2.  As described further below, the Court finds that Defendants made some statements about the first topic that were materially misleading, but Defendants' statements about the remaining topics were not materially misleading.  Even with respect to Defendants' statements about biodegradability, however, Plaintiffs have failed adequately to allege that Defendants made misleading statements with scienter, as further explained in Section III of this decision.

### A.   *Statements About Rate of Biodegradability*

Plaintiffs allege that Defendants' statements that Nodax biodegrades within 12–18 weeks were materially misleading for multiple reasons.  *See* ECF No. 44 ¶ 4.  First, in order to make plastic products that consumers use, bioplastics such as Nodax are typically combined with "other plastics in the manufacturing process or even embedded within them to hold different

8

components together," causing the final product to degrade much more slowly. *Id.* ¶ 85. Second, even if raw Nodax, rather than a finished consumer product, were placed into the environment by itself, Defendants' biodegradation estimates are allegedly based on laboratory conditions that are materially different than the environments in which plastic products are commonly discarded, such as oceans and landfills, where the biodegradation process occurs much more slowly. *Id.* ¶ 84. Defendants respond to these allegations by insisting that all of their statements related to Nodax's biodegradability were statements solely about raw Nodax and that "Plaintiffs do not identify a single statement . . . in which any Defendant said that end products made with Nodax were 100% biodegradable." ECF No. 61-1 at 16.

Defendants have overstated the extent to which their public statements were focused on the biodegradability solely of Nodax and not the end products into which Nodax would be incorporated. Several statements identified in Plaintiffs' amended complaint would lead a reasonable person to believe that Defendants were making similar statements about the biodegradability of end products:

- Danimer's joint press release with Live Oak announcing their agreement to merge said that "Nodax™ . . . eliminates the need for recycling and can replace the 80% of plastics that are never recycled or incinerated." ECF No. 44 ¶ 132.

- In an interview published that same day, Defendant Croskrey said, "our particular polymer is marine degradable, which means if it finds its way into the ocean, it will still go away." ECF No. 44 ¶ 141.

- In another interview published within a few days, Defendant Croskrey said, while discussing waste disposed in landfills, "[w]hen you make a fork or a straw or whatever you want to make out of it [*i.e.*, Nodax], if it finds its way into the wrong place, bacteria will consume it." ECF No. 44 ¶ 143.

- In a joint press release that Danimer issued with Bacardi in October 2020, the companies said that they intended to collaborate to create by 2023 a "new spirits bottle made from Nodax™ PHA [that] will biodegrade in a wide range of environments, including compost, soil, freshwater and sea water, and after 18 months disappear without leaving behind harmful microplastics." ECF No. 44 ¶ 153.

- In a joint press release that Danimer issued with Eagle Beverage in November 2020, the companies said that they planned to create, by "early 2021," "straws [that] will degrade in environments ranging from industrial composting facilities to home compost units and oceans without leaving behind microplastics."  ECF No. 44 ¶ 156.

- In Danimer's press release announcing the completion of its merger with Live Oak, Danimer reiterated its statement that "Nodax . . . can replace the 80% of plastics that are never recycled or incinerated," and further said that it would "enable customers to incorporate environmentally responsible products into their supply chains."  ECF No. 44 ¶ 167.

- In an interview that Defendant Croskrey gave on CNBC in December 2020, he said "if these products get into places that they don't belong like the ocean they will be consumed by bacteria and go away completely."  ECF No. 44 ¶ 169.[2]

- In a joint press release that Danimer issued with Mars Wrigley in March 2021, the companies announced "a two-year partnership" "to introduce Nodax® PHA into flexible and rigid packaging that reliably breaks down in both industrial composting facilities and backyard compost units," including new packages for Skittles candy that were "tentatively targeted for late 2021 or early 2022."  ECF No. 44 ¶ 177; ECF No. 61-21 at 2–3.

The statements made in the press releases about partnerships with companies like Bacardi, Eagle Beverage, and Mars Wrigley are the statements that would most obviously convey to a reasonable investor that the products into which Nodax would be incorporated would biodegrade in a manner similar to Nodax.  Defendants argue that they cannot be held liable for the statements made in these press releases because those were statements made by Bacardi, Eagle Beverage, and Mars Wrigley, respectively, rather than by Danimer or the individual Defendants.  ECF No. 61-1 at 18 n.13.  They contend that attributing the statements in these

---

[2]     Croskrey's use of the words "these products" by itself would cause a reasonable investor to believe that he was referring to end products made using Nodax.  ECF No. 44 ¶ 169.  However, the misleading nature of the statement was augmented by the fact that Croskrey made the statement in response to CNBC displaying on viewers' television screens a picture of decomposed plastic spoons "[a]fter 8 weeks of composting."  *Id.*  Although Defendants dispute whether that picture was visible to Croskrey during the interview, as opposed to being visible only to television viewers, *see* ECF No. 63 at 5, the Court deems it appropriate at the motion to dismiss stage to infer that the spoon was visible to Croskrey as well.

press releases to Defendants would run afoul of the U.S. Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, which held that only the "maker" of a particular statement "with ultimate authority over the statement" can be held liable under Section 10(b) of the Exchange Act or Rule 10b-5.  *Janus Cap.*, 564 U.S. 135, 142 (2011).

      The statements in these press releases can be attributed to Defendants, at least at the motion to dismiss stage.  Defendants' declaration that provided these press releases as exhibits in support of their motion to dismiss described each of these documents as either Danimer's press release or a "joint" press release.  *See* ECF No. 64-1 at ¶¶ 17–19.  Consistent with that characterization, the Eagle Beverage and Mars Wrigley press releases prominently include the Danimer logo, *see* ECF Nos. 61-20 & 61-21, and are still published on the "Press Releases" portion of Danimer's public website.[3]  Although the press release related to Bacardi does not similarly bear the Danimer logo,[4] Danimer maintains a page on its website that promotes its relationship with Bacardi, which links to the Bacardi press release.[5]  At the pleading stage, these circumstances are enough to infer that Danimer made the statements in these press releases.  *See Honig v. Cardis Enters. Int'l N.V.*, No. 14-cv-7548, 2016 WL 6304695, at *9 (E.D.N.Y. Oct. 27, 2016) (holding that plaintiffs had adequately alleged that defendant company made statements in

---

[3]    *Danimer Scientific and Eagle Beverage to Produce Biodegradable Drinking Straws for Quick Service Restaurants*, DANIMER SCI. (Nov. 17, 2020), https://perma.cc/R8WS-7ZR4; *Mars Wrigley and Danimer Scientific Help Environmentally Conscious Consumers to Compost at Home by Developing Biodegradable Packaging from Natural Ingredients*, DANIMER SCI. (Mar. 15, 2021), https://perma.cc/K3EZ-YABY.

[4]    *Bacardi First in Fight Against Plastic Pollution With 100% Biodegradable Spirits Bottle*, BACARDI (Oct. 21, 2020), https://perma.cc/YK4X-5PB9.

[5]    *Danimer Scientific Bacardi Partnership*, DANIMER SCI. (last visited Sept. 15, 2023), https://perma.cc/AP9W-XD2A.

press release about partnership with separate company, despite defendants' insistence that the separate company authored the press release).

Even if the Court were to disregard the statements Defendants made in the press releases about partnerships to produce consumer products with other companies, the remainder of the statements listed above were still materially misleading.  A reasonable investor would not expect raw Nodax to be discarded in a landfill or the ocean without being incorporated into a consumer product such as a bottle, a bag, or a wrapper.  Accordingly, Defendants' statements that Nodax would "eliminate[] the need for recycling" and would degrade if it were to "find[] its way into the ocean" or "the wrong place" implicitly represented to a reasonable investor that products made using Nodax would biodegrade in a manner similar to raw Nodax.  ECF 44 ¶¶ 132, 141, 143, 167, 169.

### B.    Statements About Danimer's Production Capacity

Plaintiffs have alleged that Defendants made misleading statements about Danimer's existing and future production capacity, along with Danimer's expected revenue and profits related to that production capacity.  ECF No. 44 ¶¶ 81, 101–08, 137, 146, 173, 183.  The PSLRA created a safe harbor for forward-looking statements, which provides that "a defendant is not liable if (1) the forward-looking statement is identified and accompanied by meaningful cautionary language, (2) the forward-looking statement is immaterial, or (3) the plaintiff fails to prove that the forward-looking statement was made with actual knowledge that it was false or misleading."  *In re Vivendi, S.A. Secs. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016).  "Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies."  *Id.* at 245–46.

Defendants' statements about Danimer's future production capacity and the amount Danimer expected to earn from that production capacity are forward-looking statements.  The

PSLRA's definition of forward-looking statements includes "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services," and "a statement containing a projection of revenues, income . . . or other financial items." 15 U.S.C. § 78u-5(i)(1). This definition encompasses future production quantities and the anticipated earnings associated with that production. *See In re Barrick Gold Corp. Secs. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018) (holding that statements about "the amount of gold expected to be produced" by a particular mine "and the costs of that production" were forward-looking); *In re Peabody Energy Corp. Secs. Litig.*, No. 20-cv-8024, 2022 WL 671222, at *18 (S.D.N.Y. Mar. 7, 2022) (holding that statements about the amount of coal expected to be produced from a particular mine were forward-looking).

Defendants provided investors with sufficient cautionary language about these forward-looking statements. Defendants' October 2020 investor presentation was accompanied by a disclosure that the forward-looking statements therein depended on, among other things, Danimer's "ability to implement its business strategy" and the "stability of [its] manufacturing facilities." ECF No. 61-26 at 198. Later, both Live Oak's prospectus filed in advance of the de-SPAC merger and Danimer's prospectus filed in advance of its issuance of additional shares contained warnings that Danimer's expansion of its key production facility in Kentucky might not proceed as planned and that, if the expansion were to fail or fall behind, Danimer would not be able to "achieve such production capacity." ECF No. 61-12 at 46, 47, 50; ECF No. 61-16 at 12, 14. The cautionary language from these prior SEC filings was incorporated by reference into Danimer's investor presentation in March 2021,[6] along with Danimer's press release filed the

---

[6]     *See 2020 Earnings Presentation*, DANIMER SCI. (Mar. 29, 2021), https://perma.cc/9JJF-V3M7 (referred to in Plaintiffs' complaint, *see* ECF No. 44 ¶¶ 182–85).

same day.[7]  Defendants were permitted to incorporate cautionary language by reference in this

manner.  *See In re Turquoise Hill Res. Ltd. Secs. Litig.*, 625 F. Supp. 3d 164, 215–16 (S.D.N.Y.

2022) (holding that defendant was permitted to incorporate by reference cautionary language in

annual report filed with SEC into press releases and statements made during "investor

conference calls").

Even if Defendants' cautionary language described above was insufficient, Defendants'

forward-looking statements about Danimer's production capacity, revenue, and earnings are still

protected by the PSLRA's safe harbor.  For the same reasons described below in Section III,

which explains that Plaintiffs have failed adequately to allege scienter, Plaintiffs have not

adequately alleged that Defendants knew that their statements about these projections were false

when Defendants made them, as Plaintiffs are required to do for forward-looking statements.

*See In re Nielsen Holdings PLC Secs. Litig.*, 510 F. Supp. 3d 217, 231 (S.D.N.Y. 2021) (holding

that statements were protected by safe harbor because "[p]laintiffs fail to allege any specific,

contemporaneous reports or statements showing [d]efendants did not believe their projections

when they were made").

Defendants' statements about the existing production capacity of Danimer's facilities are

not forward-looking statements and, therefore, not protected by the safe harbor.  Nevertheless,

these statements were not misleading.  Although Defendants described the first phase of

Danimer's expansion of its primary manufacturing facility in Kentucky as already

"[c]ompleted," *see* ECF No. 44 ¶¶ 81, 183, all of the statements that Plaintiffs challenge

described only the production "capacity" of that facility, and not the total amount of product that

---

[7]     *See Danimer Scientific, a Next Generation Bioplastics Company, Announces Fourth
Quarter and Full Year 2020 Results*, DANIMER SCI. (Mar. 29, 2021), https://perma.cc/5NQ4-
ADUP (referred to in Plaintiffs' complaint, *see* ECF No. 44 ¶¶ 180–81).

Danimer was actually producing, *see id.* ¶¶ 81, 101, 137, 173, 183.  Defendants made clear that, even though the facility had already been built, their description of the production capacity was based on expected production "once fully ramped up" and when the facility would be "producing at full capacity."  *Id.* ¶¶ 137, 173.  This distinction was made even clearer by Defendants' explanation during their initial presentation announcing their planned de-SPAC merger that, even though Danimer had finished in 2020 the expansion of its Kentucky facility, thereby establishing the capacity to produce 20 million pounds of finished products, Danimer expected to produce only 2 million pounds that year.  *Id.* ¶ 146; ECF No. 61-26 at 212.  Since Plaintiffs do not allege that Danimer's facilities did not actually have this production capacity—and instead allege only that Danimer was consistently producing at rates significantly below this capacity—Plaintiffs have failed to allege that Defendants' descriptions of Danimer's production capacity were materially misleading.  *See* ECF No. 44 ¶¶ 102–07.

Finally, Plaintiffs allege that Defendants' statements about Danimer's current and future production capacity were misleading because those statements consistently described production amounts in pounds of "finished product," rather than pounds of raw Nodax.  *See* ECF No. 44 ¶¶ 81, 137, 173, 183.  Plaintiffs allege that the ratio of raw Nodax to finished product was revealed to be lower than investors allegedly expected through publications by Spruce Point and Muddy Waters, along with a responsive press release by Danimer, near the end of and after the class period.  *Id.* ¶¶ 102, 108, 213, 219.  Specifically, Danimer explained that each pound of finished product contains about half a pound of Nodax.  *Id.* ¶ 219.

Plaintiffs do not allege that Danimer's purported production capacity, measured in pounds of "finished product," was literally false—only that it was misleading because investors allegedly cared more about the amount of raw Nodax produced.  *See* ECF No. 44 ¶ 108.

15

However, "Section 10(b) does not create an affirmative duty to disclose any and all material information.  Just because a reasonable investor would very much like to know a fact does not create any obligation to speak up." *Bristol-Myers Squibb*, 28 F.4th at 352–53.   A duty to disclose omitted information, such as the ratio of raw Nodax to finished product, "may arise when a corporate insider trades on confidential information, a statute or regulation requires disclosure, or a statement is made that would be inaccurate, incomplete, or misleading without further context." *Synchrony*, 988 F.3d at 167.  "For an undisclosed fact to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Id.* at 170.

Plaintiffs rely on their own say-so—without alleging any supporting facts—to assert that investors cared more about the pounds of raw Nodax that Danimer produced rather than the amount of finished product Danimer produced for sale to its customers.  *See* ECF No. 44 ¶ 108; *cf. In re Nevsun Res. Ltd.*, No. 12-cv-1845, 2013 WL 6017402, at *2, *10 (S.D.N.Y. Sept. 27, 2013) (refusing to dismiss securities fraud claims because "[p]laintiffs ha[d] pled facts demonstrating that strip ratio," a measure of a mining company's "ratio of waste rock mined compared to valuable gold ore," "[wa]s a critical metric for analysts and investors").  Plaintiffs have therefore failed to meet their burden under the PSLRA and Rule 9(b) to "explain with particularity *why* the[se] statements" about Danimer's production of finished products "were fraudulent."  *See Bristol-Myers Squibb*, 28 F.4th at 353.

C.     *Statements About Danimer's Customer Relationships*

When Live Oak and Danimer announced their plans to merge, the investor presentation that Live Oak filed with the SEC described Danimer's contracts with customers as "take or pay" contracts, meaning that Danimer would get paid for its products even if its customers did not

need to purchase as much as they had originally anticipated.  *See* ECF No. 44 ¶ 136.  Defendants

Croskrey and Hendrix reiterated the description of Danimer's contracts as "take or pay" during

an interview that they gave that same day, and Live Oak made a similar statement in its

prospectus filed in December 2020 in advance of the companies' merger.  *Id.* ¶¶ 12, 134.

Defendant Croskrey also characterized Danimer's contracts as "take or pay" in an interview with

CNBC.  *Id.* ¶ 169.

Plaintiffs allege that Defendants' description of these "take or pay contracts" was

revealed to be misleading because Muddy Waters reported, without attributing its criticism to a

particular source, that Danimer's contracts "d[id] not obligate the customers to purchase material

if it d[id] not meet customer requirements or [wa]s not produced."  ECF No. 44 ¶¶ 113, 212.

This allegation is inadequate to render Defendants' statements materially misleading because

Defendants never said that the terms of the "take or pay" contracts provided that Danimer would

get paid in full for its products under all circumstances.  Instead, in Live Oak's prospectus,

published in December 2020 in advance of the de-SPAC merger, Live Oak warned that Danimer

"currently ha[d] limited customer commitments for commercial quantities of [its] biopolymer

products" and that "[s]ome prospective customers [we]re currently evaluating and testing

[Danimer's] products prior to making large-scale purchase decisions."  ECF No. 61-12 at 46.

Danimer reiterated this same warning in the February 2021 prospectus that it filed with the SEC

in connection with its issuance of additional shares.  ECF No. 61-16 at 11.

These warnings were perfectly consistent with Muddy Waters' assertion that Danimer's

customers had the right to test whether Danimer's products met their standards before being

required to pay for them.  Accordingly, under these circumstances, Defendants' characterization

of Danimer's contracts with its customers as "take or pay" was not materially misleading.  *See In*

*re Ferrellgas Partners Secs. Litig.*, No. 16-cv-7840, 2018 WL 2081859, at *11 (S.D.N.Y. Mar.

30, 2018), *aff'd*, 764 F. App'x 127 (2d Cir. 2019) (holding that defendants' statements about

their exposure to fluctuations in commodity prices, which were mitigated by "take-or-pay

contracts," were not materially misleading because defendants "merely described the competitive

advantage of their contractual position in general terms," "did not purport to guarantee that

[they] had removed all exposure" to risk, and had included cautionary language in their SEC

filings that eliminated any perception that defendants' contractual relationships were "essentially

risk-free").

  Separate from Defendants' promotion of Danimer's "take or pay" contracts, Plaintiffs

allege that Defendants misleadingly promoted Danimer's "strong" relationships with high-profile

companies, such as Pepsi and Nestlé, when these relationships were exploratory and had not led

to those companies agreeing to purchase Danimer's products at a commercial scale.  ECF No. 44

¶¶ 12, 14, 114, 134, 162, 167, 169.  The statements on which Plaintiffs rely, however, do not

represent that these companies were purchasing commercial-scale quantities of Danimer's

products.  *See id.*  Additionally, Defendants' characterization of these relationships as "strong" or

these customers as "blue-chip" was immaterial puffery that was not materially misleading.  *See*

*Ferrellgas Partners*, 2018 WL 2081859, at *11 (holding that defendants' descriptions of

"durable long-term take-or-pay contracts with blue-chip customers" were "vague, optimistic

statements that constitute puffery").

  Defendants' disclosures throughout the class period made clear that Danimer's

relationships with these high-profile customers were focused on research and development

("R&D") rather than commercial production.  The October 2020 investor presentation on which

Plaintiffs heavily rely describes Danimer's relationships with Pepsi and Nestlé as "R&D

[a]greements," rather than describing those customers as commercial-scale purchasers of

Danimer's products.  ECF No. 61-26 at 204, 209.  Live Oak's and Danimer's SEC filings

likewise clearly disclosed that their relationships with these companies focused on R&D.  ECF

No. 61-12 at 140; ECF No. 61-16 at 56.[8]  Other portions of the same filings made clear that these

R&D relationships were different from Danimer's "supply agreements" with "other companies,"

and that the goal of Danimer's R&D relationships was, if successful, "to culminate in a supply

agreement with the customer."  ECF No. 61-12 at 139, 141; ECF No. 61-16 at 55, 57.  Danimer

warned in these filings that its "ability to grow" its revenue would depend on its ability to

develop products for new customers during the R&D stage and "to effectively transition those

customer formulations to commercial scale production."  ECF No. 61-12 at 152; ECF No. 61-16

at 39.  When coupled with these detailed disclosures, Defendants' more generic statements

promoting Danimer's relationships with name-brand companies would not have materially

misled a reasonable investor about the nature of those relationships.  *See Zhou v. NextCure, Inc.*,

No. 20-cv-7772, 2023 WL 4493541, at *11 (S.D.N.Y. July 12, 2023) (holding that defendants'

allegedly misleading statements, when considered "in the context of [d]efendant[s'] disclosures"

in their SEC filings, did not "significantly alter[] the total mix of information," thereby

precluding plaintiffs from "plead[ing] sufficiently that the statement[s] w[ere] material").

---

[8]     Live Oak's prospectus filed in connection with the de-SPAC merger explained that
"Danimer has a number of PHA research and development ('R&D') contracts with global
consumer products companies, including PepsiCo, Nestlé and Genpak."  ECF No. 61-12 at 140.
Danimer's prospectus filed in connection with its issuance of additional shares included a nearly
identical description that described Danimer's relationships with these companies as focused on
R&D.  ECF No. 61-16 at 56.

### D.    *Statements About Croskrey's Managerial Experience*

The final category of statements that Plaintiffs allege were misleading relates to statements that positively portrayed Defendant Croskrey's managerial experience.  The proxy statement that Live Oak sent to its shareholders in connection with their approval of the de-SPAC merger "portrayed [Defendant Croskrey's] business experience in a favorable light," including his experience as the President and Chief Executive Officer at Armor Holdings Products, LLC, "a manufacturer of military and police personal safety equipment," between 1999 and 2005.  ECF No. 44 ¶¶ 124, 163.  The proxy statement's description of Croskrey's experience at Armor discussed increased revenue during his tenure, along with his successfully "overseeing the acquisition and integration of 13 companies and implementing associated organic growth initiatives."  *Id.*  Danimer's SEC filings submitted in advance of its issuance of additional shares in February 2021 included a similar description of Croskrey's past experience. *Id.* ¶ 174.

Defendants' discussion about Croskrey's managerial experience did not, however, disclose that:  (i) Armor had paid a $30 million settlement to the DOJ in 2008 "to settle charges that Armor knowingly sold defective bullet-proof vests during Croskrey's tenure"; and (ii) Armor's parent company had reached a settlement in July 2011 with the DOJ and SEC regarding violations of the Foreign Corrupt Practices Act ("FCPA") that occurred between 2001 and 2006. ECF No. 44 ¶ 125.  Although the FCPA settlement was reached with Armor's parent company, the SEC's complaint included allegations that employees of Armor, other than Defendant Croskrey, directly participated in the alleged bribery.[9]

---

[9]     *SEC Charges Armor Holdings, Inc. With FCPA Violations in Connection With Sales to the United Nations*, SECS. & EXCHANGE COMM'N (July 13, 2011), https://perma.cc/QUF5-FUPF (referred to in Plaintiffs' complaint, *see* ECF No. 44 ¶ 125 n.45).

Defendants' omission of these settlements by Armor based on misconduct occurring during Croskrey's tenure at the company did not render their description of Croskrey's managerial experience materially misleading.  Plaintiffs have not alleged that any of Defendants' statements about the positive aspects of Croskrey's work at Armor "[we]re inaccurate in and of themselves." *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 719 (S.D.N.Y. 2018) (holding that statements about positive attributes of CEO were not rendered materially misleading by omitted facts about his misconduct at former company).  Additionally, Croskrey was not personally a party to these settlements with the DOJ and SEC, and Defendants' statements did not suggest that Armor had "not engaged in the undisclosed improper activities." *Id.*

### III.    Plaintiffs Fail to Allege Defendants Acted With Scienter

Although some of Defendants' statements were materially misleading for the reasons described above in Section II, Plaintiffs have failed adequately to allege that Defendants made those statements with scienter.  As stated above, the PSLRA's pleading standard requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with scienter." *New England Carpenters*, 2023 WL 5419147, at *12.  "Scienter may be established by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*  "If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care." *Bristol-Myers Squibb*, 28 F.4th at 355. "[S]cienter based on conscious misbehavior requires a showing of deliberate illegal behavior, a standard met when it is clear that a scheme, viewed broadly, is necessarily going to injure." *New England Carpenters*, 2023 WL 5419147, at *13.  "Recklessness, meanwhile, entails an extreme departure from the

21

standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.*

When a plaintiff attempts to allege scienter by arguing both that the defendants had a motive and opportunity to defraud and that there exists strong circumstantial evidence that the defendants exhibited conscious misbehavior or recklessness, the Court must "assess the total weight of the circumstantial allegations *together with* the allegations of motive and opportunity" and "consider[] the[ir] cumulative effect." *In re Hain Celestial Grp., Inc. Secs. Litig.*, 20 F.4th 131, 137–38 (2d Cir. 2021) (emphasis in original).  However, "the inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *New England Carpenters*, 2023 WL 5419147, at *12.

### A.   Motive and Opportunity to Defraud

A company's or individual defendant's "desire to sustain the appearance of corporate profitability is not itself the kind of incentive or motivation that raises an inference of scienter." *New England Carpenters*, 2023 WL 5419147, at *13.  Plaintiffs, however, assert that they have alleged special circumstances that go beyond Defendants' generic desire to maintain a profitable company and have therefore demonstrated that Defendants had sufficient motive and opportunity to defraud investors.  Plaintiffs argue that Danimer, Croskrey, and Dowdy had a motive to close the de-SPAC merger with Live Oak because the merger would provide the only available means of funding Danimer's plans to expand its manufacturing facilities.  ECF No. 62 at 26–27.  Plaintiffs further argue that, since SPACs have a limited lifespan, Defendant Hendrix was similarly incentivized to complete the de-SPAC merger to avoid returning to Live Oak's investors the money that Live Oak had raised in its IPO.  *Id.* at 28–29.  Finally, Plaintiffs argue that Danimer had a separate incentive to inflate the price of its stock in order to trigger the

redemption price of its warrants, thereby redeeming them at a low price before investors could convert the warrants into shares, which Plaintiffs allege would "result[] in a windfall . . . of over $138 million." *Id.* at 27–28.

Plaintiffs' argument that Danimer, Croskrey, and Dowdy, had a motive to mislead investors in order to use the de-SPAC merger to raise the money necessary to fund Danimer's expansion plans fails because "a desire to raise capital . . . is insufficient to establish motive because it is a goal possessed by virtually all corporate insiders." *Tabak v. Canadian Solar Inc.*, 549 F. App'x 24, 28 (2d Cir. 2013) (rejecting argument that motive to commit fraud existed in lead-up to defendant's stock offering "because [defendant] had short term loans coming due and had no available means to pay down those loans other than by issuing more stock"). This remains true even if a company decides to raise capital through merging with another company. *See Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*, No. 19-cv-7536, 2021 WL 1199035, at *24 (S.D.N.Y. Mar. 30, 2021), *aff'd*, 54 F.4th 82 (2d Cir. 2022) (holding that plaintiffs had failed to establish scienter through motive and opportunity to defraud by alleging that defendants "were motivated to complete [a] merger to expand" their company).

Plaintiffs' argument that Defendant Hendrix was incentivized to complete a de-SPAC merger, regardless of whether Danimer would be a good or bad investment for Live Oak's shareholders, rather than dissolve Live Oak and return investors' money, amounts to a "bet the company theory" of scienter—*i.e.*, an argument that "[Live Oak's] fate was dependent on the [de-SPAC merger's] success." *In re Chembio Diagnostics, Inc. Secs. Litig.*, 586 F. Supp. 3d 199, 220 (E.D.N.Y. 2022). But Plaintiffs' assertion that the failure of the de-SPAC merger would "threaten the survival of" Live Oak "is still far too generalized . . . to allege the proper concrete and personal benefit required by the Second Circuit." *Id.* at 220 (holding that plaintiffs

23

failed adequately to allege scienter and dismissing Exchange Act claims).  Although Plaintiffs insist that the SPAC model of taking a company public puts unique pressures on the shell company's management to complete a bad deal, *see* ECF No. 62 at 28 n.39, they cannot allege that Defendant Hendrix personally had a motive to defraud based on incentives supposedly faced by SPACs generally.  *See Phx. Ins. Co., Ltd. v. ATI Phys. Therapy, Inc.*, No. 21-cv-4349, 2023 WL 5748359, at *15 (N.D. Ill. Sept. 6, 2023) (dismissing claims against individual defendant due to lack of scienter, in part because "[t]o allege that employees of SPACs generally will have the motivation to defraud in order to ensure the successful acquisition of a target says nothing about the motivations, circumstances, and factors *particular* to" that defendant (emphasis in original)); *see also In re Garrett Motion Inc. Secs. Litig.*, No. 20-cv-7992, 2023 WL 2744029, at *10 (S.D.N.Y. Mar. 31, 2023) (holding that executive's stock grants that "would not vest until [the company] was a public company for at least four years" did not establish that he had a motive to defraud investors by engaging in unfavorable transactions designed to keep the company public).

Finally, Plaintiffs' argument that Danimer had an incentive to inflate the price of its stock so that it exceeded the trigger price to redeem the company's previously-issued warrants, thereby enabling Danimer to redeem the warrants at a low price before investors could exercise them, is not meaningfully different from arguing that a company executive has a motive to increase the company's share price beyond the exercise price of his or her stock options.  But such allegations are insufficient to establish a motive to defraud.  *See In re HEXO Corp. Secs. Litig.*, 524 F. Supp. 3d 283, 313 (S.D.N.Y. Mar. 8, 2021) (holding "[t]hat some of the individual defendants held options with high strike prices is not enough to support a strong inference of scienter").

B.  *Circumstantial Evidence of Conscious Misbehavior or Recklessness*

Plaintiffs have also failed adequately to allege circumstantial evidence that Defendants engaged in conscious misbehavior or recklessness.  As part of Plaintiffs' attempt to do so, they rely on the fact that "the marketing and selling of" Nodax was Danimer's "core business," which Plaintiffs insist commands the inference that Defendants must have been at least reckless in not knowing that their statements about Nodax were false.  ECF No. 62 at 31.  Although "[t]he Second Circuit has not expressly determined if the core operations doctrine remains applicable to provide scienter after the enactment of the PSLRA," it "has suggested that the doctrine can provide additional support for an inference of scienter, even if it cannot establish scienter on its own." *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 320 (S.D.N.Y. 2021).  Since "[t]he majority of courts in this Circuit . . . have adopted this approach," the Court will view Plaintiffs' other allegations of scienter through the lens of understanding that Nodax was one of Danimer's most important products.  *See id.*  However, Plaintiffs' assertion that selling Nodax was Danimer's core business is not sufficient by itself to allege that Defendants acted with scienter. *See Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020) (holding that "naked assertion" that a particular product was defendant corporation's "key product" was "plainly insufficient to raise a strong inference of collective corporate scienter").

Plaintiffs also fail to establish scienter by relying on anonymous "confidential witnesses," who were employed by Danimer and whom Plaintiffs' complaint refers to as "CWs."  *See, e.g.*, ECF No. 44 ¶ 96.  To establish scienter, allegations made by confidential witnesses must "show that individual defendants actually possessed the knowledge highlighting the falsity of public statements." *In re Telefonaktiebolaget LM Ericsson Secs. Litig.*, No. 22-cv-1167, 2023 WL 3628244, at *16 (E.D.N.Y. May 24, 2023) (finding lack of scienter and granting motion to dismiss).  Plaintiffs' complaint fails to do this because the allegations made in reliance on these

witnesses merely support Plaintiffs' arguments that Defendants' statements were false—without

suggesting that Defendants were personally aware of the information that the confidential

witnesses have provided.  More specifically, Plaintiffs make the following allegations about

these witnesses:

- CW1 was an engineer at a Danimer facility in Georgia who said that unspecified "other Danimer employees and engineers frequently expressed skepticism concerning Danimer's representations that Nodax® was 100% biodegradable." ECF No. 44 ¶¶ 96, 97.

- CW2 was a manufacturing manager at the Georgia facility, who was responsible for developing a different type of bioplastic other than Nodax, and explained that since "other chemicals are added" to Nodax to create a final, plastic product, the combined product "was not 100% biodegradable."  ECF No. 44 ¶ 98.

- CW3 was a "[w]arehouse [t]echnician" at Danimer's Kentucky facility who "thought that Danimer was not sold out" of its products because he had allegedly seen that "a large amount of product was stored in an off-site warehouse," which was so full that additional finished Nodax had to be stored at the manufacturing facility itself.  ECF No. 44 ¶¶ 110–11.  CW3 also said that Danimer did not have the necessary "food handlers' certification" to make commercial products for the name-brand companies whose relationships Danimer promoted.  Id. ¶ 119.

- CW5 was a quality assurance and quality control technician who said that Danimer's production schedules for 2021 targeted only approximately 6 million pounds of Nodax per year, less than the approximately 20 million pounds supposedly described in Danimer's public disclosures, and that the company often fell short of even those lower production targets.  ECF No. 44 ¶¶ 101, 104.

- CW4 was a "former employee," who worked at Danimer's Kentucky facility, and said that the facility's actual production of Nodax was even lower than the levels described by CW5.  CW4 characterized Danimer's plans to expand that facility as merely "aspirational" because Danimer allegedly had been unable successfully even to retrofit the facility's existing production equipment.  ECF No. 44 ¶¶ 105, 106.

As is apparent from the allegations summarized above, none of these anonymous

witnesses held a position from which it would be reasonable to infer that they conveyed this

information to Danimer's CEO, CFO, or a board member (i.e., Croskrey, Dowdy, and Hendrix).

None of the anonymous witnesses purport to have done so.  "[C]onfidential source allegations

must show that individual defendants *actually possessed the* knowledge highlighting the falsity

of public statements; conclusory statements that defendants were aware of certain information,

and mere allegations that defendants would have or should have had such knowledge is

insufficient." *Nielsen Holdings*, 510 F. Supp. 3d at 228–29 (holding that plaintiffs had failed

adequately to allege scienter). These "confidential witnesses shed no light on the scienter of"

Defendants since "none of them are alleged to have ever interacted with any" defendant. *In re*

*Bristol-Myers Squibb Co. CVR Secs. Litig.*, No. 21-cv-8255, 2023 WL 2308151, at *6 (S.D.N.Y.

Mar. 1, 2023) (holding that plaintiffs had failed adequately to allege scienter).

Similarly, the supposed admission by Danimer's Chief Technology Officer, who has not

been named as a Defendant, to the Wall Street Journal that Nodax would not biodegrade in

landfills does not suggest that Defendant Croskrey acted with scienter when he made a

conflicting statement during an interview in October 2020. *See* ECF No. 62 at 29; ECF No. 44

¶¶ 91, 134, 189. As with the anonymous witnesses described above, Plaintiffs have not alleged

that Danimer's Chief Technology Officer conveyed this information to Defendant Croskrey

before Croskrey gave the interview, or at any other time, thereby eliminating any inference that

Croskrey knowingly or recklessly spoke falsely during the interview. *See City of Birmingham*

*Firemen's & Policemen's Supplemental Pension Sys. v. Ryanair Holdings plc*, No. 18-cv-10330,

2020 WL 2834857, at *3–4 (S.D.N.Y. June 1, 2020) (holding that defendant CEO's own

"subsequent admission" that contradicted his prior statements was probative of scienter but that

"various admissions" from company's other "executives" were not because plaintiff did not

allege those admissions were communicated to CEO).

Plaintiffs also attempt to establish scienter by alleging that, after the end of the class

period on May 4, 2021, the SEC and the Division of Securities of the Kentucky Department of

Financial Institutions commenced investigations into Danimer.  ECF No. 44 ¶¶ 1, 31, 34.

Plaintiffs have not made any allegation about whether or how those investigations were resolved,

including whether they resulted in Defendants paying any penalties or admitting to any

wrongdoing.  The existence of a government investigation does not "independently raise[] a

compelling inference" of scienter, but the Second Circuit has endorsed "consider[ing] a

governmental investigation as one piece of the puzzle when taking a holistic view" of whether

scienter has been adequately alleged.  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 79–

80 & n.58 (2d Cir. 2021).

Plaintiffs' reliance on these investigations is insufficient to allege scienter because the

investigations were opened after Defendants made their allegedly misleading statements, and

Plaintiffs have made no other allegations suggesting that the investigations are probative of

conscious misbehavior or recklessness by Defendants.  Although "[r]elevant warnings from

settlements with regulators are widely recognized to be evidence of scienter," that principle

applies when government investigations existed during the class period, prior to a defendant's

alleged misstatements, so that the defendants "ha[d] been aware of the[] regulatory proceedings"

at the time the defendants made allegedly misleading statements.  *Karimi v. Deutsche Bank*

*Aktiengesellschaft*, 607 F. Supp. 3d 381, 398–99 (S.D.N.Y. 2022) (holding that plaintiffs had

adequately alleged scienter under such circumstances).  Otherwise, "it is well established that the

existence of a government investigation does not on its own establish a strong inference of

scienter," especially if "there is no allegation that Defendants knew of the existence of the

investigation at the time of the most recent challenged statement."  *Gray v. Alpha & Omega*

*Semiconductor Ltd.*, No. 20-cv-2414, 2021 WL 4429499, at *12 (S.D.N.Y. Sept. 27, 2021)

(holding that plaintiffs had failed adequately to allege scienter under such circumstances).  The

circumstances in this case fall into the latter category, rather than the former, and the government investigations into Danimer therefore do not establish a strong inference that Defendants acted with scienter.

As Defendants point out, Plaintiffs have provided no legal authority to support their argument that, since Danimer funded research conducted by professors at the University of Georgia regarding the biodegradability of Nodax, Defendants must have known, or been reckless in not knowing, that the results of that research were misleading.  *See* ECF No. 62 at 34. Providing funding for outside research is common, and Danimer's funding arrangement does not create the inference that the research was false or that Defendants acted with scienter in promoting Nodax's biodegradability based on that research.  *See In re GlaxoSmithkline PLC Secs. Litig.*, No. 05-cv-3751, 2006 WL 2871968, at *12 (S.D.N.Y. Oct. 6, 2006) (rejecting argument that defendant's funding for "independent doctors and researchers" who gave "numerous presentations . . . at medical conferences" regarding defendant's product was indicative of scienter).

The Court is mindful of the fact that it must "weigh Plaintiffs' scienter allegations as a whole," including the cumulative effect of allegations about motive and opportunity to commit fraud combined with allegations of circumstantial evidence of misconduct.  *Hain Celestial*, 20 F.4th at 137–38.  However, the Court's obligation to consider scienter allegations holistically "does not mean that [p]laintiffs can combine inadequate allegations of motive with inadequate allegations of recklessness to demonstrate scienter."  *In re Citigroup Secs. Litig.*, No. 20-cv-9132, 2023 WL 2632258, at *22 (S.D.N.Y. Mar. 24, 2023) (granting motion to dismiss and holding that plaintiffs failed adequately to allege scienter).  The Court has weighed Plaintiffs' scienter allegations cumulatively, and since none of the theories of scienter described above is

particularly strong, the Court concludes that the allegations do not cumulatively raise a compelling inference of scienter.

Plaintiffs have also failed adequately to allege that Danimer, as a corporation, acted with scienter even if the individual Defendants have not.  "Where a defendant is a corporation, this requires pleading facts that give rise to a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter." *Jackson*, 960 F.3d at 98 (affirming dismissal of Exchange Act claims against corporation).  Additionally, "[i]n exceedingly rare instances, a statement may be so dramatic that collective corporate scienter may be inferred." *Id.* at 99.  However, since "an inference of corporate scienter cannot be imputed from any of the [i]ndividual Defendants" for the reasons explained above, and Plaintiffs have not "identified any other officers or directors from whom such an inference could be imputed," Plaintiffs' attempt to assert corporate scienter fails. *Nandkumar v. AstraZeneca PLC*, No. 22-2704-cv, 2023 WL 3477164, at *4 (2d Cir. May 16, 2023) (affirming dismissal of Exchange Act claims).

### IV.     Plaintiffs' Control Person Claims Fail in the Absence of a Primary Violation

Plaintiffs' claim that the individual Defendants are liable as control persons under Section 20(a) of the Exchange Act must also be dismissed.  As explained above, "[t]o establish a prima facie case of Section 20(a) liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Schwab*, 752 F. App'x at 58 (affirming dismissal of control person claim).  Accordingly, a "control person claim under Section 20(a) of the Exchange Act . . . is necessarily predicated on a primary violation of securities law." *New England Carpenters*, 2023 WL 5419147, at *14 (affirming dismissal of control person claims).  Since Plaintiffs have failed adequately to allege primary

30

violations of the Exchange Act for the reasons explained above in Sections II and III, the Court dismisses their control person claim as well.

### V.     The Court Denies Plaintiffs Leave to File Another Amended Complaint

Plaintiffs have made the conclusory request in the final (and fiftieth) footnote on the last page of their opposition brief that "[i]n the event the Court grants Defendants' motion to dismiss, in whole or in part, Plaintiffs requests [sic] leave to amend."  ECF No. 62 at 35 n.50.  Although the Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)," the Court declines to grant Plaintiffs leave to amend.  *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 107 (2d Cir. 2022) (affirming denial of leave to amend). "A court should freely give leave when justice so requires, but it may, in its discretion, deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party."  *MSP Recovery Claims, Series LLC v. Hereford Ins. Co.*, 66 F.4th 77, 90 (2d Cir. 2023) (affirming denial of leave to amend).  "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure."  *In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 175 (2d Cir. 2021) (affirming denial of leave to amend).

The procedural history of this case highlights why Plaintiffs' attempt to seek leave to amend is inadequate.  Plaintiffs already amended their initial complaint once after a lead plaintiff and lead counsel were appointed.  ECF Nos. 1, 40, 44.  Defendants filed a pre-motion letter that previewed the reasons why they intended to move to dismiss that amended complaint.  ECF No. 49.  After receiving Plaintiffs' response, *see* ECF No. 50, Judge Brodie, who previously presided over this case, directed the parties to propose a briefing schedule, which she told them "should include Plaintiff's request for leave to amend the complaint," *see* ECF Order dated Mar. 16, 2022.  In response to that order, the parties' stipulation setting their briefing schedule said, "Lead

Plaintiff will not, at this time, request leave to amend the Consolidated Amended Complaint, but reserves its right to request such leave up until the date of the filing of a motion for class certification.  Defendants reserve all rights, including the right to oppose."  ECF No. 52 ¶ 1.

Under these circumstances, granting Plaintiffs leave to amend is not warranted.  Plaintiffs have neither made a formal motion to amend their complaint nor described what new information they would plan to add to a second amended complaint.  *See Gregory v. ProNAi Therapeutics Inc.*, 757 F. App'x 35, 39 (2d Cir. 2018) (affirming denial of leave to amend where "plaintiffs sought leave to amend in a footnote at the end of their opposition to defendants' motion to dismiss" and "included no proposed amendments").  Plaintiffs' failure to add any substance to their request for leave to amend is especially glaring because Judge Brodie expressly invited Plaintiffs to attempt to amend their complaint, and they elected not to do so. *See In re Renewable Energy Grp. Secs. Litig.*, No. 22-335-cv, 2022 WL 14206678, at *4 (2d Cir. Oct. 25, 2022) (affirming denial of leave to amend where district court set deadline for plaintiff to file letter in response to motion to dismiss "indicating his desire to further amend his pleadings in response to the motion" yet plaintiff "elected not to amend the [c]omplaint and instead opposed the motion to dismiss, including a perfunctory request for leave to amend in his opposition memorandum").  Plaintiffs' amended complaint is already 118 pages and 342 paragraphs long and appears to have been meticulously researched.  ECF No. 44.  The Court cannot identify how Plaintiffs could amend it at this stage to cure the defects discussed in this decision.

## **CONCLUSION**

For the reasons set forth above, the Court GRANTS Defendants' motion to dismiss, *see* ECF No. 61, and denies Plaintiffs' request for leave to amend.  The Clerk of Court is respectfully

directed to enter judgment in favor of Defendants and to close both this case and the consolidated

case *Skistimas, et al. v. Danimer Scientific, Inc., et al.*, No. 21-cv-02824.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
September 30, 2023